**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| IMG Holdings, Inc., *et al.*, | Case No. 25-11500 (KBO) |
| Debtors.[1] | (*Joint Administration Pending*) |

**DECLARATION OF LARRY THOMPSON IN SUPPORT OF THE DEBTORS'**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1764, I, Larry Thompson, declare as follows under the penalty of perjury:

1.      I serve as the chief executive officer ("**CEO**") and chief financial officer ("**CFO**") of IMG Holdings, Inc. ("**IMG**" and together with its affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**," or the "**Company**"). I have been the CFO since 2019 and appointed CEO in 2022. I hold a Bachelor of Science degree in finance from the University of Alabama, Birmingham, and a Master of Business Administration from the University of Michigan, Stephen M. Ross School of Business.

2.      I have more than twenty (20) years of business experience, primarily in serving as CFO or finance manager for large retail product companies. Prior to joining the Debtors'

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (1) IMG Holdings, Inc. (1398); (2) Dana Classic Fragrances Inc. (1439); (3) Inter-Marketing Group, Inc. (6628); (4) Dana Fragrance Brands, LLC (0198); (5) St. Honore Holding, Inc. (9698); and (6) IMG Fragrance Brands, LLC (0026). The address of the Debtors' corporate headquarters is 1159 2nd Avenue, #424, New York, New York 10065.

organization, I was the CFO of Champagne Armand De Brignac, the brand finance manager for Diageo North America and was an institutional equity trader with Morgan Stanley.  In May of 2020, David Cuthbert was appointed as the Company's independent director (the "**Independent Director**").

3.      As the Debtors' CEO and CFO, I have familiarity with the operations and financial activities of the Debtors, and I am generally familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of such matters.  I am authorized by each of the Debtors to submit this declaration (this "**Declaration**") on their behalf.  References to the Bankruptcy Code (the "**Bankruptcy Code**"), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      I submit this Declaration on behalf of the Debtors (a) in support of the Debtors' voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code, (b) in support of the Debtors' request for relief in the form of motions and applications (collectively, the "**First Day Pleadings**") filed contemporaneously with this Declaration, and (c) to assist this Court and other interested parties in understanding the circumstances giving rise to the commencement of the Debtors' chapter 11 cases (the "**Chapter 11 Cases**").  I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and the maximization of the value of the Debtors' estates.

5.     To familiarize the Court with the Debtors, and the relief that the Debtors seek early in these Chapter 11 Cases, this Declaration is organized in four parts.   **Part I** provides an introduction to the Debtors and detailed information on their corporate history and business operations.   **Part II** describes the Debtors' prepetition organization and capital structure.   **Part III** describes the events that led to the commencement of these Chapter 11 Cases and the Debtors' prepetition restructuring efforts and marketing process.   **Part IV** briefly addresses the First Day Pleadings and incorporates the facts set forth in each of the First Day Pleadings as if fully set forth in this Declaration.

**PART I:**

**<u>INTRODUCTION</u>**

**A.     THE CHAPTER 11 CASES.**

6.     On the date hereof (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.   The Debtors have requested that the Chapter 11 Cases be jointly administered for administrative purposes only.

7.     The Debtors continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.     To date, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed a creditors' committee in these Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

**B.     THE DEBTORS' BUSINESS OPERATIONS.**

**i.     General**

9.     The Debtors are wholly owned portfolio companies of Phoenix II Recovery, LLC (85.2%) and Phoenix Recovery III, LLC (14.8%)(collectively, the "**Phoenix Recovery Entities**")

- 3 -

established pursuant to the *Fourth Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and its Affiliated Debtors* (the "**Zohar Plan**") [*See In re Zohar III, Corp.*; United States Bankruptcy Court for the District of Delaware; Case No. 18-10512 (KBO), Docket No. 3474].

10. Originally founded in Barcelona, Spain in 1932 by Javier Serra, a former executive of the perfume house Myrurgia, the Company has a long history of creating and selling award-winning fragrances.

11. On August 22, 1932, the Company launched its first perfume "Tabu."  Created by legendary French perfumer Jean Carles — who would later compose outstanding perfumes of the era such as Miss Dior, Ma Griffe and Shocking de Schiaparelli — Tabu became a classic oriental perfume with a sensual reputation from Paris to New York.

12. After launching new successes like 20 Carats and Bolero in 1933, Canoe and Emir in 1935 (also created by Jean Carles) and Platine in 1938, the Company relocated to Paris at 9 rue de la Paix, near the prestigious Place Vendôme.  Main office operations were transferred to the United States in 1940.  Javier Serra went on to release a string of original perfumes including Voodoo in 1951 and the remarkably well received Ambush in 1955.

13. In the 1990s, the Company acquired the licenses for several iconic classic perfumes originally produced by other houses, including Chantilly, Love's Baby Soft, English Leather, British Sterling, Toujours Moi, Monsieur Musk, Heaven Sent and Navy for Women.

14. The Company's oils and solutions for fragrances are sourced and blended in the United States, while components (glass bottles, caps, pumps, *etc.*) are sourced from manufacturing partners based in China.

15.     The Company has continued to produce many of these beloved fragrances of yesteryear to the delight of their loyal customers and to new generations just discovering them. The Company maintains a website (https://danaclassics.com) to sell its fragrances directly to consumers through Shopify and its fragrances can also be found at Walmart and Amazon, among other retailers.

16.     The Company had approximately $4 million in gross sales in 2024 and $3.5 million in gross sales in 2023.  The Company is small but continues to operate well, showing steady growth despite the numerous litigation issues and significant secured debt burden described below.  As of the Petition Date, the Company had 5 employees who work remotely.

## PART II:

## THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

17.     IMG owns 100% of Dana Classic Fragrances Inc. ("**Dana**"), Inter-Marketing Group, Inc. ("**Inter-Marketing**"), IMG Fragrance Brands, LLC ("**IFB**") and Dana Fragrance Brands, LLC ("**DFB**").  DFB is the 100% owner of St. Honore Holding, Inc. ("**Honore Holding**"). Honore Holding is the 100% owner of Finanz St. Honoré B.V. ("**Finanz**"), a company organized under the laws of the Netherlands.  Finanz owns a majority of the Company's registered trademarks (the "**Trademarks**[2]").

18.     Despite owning most of the Debtors' Trademarks, Finanz was dissolved as a legal entity under the laws of the Netherlands in 2016.  As discussed more fully below, trademark litigation was commenced by Fragrance Xtreme Inc. ("**Fragrance Xtreme**") on January 3, 2024, in the United States Patent & Trademark Office ("**USPTO**") seeking to cancel the federal trademark registrations owned by Finanz, which action was pending as of the Petition Date.

---

[2]     A list of the Company's Trademarks is attached hereto as **Exhibit A**.

A.    **PREPETITION CREDIT AGREEMENT.**

19.    The Company is burdened with in excess of sixty-four million dollars ($64,000,000) of senior secured debt.  More specifically, the Debtors are obligated under that certain Third Amended and Restated Loan and Security Agreement, dated as of January 15, 2009 (as amended and modified to the date hereof, the "**Credit Agreement**"), between and among the Debtors, Patriarch Partners Agency Services, LLC, as administrative agent ("**Agent**" or "**Patriarch**"), Ark II CLO 2001-1, Ltd. (the "**Ark II Lender**"), and Zohar II 2005-1 Limited, Zohar CDO 2003-1 Limited, and Zohar III, Limited, each as lenders (collectively, the "**Zohar Lenders**").

20.    Patriarch is owed approximately $1,457,365 (plus interest per diem of $196.35 from 7/8/25) for outstanding agency fees, reimbursable expenses and indemnification amounts due under the Credit Agreement (the "**First Lien Obligations**").  The First Lien Obligations are secured by liens on all the Debtors' assets.

21.    In April 2019, Ankura Trust Company was appointed co-administrative agent for the Zohar Lenders, and Patriarch remained as co-administrative agent for the Ark II Lender.

22.    Currently, the outstanding principal and interest due and payable to ARK II Lender under the Credit Agreement is $1,643,968 (plus interest per diem of $298.46 from 7/8/25), plus all outstanding fees, and reimbursable costs and expenses (the "**Second Lien Obligations**").  The Second Lien Obligations are secured by liens on all the Debtors' assets.  The Debtors are also obligated under the Credit Agreement to the Zohar Lenders in the amount of no less than $63,593,162.00 (the "**Third Lien Obligations**").  The Third Lien Obligations are secured by liens on all the Debtors' assets.  Interest and reimbursable fees and costs continue to accrue under the Credit Agreement.

**B.**    PENDING LITIGATION.

**i.    Disney Litigation**

23.    In 2017, Disney Enterprises, Inc. ("**Disney**") obtained a judgment against Finanz (the "**Disney Judgment**") arising out of an action captioned *Disney Enterprises, Inc. v. Finanz St. Honoré*, No. 13-cv-06338-NG-SMG, that is currently pending in the United States District Court for the Eastern District of New York (the "**NY District Court**").

24.    On May 1, 2017, the NY District Court granted an Order of Attachment enjoining Finanz, its agents, employees, attorneys, or affiliated entities from directly or indirectly transferring any assets in which Finanz had an interest.  In aid of collecting on the Disney Judgment, Disney served restraining notices (the "**Restraining Notices**") on Finanz and non-parties: Dana; Patriarch; Patriarch Partners, LLC; Alvarez & Marsal Zohar Agency Services, LLC; Zohar CDO 2003-1, Ltd.; Zohar II 2005-1, Ltd.; Zohar III, Ltd.; Inter-Marketing Group, Inc.; IMG Holdings, Inc.; Ladas & Parry LLP; and Broad & Cassel LLP (collectively, the "**Restrained Notice Parties**"), whom Disney had reason to believe possessed money or property in which Finanz had an interest.

25.    On December 21, 2017, the Court granted Disney's request to deem the Restrained Notice Parties restrained under the Restraining Notices (the "**Restraining Order**"). On October 16, 2019, October 13, 2020, October 14, 2021, December 28, 2022, and December 19, 2023 and December 19, 2024, the NY District Court granted Disney's requests to extend the Restraining Order against all of the Restrained Notice Parties.  The Restraining Order remains in full force and effect.

26.    On September 20, 2018, the NY District Court entered a supplemental judgment for attorneys' fees in favor of Disney (the "**Supplemental Disney Judgment**").  The Debtors are

- 7 -

indebted to Disney under the Supplemental Disney Judgment in the amount of $1,195,552.12, as of the Petition Date, exclusive of post-judgment interest and attorneys' fees expended since the Supplemental Disney Judgment.

27.     The Restraining Order prevents the transfer of any of the Debtors' assets (outside a formal bankruptcy proceeding) unless and until the Supplemental Disney Judgment is paid in full.

### ii.     Ice Box Litigation

28.     Dana and Finanz are parties to an action pending in the United States District Court for the Eastern District of New York asserting claims for breach of contract and fraud relating to a license of certain intellectual property to Icebox-Scoops, Inc. ("**Icebox**").  *Icebox-Scoops, Inc. v. Finanz St. Honoré B.V., et al.*, Case No. 07-cv-0544.  A jury found Dana and Finanz liable and Icebox is proceeding with discovery directed to the damages phase of the case.  No trial date has been set for the damages phase.

### iii.     The Trademark Cancellation Proceeding

29.     Dana owns approximately 25 common law trademarks ("**Common Law Marks**") and IFB owns three registered trademarks (together with the Common Law Marks, the "**Marks**"). Approximately 23 of the Common Law Marks were registered by Finanz with the USPTO (the "**Finanz Registrations**").

30.     On January 3, 2024, Fragrance Xtreme initiated a cancellation proceeding before the USPTO (No. 92084070) (as amended on July 16, 2025) seeking the cancellation of the Finanz Registrations (the "**Cancellation Proceeding**").

31.     Fragrance Xtreme also filed intent-to-use applications with the USPTO to register the Common Law Marks, which are reflected in the Finanz Registrations, under its own name (the "**Registration Applications**").

32.     Fragrance Xtreme claims that because Finanz was dissolved in 2016, all of the documents signed by Finanz after that date to maintain the Finanz Registrations were fraudulent documents and that cancellation of the Finanz Registrations is based on constructive abandonment under United States case law.    The Debtors dispute the allegations asserted in the Cancellation Proceeding and reserve all of their defenses thereto.

33.     The Cancellation Proceeding was voluntarily stayed prior to the Petition Date for several reasons, including, among other things, to allow time for the parties to work on the Creditor Resolution (as defined below) and to consummate the Transaction (as defined below).  Disney also filed a Motion to Intervene in the Cancellation Proceeding.

### iv.    Asbestos Litigation

34.     Dana and IMG are named defendants in dozens of asbestos lawsuits related to talc associated claims dating back to the 1990's pending in various jurisdictions across the United States.  Given the lack of funds available to the Debtors to retain counsel to defend these actions, the Debtors have had numerous unsecured default judgments entered against the Company.

### C.    OTHER CREDITORS.

35.     As of the Petition Date, the Debtors had approximately $500,000 in unsecured trade debt.

### PART III:

### EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

### A.    PREPETITION MARKETING PROCESS.

36.     In an effort to maximize value for all stakeholders, the Debtors have been negotiating with their largest creditors, running the Company in the ordinary course of business while marketing their business and related intellectual property for the past several years.  In

furtherance of these efforts, the Debtors' Independent Director reached out to two investment banking firms who in turn presented the opportunity to acquire the Company, or its assets, to approximately 10 potential purchasers identified as possibly being interested in the Debtors' business operations and/or trademarks (the "**Marketing Process**").

37.     During the Marketing Process, the Debtors received several non-binding LOIs from various potential purchasers, however, the Debtors were never in a position to execute on a sale due to the low value of those offers, the Company's capital structure, significant litigation against the Company, and Disney's Restraining Order, which precluded any transfer of the Debtors' assets.

38.     More specifically, given the many complicated legal and financial hurdles facing the Company, as set forth above, including the large amount of senior secured debt due under the Credit Agreement, the Disney Restraining Order, the dissolution of Finanz in 2016, the Ice Box litigation, and the Cancellation Proceeding, the Debtors spent years negotiating with Patriarch, the Zohar Lenders and Disney to reach a resolution (the "**Creditor Resolution**") that would allow the Company to be sold as a going concern with an agreed upon sharing of any proceeds.  The Creditor Resolution was finally reached on or about December 30, 2024 (as amended on August 7, 2025), in the form of a written Settlement Agreement attached as **Exhibit B** hereto.

39.     As a result of the ongoing marketing process and the Creditor Resolution, Fragrance Xtreme submitted a non-binding letter of intent and thereafter the parties entered into a binding proposed asset purchase agreement (the "**APA**"), subject to higher or better offers, with respect to a potential transaction (the "**Transaction**") for the acquisition of substantially all of the Debtors' assets, including the Marks (**"Purchased Assets"**).  The proposed Transaction will resolve the Cancellation Proceeding initiated by the Buyer, as well as the Disney Restraining Order and Disney Litigation (as described above).

40.     The proposed purchase price for the Transaction is three million dollars ($3,000,000.00) (the "**Purchase Price**").  As part of the Transaction, the Buyer requires, among other things: (i) a free and clear sale of the Purchased Assets in which no debts, liabilities, or other obligations of the Debtors, or otherwise relating to the Purchased Assets, are assumed by Buyer; and (ii) a full and unconditional release from the Debtors, Patriarch, the Zohar Lenders and Disney of any security interest or other lien with respect to the Purchased Assets, to consummate the Transaction (the "**Releases**").

41.     Pursuant to the Creditor Resolution, subject to the closing of the transactions contemplated by the APA (the "**Closing**"), the Purchase Price is to be distributed pursuant to the terms of the APA as follows:

At the Closing, Buyer will:

> Deliver One Million, Fifty-Two Thousand, Four Hundred and Sixty-Five Dollars ($1,052,465.00) to the Debtors, less up to $250,000 as a partial repayment of the DIP Facility.  The Debtors will distribute the proceeds of the initial payment in accordance with the terms of a side letter executed by Patriarch, the Zohar Lenders, Disney and the Debtors (the "**Side Letter**").

> Deliver Two Hundred Thirty-Six Thousand, Two Hundred and Sixty-Eight Dollars ($236,268.00) to Disney;

> Place Two Hundred Thirty-Six Thousand, Two Hundred and Sixty-Eight Dollars ($236,268.00) into an escrow account (the "**Escrow Account**") for the benefit of Disney (the "**Escrowed Amount**") pursuant to a separate escrow agreement (the "**Escrow Agreement**"), which Escrowed Amount shall be released on the terms and subject to the conditions set forth in the Escrow Agreement and the Side Letter.  An Escrow Agent will be appointed to act pursuant to the Escrow Agreement.

> Deliver a Promissory Note in the principal amount of $1,225,000 for the balance of the Purchase Price, less up to $250,000 for the full repayment of the DIP Facility (as defined below) (the "**Final Payment**"), payable to Patriarch and the Ark II Lender (the

"**Promissory Note**"), in accordance with the terms set forth in the Side Letter.

In the event that the Final Payment is not made, or is only made in part, any payments received from the Buyer shall be distributed in accordance with the Side Letter. The Side Letter pertains only to the allocation of the Purchase Price among the parties thereto (Disney, the Zohar Lenders and Patriarch) and does not otherwise modify or affect in any manner the terms and conditions of the APA.

Buyer shall also acquire certain inventory from Sellers as part of the Purchased Assets, in exchange for the consideration set forth on Exhibit A-1 (the "**Inventory Payment**"). The Inventory Payment shall be in addition to the Purchase Price and shall be payable by Buyer to Sellers at the Closing.

42.     To make sure the Debtors received the highest possible value for the Purchased Assets, the Debtors reached out again to various parties that had shown an interest in the Company over the years, and a nationally known investment banker, to determine if there was additional value that could be obtained for the Purchased Assets. However, given the pending Cancellation Proceeding, the Disney Restraining Order, and the other legal and financial issues facing the Company, the Debtors determined that the proposed Transaction was the highest and best value that could be realized for the Purchased Assets.

43.     Patriarch, the Ark II Lender and the Zohar Lenders (collectively, the "**Prepetition Senior Secured Lenders**"), collectively holding more than sixty million dollars in senior secured claims and liens on substantially all of the Debtors' assets, agree that the proposed Transaction is the highest and best offer for the Purchased Assets and support the Transaction. Nevertheless, the Transaction is subject to higher and better offers to allow the Debtors to pursue an alternative transaction should a better offer be received during the sale process.

44.     Concurrently with the filing of the Debtors' petitions commencing these cases, the Debtors filed a motion seeking approval of the Transaction with this Court (the "**Sale Motion**").

**B.      POST-PETITION FINANCING AND USE OF CASH COLLATERAL.**

45.      The Debtors anticipated the need for post-petition financing and have filed a motion seeking entry of interim and final orders authorizing the Debtors to obtain postpetition financing (the **"DIP Motion"**).  Prior to the Petition Date, as part of the Transaction, Fragrance Xtreme (as **"DIP Lender"**) agreed to provide the Debtors with debtor-in-possession financing to fund the costs of these Chapter 11 Cases that is reflected in a DIP Term Sheet (the "**DIP Term Sheet**") that provides for a proposed $500,000 "new money" DIP facility, at a competitive interest rate (the **"DIP Facility"**).  The DIP Facility will be repaid by credits against the Purchase Price for the proposed Transaction, as more fully set forth above.

46.      As described further in my declaration (the **"DIP Declaration"**) filed in support of the DIP Facility, I conducted a market check by seeking competing DIP financing offers from three (3) potential DIP lenders.  No other proposals were received, given the amount owed to the Prepetition Senior Secured Lenders when compared to the value of the Debtors' assets.  Based upon my efforts to arrange DIP financing with prospective lenders, the Debtors believe that no other, better options for DIP financing are available to them other than the proposed DIP Facility.

47.      The Debtors, in conjunction with their counsel, determined that the terms and conditions of the proposed DIP Facility were and remain the best and only available under the circumstances and adequately addresses the Debtors' financing needs during these Chapter 11 Cases.  Importantly, the DIP Facility was negotiated at arms' length among the proposed DIP Lender and the Debtors' proposed counsel.

48.      The Debtors do not have the ability to borrow under their existing prepetition Credit Agreement.  The Debtors require funds to sustain their operations and pay for the costs of the Chapter 11 process.  In light of the proposed Transaction, the timeline for the Debtors' stay in

Chapter 11 will be materially shortened. Nonetheless, the Debtors require the funds to be provided under the DIP Facility to support their operations and the costs of the Chapter 11 Cases. The DIP Facility is the best and only path forward to ensure that the Debtors can continue operating their businesses while providing sufficient liquidity to administer these Chapter 11 Cases and facilitate the sale process.

49.     In addition, given the Prepetition Secured Lenders have a lien on substantially all of the Debtors' assets, Patriarch, the holder of the First Lien Obligations, has agreed to allow the Company to continue to use cash collateral during these Chapter 11 Cases, as more fully set forth in the DIP Motion filed contemporaneously herewith.

## PART IV:

## FIRST DAY PLEADINGS

50.     To facilitate their restructuring efforts, the Debtors have filed various First Day Pleadings concurrently with this Declaration.

51.     I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief and are incorporated herein by reference.

52.     I believe that the relief sought in each First Day Pleading is vital to enable the Debtors' transition into Chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value, is necessary to avoid immediate and irreparable harm, and constitutes a critical element in maximizing value during these Chapter 11 Cases.

53.     Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in its entirety.

4896-4041-5310, v. 8

## **DECLARATION**

Pursuant to Section 1746 of Title 28 of the United States Code, I declare under penalty of

perjury that the foregoing is true and correct.

Dated: August 11, 2025

By:      */s/ Larry Thompson*
        Larry Thompson
        Chief Executive Officer and Chief Financial
        Officer

# <u>EXHIBIT A</u>

## Trademarks

| MARKS | DATES OF FIRST USE IN U.S. COMMERCE | GOODS |
|---|---|---|
|  | MAY 1, 2007 | AFTER SHAVE LOTIONS; COLOGNE |
|  | JUN. 13, 1968 | PERFUME, COLOGNE, COLOGNE MISTS, COLOGNE SPRAY, SHIMMER BODY MIST, ALL-OVER BODY SPRAY, BODY MISTS, BODY SPRAYS, TOUCH-TIP FRAGRANCE |
| DANA | 1933 | AFTER SHAVE LOTIONS, BODY LOTION, BODY SOUFFLE IN THE NATURE OF SKIN LOTIONS, COLOGNE, DUSTING POWDER, PERSONAL DEODORANT, DRY BODY OIL, EAU DE COLOGNE, EAU DE PERFUME, EAU DE PERFUME SPRAY MIST, EAU DE TOILETTE, FOAMING BATH SHOWER GEL, HAND AND BODY LOTION, HAND AND BODY MOISTURIZER, MOISTURIZING GEL, PERFUME BODY SOUFFLÉ IN THE NATURE OF SKIN LOTIONS, PUMICE SHOWER GEL, SHOWER GEL, SOAP |
| CANOE | DEC. 31, 1945 | FRAGRANCES; COLOGNE |
| BRITISH STERLING | FEB. 4, 1965 | FRAGRANCES; COLOGNE |
| ENGLISH LEATHER | JAN. 1, 1951 | AFTER-SHAVE; BAR SOAP; COLOGNE; DEODORANT FOR PERSONAL USE; EAU DE COLOGNES; PERFUMED SOAPS; SOAPS FOR PERSONAL USE |
| HEAVEN SENT | NOV. 3, 1980 | FRAGRANCES |
| TOUJOURS MOI | 2009 | FRAGRANCES; PERFUMES; COLOGNE |
| BRITISH STERLING H.I.M. | FEB. 4, 1965 | FRAGRANCES; COLOGNE |
| MONSIEUR MUSK | MAR. 1, 1988 | FRAGRANCES; PERFUMES; DEODORANT; BATH SOAPS; NON-MEDICATED LIQUID SOAPS; AFTER-SHAVE BALM; SHOWER GEL; BODY SPRAY |
|  | 2016 | FRAGRANCES |
| NAVY FOR WOMEN | 2009 | FRAGRANCES; PERFUMES; COLOGNE |
|  | 2012 | FRAGRANCES; PERFUMES; COLOGNE; AFTERSHAVE; BODY WASH FOR HUMANS; BODY DEODORANT |

| | | |
|---|---|---|
| | AUGUST 2015 | FRAGRANCES; PERFUME; COLOGNE; BATH PRODUCTS, NAMELY, SHAVING PREPARATIONS, SHAVING CREAMS, SHAVING GELS, SHAVING MOUSSE, SHAVING LOTIONS, SHAVING SOAPS, AND SHAVING BALM; AFTERSHAVE LOTIONS; SHOWER GELS; AND DEODORANTS AND ANTIPERSPIRANTS |
| | SEP. 30, 1965 | MEN'S TOILETRIES-NAMELY, COLOGNE, AFTER-SHAVE LOTION |
| TABU | DEC. 10, 1932 | PERFUME, COLOGNE, LIPSTICK, SACHET POWDER, AND HAND LOTION |
| NAVY | FEB. 1989 | FRAGRANCES, NAMELY, COLOGNES |
| LOVE'S | | PERFUME, COLOGNE, BODY MISTS, BODY SPRAYS, BODY OILS, BODY POWDER, FACIAL AND BODY SOAP, HAIR SHAMPOO, HAIR CONDITIONER, BUBBLE BATH, BATH OIL AND BATH CRYSTALS |
| LOVE'S BABY SOFT | MAR. 1, 1989 | COLOGNE SPRAY, LIGHT COLOGNE SPLASH, BODY MIST, COLOGNE MIST, SKIN MOISTURIZING LOTION, BODY WASH, BODY POWDER, PERSONAL DEODORANT, PERFUME, ALL OVER BODY SPRAY, AND GIFT SETS CONTAINING TWO OR MORE OF THESE PRODUCTS |
| | 1941 | MEN'S TOILETRIES-NAMELY, ALL-PURPOSE LOTION, USABLE AS AFTER SHAVE LOTION, COLOGNE, TOILET WATER, AND AFTER BATH LOTION |
| | 1940 | TOILET PREPARATIONS, NAMELY, AFTER SHAVE LOTION, EAU DE COLOGNE |

| "CANOE" | DEC. 31, 1945 | TOILET SOAPS |
|---|---|---|
|  | 2016 | FRAGRANCES |

IMG Registered Marks

| MARKS and USPTO Reg. Nos. | GOODS |
|---|---|
| MONSIEUR MUSK RN 1566699 | CLASS 03:  COLOGNE, AFTERSHAVE |
| CHANTILLY RN  865906 | CLASS 03: PERFUMES, DUSTING POWDER, SKIN LOTIONS AND DEODORANT |
|  RN 2145118 | CLASS 03: EAU DE PARFUM SPRAY, HAND AND BODY MOISTURIZER, PERFUMED TALC, EAU DE TOILETTE SPRAY |

# <u>EXHIBIT B</u>

## Settlement Agreement

4896-4041-5310, v. 8

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this **"Agreement"**) is made and entered into as of the 30th day of December 2024, as amended on August 7, 2025, by, between and among: (i) IMG Holdings, Inc., a Delaware corporation (**"IMG Holdings"**), Dana Classic Fragrances Inc., a Delaware corporation (**"Dana"**), Inter-Marketing Group, Inc., a Florida corporation (**"IMG"**), Dana Fragrance Brands, LLC, a Delaware limited liability company (**"DFB"**), IMG Fragrance Brands, LLC, a Delaware limited liability company ("IFB"), St. Honore Holding, Inc., a Delaware corporation (**"St. Honore Holding"**), and Finanz St. Honoré B.V., a company that was organized under the laws of the Netherlands (**"Finanz"** and together with IMG Holdings, Dana, IMG, DFB, St. Honore Holding, collectively the **"Dana Entities"**); (ii) Disney Enterprises, Inc. (**"Disney"**); (iii) Patriarch Partners Agency Services, LLC (**"PPAS"**) as administrative agent for Ark II CLO 2001-1, Limited ("Ark II"); and (iv) Phoenix II Recovery, LLC and Phoenix III Recovery LLC (as successors in interest to Zohar II 2005-1, Limited and Zohar III, Limited, collectively, "**Phoenix Recovery**").  The Dana Entities, Disney, PPAS and Phoenix Recovery are collectively referred to herein as the "Parties", or each separately, a "Party".

WHEREAS, on November 15, 2013, Disney commenced an action against Finanz in the United States District Court for the Eastern District of New York (the **"Court"**) captioned *Disney Enters., Inc. v. Finanz St. Honoré B.V.*, Case No. 13-cv-06338 (NG) (the **"New York Action"**).

WHEREAS, on May 1, 2017, the Court granted an Order of Attachment enjoining Finanz, its agents, employees, attorneys, or affiliated entities from directly or indirectly transferring any assets in which Finanz had an interest (Dkt. No. 78).

WHEREAS, on October 5, 2017, Disney obtained a judgment for damages and attorneys' fees (Dkt. No. 110) against Finanz in the New York Action (the **"Disney Judgment"**).

WHEREAS, in aid of collecting on the Disney Judgment, Disney served restraining notices (the **"Restraining Notices"**) on Finanz and numerous other non-parties (collectively, the **"Restrained Notice Parties"**) whom Disney had reason to believe possessed money or property in which Finanz had an interest.

WHEREAS on December 21, 2017, the Court granted Disney's request to deem the Restrained Notice Parties restrained under the Restraining Notices (Dkt. No. 125) (the **"Restraining Order"**).

WHEREAS, on August 30, 2018, Disney moved for a turnover order against Dana for $1,200,000 to satisfy the Disney Judgment and for attorneys' fees accrued by Disney since the entry of the Disney Judgment.

WHEREAS, on September 20, 2018, the Court entered a supplemental judgment for attorneys' fees in favor of Disney (the **"Supplemental Disney Judgment"**) (Dkt. No. 141).

WHEREAS, on October 12, 2018, PPAS moved to intervene in the New York Action, claiming an interest in the assets of Dana in its capacity as the administrative agent of certain secured creditors.

WHEREAS, on October 16, 2019, October 13, 2020, October 14, 2021, December 28, 2022, December 19, 2023, and December 19, 2024 the Court granted Disney's requests to extend the Restraining Order against all of the Restrained Notice Parties. (Dkt. Nos. 164, 177, 190, 195, 197, 198).  The Restraining Order remains in full force and effect as does the Attachment Order.

WHEREAS Fragrance Xtreme, Inc. ("Fragrance Xtreme") wishes to purchase approximately 25 common law trademarks held by Dana (**"Common Law Marks"**) and three registered trademarks held by IMG Fragrance Brands, LLC (with the Common Law Marks, the "**Marks**"), which are set forth in Appendix A of this Settlement Agreement.

2

WHEREAS, approximately 23 of the Common Law Marks were registered by Finanz with the U.S. Patent and Trademark Office ("USPTO") (the "Finanz Registrations");

WHEREAS, on January 3, 2024, Fragrance Xtreme initiated a cancellation proceeding before the USPTO (No. 92084070) seeking the cancellation of the Finanz Registrations (the "**Cancellation Proceeding**").

WHEREAS, Fragrance Xtreme has filed intent-to-use applications with the USPTO to register the Common Law Marks, which are reflected in the Finanz Registrations, under its own name (the "**Registration Applications**").

WHEREAS, on April 1, 2024, Fragrance Xtreme sent the Dana Entities a revised draft of a non-binding Letter of Intent (the "**LOI**") offering to purchase the Marks (together with their goodwill and related assets),.

WHEREAS, the parties have agreed to forego the negotiation and signing of the LOI, and Fragrance Xtreme and the Dana Entities intend to enter into a binding Asset Purchase Agreement (the "APA") to finalize the purchase of the Marks (together with their goodwill and related assets as specified in the APA), for $3 million dollars (the "Purchase Price"), which transaction will be consummated in a 11 U.S.C. Sec. 363 process in a chapter 11 proceeding to be commenced by the Dana Entities (the "Chapter 11") on or before August 10, 2025 (unless otherwise extended by the parties).  The parties have agreed that no chapter 11 filing will be made unless and until an asset purchase agreement is fully agreed to and signed.  Fragrance Xtreme will be providing debtor in possession financing in an amount up to $500,000.00 (the "DIP Financing", which will be repaid as set forth below.

WHEREAS, to settle all claims and disputes between the Parties, and effectuate the sale of the Marks to Fragrance Xtreme, the Parties agree to the terms set forth herein.

3

NOW THEREFORE, in consideration of the promises, agreements, and covenants contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

1.    Payment.  Subject to the terms set forth herein, the Parties agree that Dana will instruct Fragrance Xtreme that, subject to the execution and delivery by Fragrance Xtreme and Dana of the APA and the closing of the transactions contemplated thereby (the "Closing"), including the delivery at Closing by Disney and the other Parties of necessary releases (in recordable form as necessary) of any and all liens and attachments on the Common Law Marks and Finanz Registrations, the Purchase Price is to be distributed pursuant to the terms of the APA as follows:

a.  At the Closing, Fragrance Xtreme shall pay the $1,775,000 dollars of the Purchase Price as follows:

i.  One half (1/2) of the outstanding DIP Financing, together with accrued and unpaid interest (up to $250,000 in the aggregate) specified in Section 2.05(b)(iv) of the APA will be credited at Closing to Fragrance Xtreme against the $1,775,000;

ii.  One Million, Fifty-Two Thousand, Four Hundred and Sixty-Five ($1,052,465) Dollars to Dana (assuming the DIP Financing repayment is $250,000; if less than $250,000 is outstanding as of closing then the payment to Dana shall be increased by the difference between $250,000 and the amount owed as of Closing);

iii.  Two Hundred Thirty-Six Thousand, Two Hundred and Sixty-Eight ($236,268) Dollars to Disney;

4

iv. Two Hundred Thirty-Six Thousand, Two Hundred and Sixty-Eight ($236,268) into an escrow account for the benefit of Disney (the "**Escrowed Amount**") pursuant to a separate escrow agreement (the "**Escrow Agreement**"), which shall be released on the terms and subject to the conditions set forth in the Escrow Agreement; and

v. A promissory note for the Final Payment in the amount of $1,225,000 in favor of PPAS, in form agreed to by the Parties. The Note will be secured by all of the assets being purchased by Fragrance Xtreme.

b. Pursuant to the APA, Fragrance Xtreme has agreed to purchase certain of the Company's inventory, in accordance with the terms and conditions set forth in the APA. Fragrance Xtreme will pay the additional agreed amount for the purchased inventory to the Company at Closing.

c. As more fully set forth in the APA, Fragrance Xtreme is not purchasing the Company's accounts receivable, accounts payable and/or cash on hand. Any and all excess amounts of those items (as well as any additional items excluded from the purchase pursuant to the APA) shall be distributed in accordance with the Side Letter.

d. No later than the date of the Final Payment as set forth in the executed APA, Fragrance Xtreme shall deliver One Million Two Hundred Twenty-Five Thousand Dollars ($1,225,000) Dollars to PPAS, minus the remaining

5

amount outstanding on the DIP Financing (up to $250,000) (the "**Final Payment**").

    e.   Within three (3) business days of PPAS's receipt of the Final Payment, PPAS shall provide written notice to Disney that it has received the Final Payment and the Escrowed Amount shall be released to Disney without further notice to any party pursuant to the terms of the Escrow Agreement.

    f.   In the event that the Final Payment is not made, or is only made in part, any payments received by PPAS from Fragrance Extreme shall be distributed in accordance with the Side Letter executed by the Parties. The Side Letter pertains only to the allocation of the Purchase Price among the Parties to this Agreement and does not otherwise modify or affect in any manner the terms and conditions of this Agreement.

2.    <u>No-Challenge Covenant</u>: The Dana Entities, Disney, PPAS and Phoenix Recovery, all of their respective owners, partners, affiliates, officers, directors, employees, representatives, agents and professionals, and all of their respective successors and assigns promise not to challenge, or cause any other individual, association, or entity to challenge, or aid any other individual, association, or entity in challenging the Registration Applications or Fragrance Xtreme's subsequent use of any of the Common Law Marks identified in the APA, or to Fragrance Xtreme's pending TTAB cancellation proceeding against Finanz.

3.    <u>Settlement Effective Date</u>.  This Agreement shall be binding and effective on the parties as of the date hereof; provided that Section 2 (No Challenge Covenant), Section 4 (Mutual Releases), Section 5 (Dismissal of New York Action) and Section 6 (Cancellation Proceeding)

57772/0001-48608395v13

shall only become effective when (1) Fragrance Xtreme and Dana fully execute the APA, (2) Fragrance Xtreme has paid the amounts due at Closing as set forth in 1(a) of this Agreement; and (3) each of the Parties have executed this Agreement (the date referred to in this clause 3, the "**Settlement Execution Date**.")  If Fragrance Xtreme and Dana have not fully executed the APA by the Outside Date (as extended), each Party shall have the right to fully rescind this Agreement by written notice to all counsel. The "**Outside Date**" shall be the date that is prior to any chapter 11 filing, but in no event later than 15 days following the Settlement Execution Date.  Upon execution of the APA by Fragrance Xtreme and Dana, an executed copy of the APA shall be sent to all Parties to this Agreement.

4.    <u>Mutual Releases</u>.  All Parties acknowledge that this Agreement is intended to fully resolve all liabilities, if any, between and among the Parties, including, but not limited to, the Marks, the Cancellation Proceeding, the New York Action, the Restraining Notice, and the Disney Judgment and Supplemental Judgment except as provided in the last sentence of this paragraph (the "Released Liabilities"), and, on the Settlement Effective Date, all Parties do forever release, acquit and forever discharge each other and all of their respective parent corporations, owners, partners, affiliates, officers, directors, members, employees, representatives, agents and professionals, and all of their respective successors and assigns, from any and all liability of any kind whatsoever, whether known or unknown, arising from, related to or in connection with the Released Liabilities, whether or not asserted, known or unknown except for their obligations under this Settlement Agreement, the Escrow Agreement, or the Side Letter.  For the avoidance of doubt, the Released Liabilities shall not include any of the obligations or liabilities set forth in the Asset Purchase Agreement as they apply to the signatories to the Asset Purchase Agreement. Notwithstanding anything contained in this Agreement, PPAS and Phoenix Recovery agree that

7

while the payments made pursuant to the Settlement Agreement cannot be challenged, they expressly do not release each other from any claims or counterclaims, including but not limited to those asserted in any other pending litigation matter between them or that may be asserted in the future.

5.      <u>Dismissal of New York Action</u>.  On the Settlement Effective Date, Disney shall dismiss the New York Action with prejudice and, subject to the terms herein, fully release the Restraining Order against all of the Restrained Notice Parties.

6.      <u>Cancellation Proceeding</u>. The Dana Entities, Disney, PPAS and Phoenix Recovery, all of their respective owners, partners, affiliates, officers, directors, employees, representatives, agents and professionals, and all of their respective successors and assigns promise not to challenge, or cause any other individual, association, or entity to challenge, or aid any other individual, association, or entity in challenging the Cancellation Proceeding. On the Settlement Effective Date, (i) Dana shall withdraw any opposition to the Cancellation Proceeding, and (ii) Disney shall withdraw its appearance in the Cancellation Proceeding and its pending motion to intervene therein.

7.      <u>No Admission of Wrongdoing; Settlement Discussions.</u>  This Agreement and all negotiations, statements, and proceedings in connection herewith shall not be deemed to be evidence of, an admission of, or concession of any liability or wrongdoing by any Party, and shall not be offered or received in any action or proceeding (except an action to enforce this Agreement), or be used in any way as an admission, concession, or evidence of any liability or wrongdoing of any nature by any Party.  This Agreement involves the settlement of disputed claims, and nothing contained in this Agreement shall be construed as an admission by any Party.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement shall not, and no

8

negotiations relating to this Agreement shall be, admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

8.   Authority.  The Parties represent and warrant to each other that the signatories to this Agreement have the full power and authority to enter into this Agreement on behalf of their respective clients or Parties and have had an opportunity to review the Agreement with counsel of their choosing.

9.   GOVERNING LAW AND JURISDICTION.

(A)   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS OR CHOICE OF LAW.  THE PARTIES AGREE THAT ALL ACTIONS CONCERNING ANY DISPUTE ARISING HEREUNDER OR RELATED HERETO SHALL BE FILED OR MAINTAINED EXCLUSIVELY IN A COURT SITTING IN THE STATE OF DELAWARE.

(B)   THE PARTIES HERETO HEREBY CONSENT TO THE JURISDICTION OF THE APPLICABLE COURTS LOCATED IN THE STATE OF DELAWARE AND IRREVOCABLY AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURT.  THE PARTIES HERETO ACCEPT FOR EACH OF ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE COURT AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREE TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT.  THE PARTIES

FURTHER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LAWSUIT OR JUDICIAL PROCEEDING ARISING OR RELATING TO THIS AGREEMENT.

      10.    <u>Notice and Mediation.</u>  For any disputes that arise out of or are related to the subject matter of this Agreement, the parties to the dispute must give prompt written notice of the dispute to all Parties to this Agreement, but in no event more than thirty (30) days following the onset of the dispute. If the parties are unable to resolve the dispute within sixty (60) days of such notice, the parties to the dispute and all Parties who are impacted by the dispute, shall engage in a mediation with a third-party mediator to resolve the dispute before any formal action is filed in any court. All notices under this Agreement shall be effective when received and addressed:

10

If to Disney, then to:
Jenny Kim
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY 10069
Attention: Jenny Kim
Email: jkim@bsfllp.com

If to the Dana Entities:
William Chipman, Esquire
Chipman Brown Cicero & Cole LLP
Hercules Plaza
1313 N. Market Street
Suite 5400
Wilmington, DE 19801
Email: chipman@chipmanbrown.com

If to PPAS:
Carolyn Traister Schiff, Esq.
Patriarch Partners Agency Services, LLC
27 Trinity Place
#249
Email:  carolyn.schiff@patriarchpartners.com

If to Phoenix Recovery:
Jared Kochenash, Esquire
Young, Conaway, Stargatt & Taylor
Rodney Square
1000 North King Street
Wilmington, DE 19801
Email:  jkochenash@ycst.com

11.    <u>Binding on Successors.</u>  This Agreement shall be binding upon and inure to the benefit of the Parties and their successors, representatives, and assigns.

12.    <u>Execution.</u>  This Agreement may be executed in multiple counterparts, any of which may be transmitted electronically, and each of which should be deemed an original and all of which together shall constitute one and the same instrument.  The signatories hereto may execute this Agreement by digital signature or other electronic means in lieu of an ink signature.

11

13.    <u>Legal Fees.</u>    Each of the Parties hereto shall be solely responsible for their respective legal fees and costs incurred, or that will be incurred, in connection with this Settlement or Settlement Agreement, including, but not limited to, the enforcement of this Settlement Agreement.

14.    <u>Entire Agreement</u>.    This Agreement, together with the Side Letter and the Escrow Agreement, constitutes the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein, and fully supersedes any and all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

15.    <u>Amendments; Termination</u>. Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated, in whole or in part, except upon a written agreement signed by each of the Parties hereto.

WHEREFORE, the undersigned have executed and delivered this Agreement on behalf of the Parties as of the date first written above.

Dana Classic Fragrances Inc.

By: _____

Disney Enterprises, Inc.

By: _____

13. <u>Legal Fees.</u> Each of the Parties hereto shall be solely responsible for their respective legal fees and costs incurred, or that will be incurred, in connection with this Settlement or Settlement Agreement, including, but not limited to, the enforcement of this Settlement Agreement.

14. <u>Entire Agreement</u>. This Agreement, together with the Side Letter and the Escrow Agreement, constitutes the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein, and fully supersedes any and all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

15. <u>Amendments; Termination</u>. Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated, in whole or in part, except upon a written agreement signed by each of the Parties hereto.

WHEREFORE, the undersigned have executed and delivered this Agreement on behalf of the Parties as of the date first written above.

Dana Classic Fragrances Inc.

By: _____

Disney Enterprises, Inc.

By: _____

12

Patriarch Partners Agency Services, LLC as administrative agent for
Ark II CLO 2001-1, Limited

By: _____


Phoenix II Recovery, LLC and Phoenix III Recovery LLC
(as successors in interest to Zohar II 2005-1, Limited and Zohar III, Limited)

By: _____

13

Patriarch Partners Agency Services, LLC as administrative agent for
Ark II CLO 2001-1, Limited

By: _____


Phoenix II Recovery, LLC and Phoenix III Recovery LLC
(as successors in interest to Zohar II 2005-1, Limited and Zohar III, Limited)

By: _____

13