## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| IMG Holdings, Inc., *et al.*, | Case No. 25-11500 (KBO) |
| Debtors.[1] | (*Joint Administration Pending*) |

### DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDER; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF

IMG Holdings, Inc. and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the **"Debtors"** or the **"Company"**) state as follows in support of this motion (this **"Motion"**):

### RELIEF REQUESTED

1.    The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the **"Interim Order"**),[2] and a final order (the **"Final Order"** and, together with the Interim Order, the **"DIP Orders"**):

(a)    authorizing Debtors, (as the **"Borrowers"** or **"Loan Parties"**) to obtain and be obligated in respect of postpetition financing (the **"DIP Facility"**) in the form of that certain DIP Term Sheet (the **"DIP Term Sheet"**), by and among the Debtors and the lender, Fragrance Xtreme Inc. (the **"DIP Lender"**), attached to the Interim Order as **Exhibit 1**, and which DIP Facility shall include up to a maximum principal amount of $500,000 as new money funding (such funds the **"DIP Loans"**) on a final basis, to be loaned pursuant to the DIP Term Sheet by and among the Loan

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (1) IMG Holdings, Inc. (1398); (2) Dana Classic Fragrances Inc. (1439); (3) Inter-Marketing Group, Inc. (6628); (4) Dana Fragrance Brands, LLC (0198); (5) St. Honore Holding, Inc. (9698); and (6) IMG Fragrance Brands, LLC (0026). The address of the Debtors' corporate headquarters is 1159 2nd Avenue, #424, New York, New York 10065.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Interim Order or the DIP Term Sheet (as defined herein), as applicable.

Parties and the DIP Lender, pursuant to the terms of the DIP Orders and other documents required to be executed or delivered by or in connection with the DIP Facility (each as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and the Interim Order, collectively, the **"DIP Documents"**), to enable the Debtors to pay the expenses in the DIP loan budget (**"Approved Budget"**) attached as <u>Exhibit 2</u> to the Interim Order);

(b)     authorizing the Borrowers to execute and deliver the DIP Documents and to perform their respective obligations thereunder and to perform such other and further acts as may be required in connection with the DIP Documents;

(c)     authorizing the Borrowers to borrow (i) up to $250,000 of DIP Loans pursuant to the Interim Order (the **"Interim DIP Amount"**) and (ii) up to the full amount of the DIP Loans, inclusive of the Interim DIP Amount, pursuant to the Final Order;

(d)     authorizing the Borrowers to grant security interests, liens, and superpriority claims (including superpriority claims pursuant to 11 U.S.C. § 364(c)(1) (**"Superpriority Claims"**) and liens pursuant to 11 U.S.C. §§ 364(c)(2), 364(c)(3), and 364(d) (the **"DIP Liens"**)) to the DIP Lender, in each case payable from, and having recourse to substantially all of the Debtors' assets, as set forth in the DIP Documents (the **"DIP Collateral"**), and all proceeds thereof; <u>provided</u>, <u>however</u>, that such security interests, liens, and Superpriority Claims shall have the priority described in the DIP Documents and the DIP Orders;

(e)     authorizing the Debtors to use the cash collateral (the **"Cash Collateral"**) of the Prepetition Secured Parties (as defined below), as such term is defined in 11 U.S.C. § 363(a), in accordance with the Debtors' weekly cash flow forecast setting forth all projected post-petition cash receipts and cash disbursements as set forth in the Approved Budget, and all future budgets, pursuant to the terms of the interim cash collateral order, substantially in the form attached hereto as **<u>Exhibit B</u>** (the **"Interim Cash Collateral Order"**), to be followed by the final cash collateral order (the **"Final Cash Collateral Order"** and, together with the Interim Cash Collateral Order, the **"Cash Collateral Orders"**);

(f)     granting adequate protection in favor of the Prepetition Secured Party (as defined below) in accordance with the Interim Cash Collateral Order;

(g)     subject to entry of the Final Order, authorizing the waiver by the Debtors of the right to (i) assert claims to surcharge against the DIP Collateral or the Prepetition Collateral pursuant to 11 U.S.C. § 506(c) and (ii) seek marshaling with respect to the DIP Collateral or the Prepetition Collateral;

(h)     modifying the automatic stay imposed under 11 U.S.C. § 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, the DIP Orders and the Cash Collateral Orders, as applicable;

(i)      scheduling a Final Hearing within approximately 21 days of the commencement of these chapter 11 cases to consider entry of the Final Order and the Final Cash Collateral Order; and

(j)      granting related relief.

2.      In support of the Motion, the Debtors rely on the *Declaration of Larry Thompson in Support of Chapter 11 Petitions and First Day Pleadings* (the **"First Day Declaration"**), and the *Declaration of Larry Thompson in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lender; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the **"DIP Declaration"**), each of which is filed substantively contemporaneously herewith and incorporated herein by reference.

## JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the District of Delaware (the **"Court"**) has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.      The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the **"Local Rules"**), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4912-8749-7047, v. 4

6.      The  bases  for  the  relief  requested  herein  are  sections  105,  361,  362,  363(b),
363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of title 11 of
the United States Code (the **"Bankruptcy Code"**), Bankruptcy Rules 2002, 4001, 6003, 6004,
and 9014, and Local Rules 2002-1(b), 4001-2, and 9013.

## PRELIMINARY STATEMENT

7.      The  Debtors  require  immediate  access  to  incremental  liquidity  in  the  form  of
postpetition  financing  to  avoid  immediate  harm,  preserve  the  value  of  the  Debtors'  estates,
undertake  a  successful  reorganization  process,  and  maximize  recoveries  for  all  stakeholders.
Accordingly, the Debtors seek authorization to enter into the DIP Facility in an aggregate principal
amount of up to $500,000, with up to $250,000 of such amount available upon interim approval
of this Motion.

8.      The Debtors will use the proceeds of the DIP Facility to, among other things, (a)
pay the fees, costs, and expenses incurred in connection with these Chapter 11 Cases, (b) fund any
obligations benefitting from the Carve-Out, (c) permit the orderly continuation of the operation of
their business, (d) maintain business relationships with customers, vendors, and suppliers, (e) make
payroll and provide benefits to employees, and (f) satisfy other working capital and operational
needs.  Obtaining an immediate injection of cash is critical.  The incurrence of new debt under the
DIP  Term  Sheet  and  use  of  Cash  Collateral  is  necessary  and  vital  to  the  preservation  and
maintenance of the going concern value of the Debtors.  Immediate and irreparable harm will be
caused to the Debtors and their estates if immediate financing is not obtained and permission to
use Cash Collateral is not granted.

9.      For these reasons, and for the reasons set forth below and in the DIP Declaration
and First Day Declaration, the Debtors believe, in the exercise of their business judgment, that

approval of the DIP Facility will maximize value for the Debtors' stakeholders.  Accordingly, the Debtors respectfully request that the Court enter the DIP Orders authorizing the Debtors' access to the DIP Facility.

## BACKGROUND

10.     The Debtors are wholly owned portfolio companies of Phoenix II Recovery, LLC (85.2%) and Phoenix Recovery III, LLC (14.8%)(collectively, the **"Phoenix Recovery Entities"**) established pursuant to the Fourth Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and its Affiliated Debtors (the **"Zohar Plan"**) [*See In re Zohar III, Corp.*; United States Bankruptcy Court for the District of Delaware; Case No. 18-10512 (KBO), Docket No. 3474].

11.     Originally founded in Barcelona, Spain in 1932 by Javier Serra, a former executive of the perfume house Myrurgia, the Company has a long history of creating and selling award-winning fragrances.

12.     On August 22, 1932, the Company launched its first perfume "Tabu."  Created by legendary French perfumer Jean Carles — who would later compose outstanding perfumes of the era such as Miss Dior, Ma Griffe and Shocking de Schiaparelli — Tabu became a classic oriental perfume with a sensual reputation from Paris to New York.

13.     After launching new successes like 20 Carats and Bolero in 1933, Canoe and Emir in 1935 (also created by Jean Carles) and Platine in 1938, the Company relocated to Paris at 9 rue de la Paix, near the prestigious Place Vendôme.  Main office operations were transferred to the United States in 1940.  Javier Serra went on to release a string of original perfumes including Voodoo in 1951 and the remarkably well received Ambush in 1955.

14.     In the 1990s, the Company acquired the licenses for several iconic classic perfumes originally produced by other houses, including Chantilly, Love's Baby Soft, English Leather, British Sterling, Toujours Moi, Monsieur Musk, Heaven Sent and Navy for Women.

15.     The Company's oils and solutions for fragrances are sourced and blended in the United States, while components (glass bottles, caps, pumps, *etc*.) are sourced from manufacturing partners based in China.

16.     The Company has continued to produce many of these beloved fragrances of yesteryear to the delight of their loyal customers and to new generations just discovering them. The Company maintains a website (https://danaclassics.com) to sell its fragrances directly to consumers through Shopify and its fragrances can also be found at Walmart and Amazon, among other retailers.

17.     The Company had approximately $4 million in gross sales in 2024 and $3.5 million in gross sales in 2023.  The Company is small but continues to operate well, showing steady growth despite the numerous litigation issues and significant secured debt burden described below.  As of the Petition Date, the Company had 5 employees who work remotely.

18.     Additional factual background regarding the Debtors' business operations, corporate and capital structures, and prepetition restructuring efforts are described in greater detail in the First Day Declaration, filed contemporaneously with this Motion and incorporated herein by reference.

19.     On August 11, 2025 (the **"Petition Date"**), the Debtors commenced with the Court voluntary cases (the **"Chapter 11 Cases"**) under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their business and managing their properties as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.

20.    Contemporaneously with the filing of this Motion, the Debtors have filed with the Court a motion requesting joint administration of these Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2

21.    As required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2, the Debtors submit the following concise statement of the material terms of the DIP Facility:[3]

| Summary of Material Terms | |
|---|---|
| **Parties to the Proposed DIP Facility**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Borrowers**:  IMG Holdings, Inc. and Dana Classic Fragrances, Inc., and its wholly owned subsidiaries (collectively, the **"Debtors"** and each a **"Debtor"**), as debtors and debtors in possession under title 11 of the United States Code (the **"Bankruptcy Code"**).<br><br>**DIP Lender**: Fragrance Xtreme Inc. |
| **Purpose**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)* | The Debtors have an immediate and critical need to obtain financing pursuant to the DIP Facility and to continue to use the Prepetition Collateral of the Prepetition Secured Parties (including Cash Collateral) in order to, among other things, (a) pay the fees, costs, and expenses incurred in connection with these Chapter 11 Cases, (b) fund any obligations benefitting from the Carve-Out, (c) permit the orderly continuation of the operation of their business, (d) maintain business relationships with customers, vendors, and suppliers, (e) make payroll and provide benefits to employees, and (f) satisfy other working capital and operational needs.<br><br>*See* Interim Order ¶ G(2). |
| **Borrowing Limits**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)A* | The DIP Facility provides for the following:<br><br>$250,000 shall be available upon entry of the Interim Order;<br><br>$500,000 shall be available upon entry of the Final Order.<br><br>*See* DIP Term Sheet - DIP Facility, Interim Funding; *See* Interim Order ¶ 3(b). |

---

[3]    This concise statement is qualified in its entirety by, and subject to, the DIP Documents.  To the extent there is any conflict between this concise statement and the DIP Documents, the terms of the DIP Documents shall control.

4912-8749-7047, v. 4

| Summary of Material Terms | |
|---|---|
| **Initial Approved Budget**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(iii)* | A copy of the Approved Budget is attached as <u>Exhibit A</u> to the DIP Term Sheet attached to the Interim Order. |
| **Interest Rate**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Loan shall have an interest rate of 12%.<br><br>*See* DIP Term Sheet - Interest Rate. |
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)* | The maturity date (**"Maturity Date"**) shall be the earliest to occur of:<br><br>(i)     90 days after the Petition Date;<br><br>(ii)    the closing date following entry of one or more final orders approving the sale of all or substantially all of the assets belonging to the Debtors in the Chapter 11 Cases;<br><br>(iii)   the acceleration of any outstanding DIP Loans following the occurrence of an uncured Event of Default (as defined herein); or<br><br>(iv)   entry of an order by the Bankruptcy Court in the Chapter 11 Cases either (a) dismissing such case or converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or (b) appointing a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of the Debtors (i.e., powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), in each case without the consent of the DIP Lender. All amounts outstanding under the DIP Facility shall be due and payable in full, and the DIP Commitments thereunder shall terminate, on the Maturity Date.<br><br>*See* DIP Term Sheet – Maturity Date. |
| **Commitment**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | The DIP Facility provides for the following:<br><br>$250,000 shall be available upon entry of the Interim Order;<br><br>An additional $250,000 shall be available upon entry of the Final Order.<br><br>*See* DIP Term Sheet - DIP Facility, Interim Funding; *See* Interim Order ¶ 3(b). |
| **Conditions Precedent to Closing and Lending**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | The obligations of the DIP Lender to consummate the transactions contemplated herein and to make the DIP Facility available to the Debtors are subject to the satisfaction, in each case in the sole judgment of the DIP Lender, of the following:<br><br>(i)     All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility and the approval thereof shall comply with the terms of the DIP Term |

| Summary of Material Terms | |
|---|---|
| | Sheet and be in form and substance reasonably satisfactory to the DIP Lender; |
| | (ii)    The Interim Order shall be in full force and effect, and shall not have been appealed, reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is or may be materially adverse to the interests of the DIP Lender; and |
| | (iii)    The DIP Lender shall have received and approved the Approved Budget. |
| | (iv)    On the Closing Date and the funding date of each Draw, the following conditions precedent shall have been satisfied: |
| | Conditions Precedent to Each Draw |
| | (i)    Each of the Interim Order or Final Order, as the case may be, shall be in a form that is acceptable to the DIP Lender in its sole and absolute discretion; |
| | (ii)    The Interim Order or Final Order, as the case may be, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is materially adverse to the interests of the DIP Lender; |
| | (iii)    The Debtors' use of the proceeds is consistent with the Approved Budget; |
| | (iv)    There shall be no uncured Event of Default; and |
| | (v)    The representations and warranties of the Debtors shall be true and correct immediately prior to, and after giving effect to, funding, as qualified in "Availability and Draw Procedure." |
| | *See* DIP Term Sheet - Conditions Precedent to Closing of the DIP Facility, Conditions Precedent to Each Draw. |
| **Events of Default**<br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(M)* | The occurrence of any one or more of the following shall constitute an "Event of Default": |
| | (i)    Failure by the Debtors to pay principal, interest or any other amounts provided by the DIP Term Sheet when due; |
| | (ii)    Any representation or warranty made by any Debtor shall prove to have been incorrect in any material respect when made; |

| Summary of Material Terms | |
|---|---|
| | (iii)    Without the consent of the DIP Lender and the Prepetition Agent, any of the Chapter 11 Cases shall be dismissed or converted to a Chapter 7 case; |
| | (iv)    Unless consented to, or such relief is granted pursuant to a motion by, the DIP Lender or the Prepetition Agent, a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers relating to the operation of the business of the Debtors (i.e., powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases; |
| | (v)    Any other super-priority claim or lien which is pari passu with or senior to the claims or liens of the DIP Lender or the Prepetition Agent under the DIP Facility or Cash Collateral Order shall be granted in any of the Chapter 11 Cases, other than the Carve-Out; |
| | (vi)    Any Debtor shall make any payment on account of any pre-petition indebtedness or payables of a Debtor except as otherwise permitted under the Approved Budget; |
| | (vii)    Any material provision of the DIP Term Sheet, the DIP Orders or the Cash Collateral Orders shall cease to be valid and binding on any Debtor, or any Debtor shall so assert in any pleading filed in any court; |
| | (viii)    An order shall be entered amending, modifying or supplementing the DIP Orders or Cash Collateral Orders without the prior written consent of the DIP Lender or Prepetition Agent; |
| | (ix)    The failure to satisfy any of the Sale Milestones; and |
| | (x)    The filing of a challenge by the Debtors or supported by the Debtors to the liens or claims of the DIP Lender or Prepetition Agent based upon the DIP Lender or Prepetition Agent's prepetition conduct |
| | *See* DIP Term Sheet – Events of Default. *See* Interim Cash Collateral Order ¶ 16 |
| **Carve-Out**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)* | The Prepetition Liens, the liens and security interests in the DIP Collateral, the Adequate Protection Liens, and all superpriority administrative expense claims granted under the DIP Orders or the Cash Collateral Orders, shall be subject and subordinate to the Carve-Out.<br><br>"Carve-Out" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court under section 156(c) of title 28 of the United States Code and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the applicable statutory rate (without regard to the notice set forth in (iii) below) (collectively, the **"Statutory Fees"**), which Statutory Fees shall not be subject to any budget; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent permitted to be paid at any time, whether by interim order, procedural order, or |

| Summary of Material Terms | |
|---|---|
| | otherwise (which order has not been vacated or stayed), all unpaid fees and expenses of professionals pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the **"Professionals"** and such claims, the **"Allowed Professional Claims"**) subject to the Approved Budget.<br><br>*See* DIP Term Sheet – Carve-Out; *See* Interim Order ¶ 9. |
| **Priority of Claims and Liens; Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i);*<br><br>*Local Rule 4001-2(a)(i)(G)* | **Security/Priority**<br><br>Subject to the Carve Out, all amounts owing by the Debtors under the DIP Facility shall be joint and several as to each Debtor and (a) will be entitled to super-priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any or all administrative expense claims of every kind and nature whatsoever, and (b) will be secured by a perfected security interest pursuant to section 364(c)(2), section 364(c)(3) and section 364(d) of the Bankruptcy Code with priority over any security interest securing Debtors' existing secured credit facilities and other indebtedness (the **"Existing Indebtedness"**), pursuant to section 364(d)(1) of the Bankruptcy Code in all of the assets of the Debtors, as further described in the "Collateral" section below.<br><br>The relative priority of all amounts owed under the DIP Facility will be subject only to the Carve Out.<br><br>All of the liens described herein shall be effective and perfected as of the entry of any DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.<br><br>**Collateral**<br><br>All amounts owing by the Debtors under the DIP Facility in respect thereof will be secured by a first priority perfected security interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Debtors, whether now owned or hereafter acquired, including, without limitation, deposit and other accounts, inventory, equipment, receivables, capital stock or other ownership interest in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, and other general intangibles, and all products and proceeds thereof, and, upon entry of the Final DIP Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates (the **"Collateral"**), subject only to the Carve-Out.<br><br>The DIP Facility shall be the joint and several obligation of each Debtor and the DIP Lender may exercise its rights with respect to any asset or grouping of assets, through foreclosure or otherwise.  Subject to entry of the Final DIP Order, the Debtors shall waive and the DIP Orders shall prohibit marshalling of any of the Collateral or other interest of the DIP Lender or under any similar theory.<br><br>*See* DIP Term Sheet – Security/Priority and Collateral; *See* Interim Order ¶ 7 and 8. |
| **Adequate Protection / Identity of Each** | As adequate protection against the risk of any diminution in the value of the Prepetition Liens in the Prepetition Collateral, as such terms are defined in the Credit |

| Summary of Material Terms |
|---|

| | |
|---|---|
| **Entity with Interest in Cash Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv);*<br><br>*Local Rule 4001-2(a)(i)(K) & (P)* | Agreement (the **"Prepetition Collateral"**), which results from, arises from, or is attributable to, the priming of the Prepetition Liens, the imposition of the automatic stay under section 362 of the Bankruptcy Code, or the use, sale, or lease of such Prepetition Collateral, or the grant of a lien under section 364 of the Bankruptcy Code and applicable case law interpreting the same (any such diminution, **"Diminution in Value"**), the Prepetition Secured Parties shall be granted the following adequate protection, subject in all cases to the Carve-Out (defined below), the DIP Liens, DIP Superpriority Claims, and the Permitted Liens:<br><br>a.      **Adequate Protection Liens**.  Pursuant to sections 361 and 363(e) of the Bankruptcy Code, effective as of the Petition Date and perfected without the need for execution by the Borrower or the Guarantors or the recordation or other filing by the Prepetition Secured Parties of security agreements, control agreements, pledge agreements, financing statements, or other similar documents or the possession or control by the Prepetition Secured Parties, the Prepetition Secured Parties, solely to the extent of any Diminution in Value, shall be granted valid, binding, continuing, enforceable, fully perfected replacement and additional liens on and security interests in (collectively, the **"Adequate Protection Liens"**) all Prepetition Collateral.  The Adequate Protection Liens shall be non-avoidable and shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code.  The Adequate Protection Liens shall be enforceable against and binding upon the Borrower, the Guarantors, their estates and any successors thereto, including, without limitation, any trustee or other estate representative appointed in any Successor Case.<br><br>b.      **Adequate Protection Superpriority Claim**.  To the extent of the aggregate Diminution in Value, the Prepetition Secured Parties shall be granted allowed superpriority administrative expense claims against the Debtors, and their estates, as provided in section 507(b) of the Bankruptcy Code and with priority in payment over any and all other claims and administrative expense claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114, and any other provision of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, and any successor trustee or creditor in the Chapter 11 Cases or any Successor Case (the **"Adequate Protection Superpriority Claims"**).<br><br>c.      **Adequate Protection Payments, Etc.**  As further adequate protection, from and after entry of the Interim Cash Collateral Order, the Debtors shall accrue, to be paid at closing from sale proceeds, (1) under the terms of the Prepetition Loan Agreement, all interest due under the Prepetition Loan Agreement, calculated at the default rates under the Prepetition Loan Agreement, and (2) all accrued and unpaid fees and disbursements (including all reasonable and documented fees, out-of-pocket costs and expenses of legal, financial, and other advisory professionals of the Prepetition Secured Parties (including, without limitation, Cole Schotz P.C.)) owing to the Prepetition Secured Parties under the Prepetition Loan Agreement, whether incurred prior to or after the Petition Date.  Payment of any amounts set forth in this clause (c)(2) shall not be subject to disgorgement or recharacterization. |

| Summary of Material Terms |
|---|

|  | *See* Interim Cash Collateral Order ¶ 4. |
|---|---|
| **Debtors' Stipulations**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii);*<br><br>*Local Rule 4001-2(a)(i)(B)* | Upon entry of the Interim Order:<br><br>(i)    The Debtors shall stipulate (a) to the validity, extent, security, enforceability, priority, unavoidability and perfection of the Prepetition Liens and Prepetition Secured Obligations, (b) to the amount, validity, and lack of defense, counterclaim or offset of any kind to the Prepetition Secured Obligations, and (c) that all cash of the Debtors constitutes "cash collateral" of the Prepetition Secured Lender for purposes of section 363 of the Bankruptcy Code (the **"Cash Collateral"**) (subject to a challenge period acceptable to the Prepetition Secured Parties and consistent with applicable local rules).<br><br>(ii)    The Debtors shall waive any right to surcharge pursuant to section 506(c) of the Bankruptcy Code the DIP Collateral with respect to the DIP Lender, and the Prepetition Collateral with respect to the Prepetition Secured Parties, subject to entry of the Final DIP Order and the Final Cash Collateral Order.<br><br>(iii)    The Debtors shall waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the DIP Lender, and the Prepetition Collateral with respect to the Prepetition Secured Parties, subject to entry of the Final DIP Order and the Final Cash Collateral Order.<br><br>(iv)    The Prepetition Secured Parties shall be entitled to the benefit of section 552(b) of the Bankruptcy Code, and the Debtors shall waive the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the Prepetition Secured Parties, subject to entry of Final DIP Order and the Final Cash Collateral Order.<br><br>(v)    The Debtors shall waive and forever release and discharge any and all claims and causes of action against each of the DIP Lender and Prepetition Secured Parties (and their respective related parties and representatives) as of the date of the applicable DIP Order or Cash Collateral Order.<br><br>(vi)    No Cash Collateral, proceeds of the DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to, or contest the validity, extent, enforceability, security, perfection, or priority of any of the DIP Liens, Prepetition Liens, DIP Obligations, or Prepetition Secured Obligations, (b) investigate or initiate any claim or cause of action against any of the DIP Lender or Prepetition Secured Parties, (c) object to or seek to prevent, hinder, or delay or take any action to adversely affect the rights or remedies of the DIP Lender or the Prepetition Secured Parties, or |

| Summary of Material Terms |
|---|

<table>
<tr><td></td><td>(d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the DIP Documents and the DIP Orders) that are senior to or <em>pari passu</em> with the DIP Liens, DIP Superpriority Claims, the Adequate Protection Liens or claims granted under the DIP Orders or Cash Collateral Orders, or the Prepetition Liens, provided, however, that no more than $25,000 in the aggregate of the proceeds of the Prepetition Collateral, and the Cash Collateral may be used by a Committee (if any) appointed in these Chapter 11 Cases to investigate (but not prosecute or Challenge, or commence, or initiate the prosecution of, any Challenge, including the preparation of any complaint or motion on account of, or objection to) the Stipulations before termination of the Challenge Period.<br><br>(vii)    The DIP Lender and the Prepetition Secured Lender shall be entitled to good faith protection under section 364(e) of the Bankruptcy Code.<br><br><em>See</em> DIP Term Sheet – DIP Facility; <em>See</em> Interim Order ¶¶ G, H, I, 3, 8, 12, 26, 37 and 38; <em>See</em> Interim Cash Collateral Order ¶¶ E and 11.</td></tr>
<tr><td><strong>Waiver/Modification of the Automatic Stay</strong><br><em>Fed. R. Bankr. P. 4001(c)(1)(B)(iv)</em></td><td>The automatic stay of section 362 of the Bankruptcy Code will be modified and vacated to the extent necessary to permit the Debtors, the DIP Lender and/or the Prepetition Secured Party to accomplish the transactions contemplated by the Interim Order.<br><br><em>See</em> Interim Order ¶ 3(d); <em>See</em> Interim Cash Collateral Order ¶ 15.</td></tr>
<tr><td><strong>Milestones</strong><br><em>Fed. R. Bankr. P. 4001(c)(1)(B)(vi);</em><br><br><em>Local Rule 4001-2(i)(a)(H)</em></td><td>The Debtors shall comply with the following milestones for a sale of substantially all of the Debtors' assets (a <strong>"Bankruptcy Sale"</strong>) in the Chapter 11 Cases (the <strong>"Bankruptcy Milestones"</strong>):<br><br>Within five (5) days of the execution of the Asset Purchase Agreement between the Debtors and DIP Lender (the <strong>"APA"</strong>), the Debtors shall file a motion in the Bankruptcy Court in the Bankruptcy Case (the <strong>"Sale Motion"</strong>) seeking the approval of the transactions contemplated in the APA including, without limitation, the Expense Reimbursement (as defined in the APA).<br><br>Within five (5) days of the execution of the APA, Debtors shall file a motion in the Bankruptcy Court in the Bankruptcy Case seeking the approval of the DIP Loan.<br><br>On or before August 15, 2025, the Interim DIP Order shall have been entered by the Bankruptcy Court in the Bankruptcy Case.<br><br>On or before September 12, 2025, the Final DIP Order shall have been entered by the Bankruptcy Court in the Bankruptcy Case.<br><br>On or before October 10, 2025, an order approving the Bankruptcy Sale to the Buyer or other winner of the auction, as applicable, shall have been entered by a Bankruptcy Court; and<br><br>On or before October 24, 2025, or such later date as Buyer shall agree in writing, the Bankruptcy Sale shall been consummated.</td></tr>
</table>

| Summary of Material Terms | |
|---|---|
| | *See* Interim Order ¶ 14; *See* DIP Term Sheet – Sale Milestones. |
| **Indemnification**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The Debtors shall provide for customary indemnification by each of the Debtors, on a joint and several basis, of the DIP Lender (together with their related parties and representatives).<br><br>*See* DIP Term Sheet - Indemnification; *See* Interim Order ¶ 18; *See* Interim Cash Collateral Order ¶ E(ii)(d). |
| **506(c) Waiver / Section 552(b) Wavier**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x)*<br>*Local Rule 4001-2(a)(i)(C)* | Subject to entry of the Final Order, in light of (i) the DIP Lender's agreement that their liens and superpriority claims shall be subject to payment of the Carve-Out and (ii) the Prepetition Secured Parties agreement that, with respect to the Prepetition Collateral, their respective liens and claims, including any adequate protection liens and claims, shall be subject to payment of the Carve-Out, and subordinate to the DIP Liens, the DIP Lender and the Prepetition Secured Parties have negotiated for, and the Debtors intend to seek in the Final Order, (a) a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, (b) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, or the Prepetition Collateral, as applicable, and (c) a waiver of the surcharge provisions of section 506(c) of the Bankruptcy Code.<br><br>*See* Interim Order ¶¶ H, 3(e), 8, 37, and 38; *See* Interim Cash Collateral Order ¶¶ E(vii), 13; and 20(e). |
| **Liens on Avoidance Actions**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(xi)* | Subject to entry of the Final Order, the DIP Liens include any proceeds or property recovered, unencumbered or otherwise from all of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and similar statutes or common law.<br><br>*See Interim Order ¶ 8.* |
| **Fees**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(K) and 2(a)(ii)* | The Debtors shall pay all costs and expenses of the DIP Lender, including, without limitation, the payment in kind of all reasonable and documented fees and expenses of the DIP Lender's professionals and advisors.<br><br>*See* DIP Term Sheet – Fees; *See* Interim Order ¶ 18. |

## I. Debtors' Prepetition Capital Structure

22.     As of the Petition Date, the Company is burdened with in excess of sixty-four million dollars ($64,000,000) of senior secured debt.  More specifically, the Debtors are obligated under that certain Third Amended and Restated Loan and Security Agreement, dated as of January 15, 2009 (as amended and modified to the date hereof, the "**Credit Agreement**"), between and among the Debtors, Patriarch Partners Agency Services, LLC, as administrative agent

("**Prepetition Agent**" or "**Patriarch**") and certain lenders[4] that are signatories thereto (the **"Prepetition Secured Parties"**). Pursuant to the Credit Agreement and as security for payment of amounts due thereunder, the Debtors granted to the Prepetition Agent a security interest (the **"Prepetition Liens"**) in substantially all of the Debtors' assets (the **"Prepetition Collateral"**).

23. Patriarch is owed approximately $1,457,365 (plus interest per diem of $196.35 from 7/8/25) for outstanding agency fees, reimbursable expenses and indemnification amounts due under the Credit Agreement (the "**First Lien Obligations**").

24. In April 2019, Ankura Trust Company was appointed co-administrative agent for the Zohar Lenders, and Patriarch remained as co-administrative agent for the Ark II Lender.

25. Currently, the outstanding principal and interest due and payable to ARK II Lender under the Credit Agreement is $1,643,968 (plus interest per diem of $298.46 from 7/8/25), plus all outstanding fees, and reimbursable costs and expenses (the "**Second Lien Obligations**"). The Second Lien Obligations are secured by liens on all the Debtors' assets.

26. The Debtors are also obligated under the Credit Agreement to the Zohar Lenders in the amount of no less than $63,593,162.00 (the "**Third Lien Obligations**" and together with the First Lien Obligations and the Second Lien Obligations, the **"Prepetition Secured Obligations"**). The Third Lien Obligations are secured by liens on all the Debtors' assets. Interest and reimbursable fees and costs continue to accrue under the Credit Agreement.

27. As of the Petition Date, the Debtors had approximately $500,000 in unsecured trade debt.

---

[4] The lenders include Ark II CLO 2001-1, Ltd. (the **"Ark II Lender"**), and Zohar II 2005-1 Limited, Zohar CDO 2003-1 Limited, and Zohar III, Limited (collectively, the **"Zohar Lenders"**).

II.    **Debtors' Need for Postpetition Financing**

28.    As of the Petition Date, the Company had only minimal cash on hand and no remaining availability under its Credit Agreement.  Given the Company's current cash position, the Company does not have the ability to pay any of its operating costs in the ordinary course of business and fund these cases, absent approval of the DIP financing.  Just prior to the Petition Date, the DIP Lender provided the Debtors with the DIP Term Sheet for debtor-in-possession financing to fund limited operations and the costs of these Chapter 11 Cases to run a sale process to maximize the value of the Debtors' assets.  The DIP Facility is the best and only path forward to ensure that the Debtors can continue operating their business while providing sufficient liquidity to administer these Chapter 11 Cases and facilitate the restructuring process.

III.    **Debtors' Efforts to Obtain Postpetition Financing**

29.    In order to obtain access to essential liquidity to support the Debtors' postpetition operations and the proposed restructuring process, the Debtors conducted a market check by seeking competing DIP financing offers from three other prospective lenders.  No other proposals were received.  The primary reasons for the lack of competing proposals are because (i) the Prepetition Secured Parties were unwilling to permit a priming lien in favor of a third party, other than the DIP Lender, and (ii) the other potential lenders are unwilling to provide a DIP facility junior to the Prepetition Secured Parties.  Based upon the Debtors' efforts to arrange DIP financing with other prospective lenders, the Debtors and their advisors believe that no other better options for DIP financing are available to them other than the proposed DIP Facility.

30.    Accordingly, the Debtors and the DIP Lender intend to enter into the DIP Term Sheet, which is attached to the Interim Order as Exhibit A.

4912-8749-7047, v. 4

## BASIS FOR RELIEF REQUESTED

1. **Debtors Should Be Authorized to Enter into the DIP Term Sheet**

   A. **Entering into the DIP Facility is a Sound Exercise of Debtors' Business Judgment**

31.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  Indeed, "courts will almost always defer to the business judgment of a debtor in the selection of the lender." *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *See also In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. Jun. 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

32.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment

- 18 -

made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").  Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  This includes the recognition that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization. *In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986).  Finally, the Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. As the Bankruptcy Court for the Southern District of New York has explained:

> Although all parties . . . are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

*In re ION Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. Jul. 6, 2009).

33.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an extensive arm's-length negotiation process and careful evaluation of available alternatives.  Having analyzed the advantages and disadvantages of the proposed DIP Facility, the Debtors believe that they have obtained the best financing available under the totality of the circumstances and that the proposed DIP Facility will position the Debtors to maximize the value of their estates.  Accordingly, the Court should authorize the Debtors' entry into the DIP Facility.

**B.      The Debtors Should Be Authorized to Grant Liens, Including Priming Liens, and Superpriority Claims**

34.      The Debtors propose to obtain the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) and 364(d) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lender continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and DIP Liens on the DIP Collateral.  The Debtors also seek authority to grant the DIP Lender Superpriority Claims.

35.      Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

36.      In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (a) the debtor obtains the consent of such parties or (b) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

37.     In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider various factors including whether:

> a.     unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> b.     the credit transactions are necessary to preserve assets of the estate;
>
> c.     the terms of the credit agreement are fair, reasonable, and adequate;
>
> d.     the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and
>
> e.     the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

38.     As described further in the DIP Declaration, the Debtors conducted a market check seeking competing DIP financing offers.  No other proposals were received.

39.     Ultimately, the Debtors, in conjunction with their advisors, determined that the terms and conditions of the proposed DIP Facility were and remain the best and only available under the circumstances and adequately addresses the Debtors' financing needs during these Chapter 11 Cases.  Importantly, the DIP Facility was negotiated at arms' length among the proposed DIP Lender and the Debtors' proposed counsel.

4912-8749-7047, v. 4

40.     The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, and capital structure, and the circumstances of these Chapter 11 Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.

41.     Further, the Prepetition Secured Parties have consented to the Debtors incurring debtor-in-possession financing, the priming of their Prepetition Liens, and the use of their Cash Collateral, only on the terms of and subject to the conditions set forth in the DIP Documents and the Interim Cash Collateral Order.

42.     The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.

43.     Financing on a postpetition basis is not otherwise available without granting the DIP Lender: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims and priming liens to the extent set forth in the Interim Order and the DIP Documents, and (3) the other protections set forth in the Interim Order.

44.     Based upon the Debtors' efforts to arrange financing with prospective DIP lenders, the Debtors and their advisors believe that no other, better options for DIP financing are available

4912-8749-7047, v. 4

to them other than the proposed DIP Facility.  Additionally, as noted above and described in the DIP Declaration, the Debtors believe that the proposed DIP Facility is critical to preserving the Debtors' enterprise value and positioning the Debtors to run a value-maximizing restructuring process.  Thus, the Debtors have determined that the DIP Facility provides the best and only opportunity available to the Debtors under the circumstances to fund these Chapter 11 Cases.

45.     Absent the proposed DIP Facility, which will provide the Debtors with access to liquidity to operate the Debtors' business and administer these Chapter 11 Cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Without postpetition financing, the Debtors lack sufficient funds to continue operations, pay their debts as they come due, and cover the projected costs of the Chapter 11 Cases.  Under the circumstances, the Debtors believe that the terms of the proposed DIP Facility, taken as a whole, are fair and reasonable.

46.     For the reasons discussed herein, including the terms of the proposed DIP Facility as well as the unavailability of actionable alternative sources of financing, the Debtors satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

C.     **The Debtors Should Be Authorized to Pay DIP Fees**

47.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay the DIP Lender certain fees and expenses as noted above and set forth in the DIP Term Sheet. It is understood and agreed by all parties, including the Debtors, that this compensation is an integral component of the overall terms of the DIP Facility, and was required by the DIP Lender as consideration for the extension of post-petition financing.

4912-8749-7047, v. 4

48.     The Debtors believe the DIP Lender agreed to provide the DIP Loans with the specific intent to both fully fund the Debtors' reorganization while simultaneously keeping the postpetition financing narrowly tailored to meet the Debtors' restructuring needs.  The DIP Lender and the Debtors, along with their advisors, extensively negotiated the terms of the proposed DIP Facility.  Such negotiations included drafts of key documents, including the proposed Interim Order and the DIP Term Sheet, and various discussions both amongst the Debtors, the DIP Lender, and their respective advisors.  The Debtors believe that the terms of the proposed DIP Facility, including the fees and conditions contained therein, represent the best available terms for the Debtors.  Accordingly, the Court should authorize the Debtors to incur such obligations under the DIP Documents in connection with entering into those agreements.

**2.      The Debtors Should Be Authorized to Use Cash Collateral and Provide Adequate Protection**

49.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2) conditions use of Cash Collateral upon (a) obtaining consent of each party that has an interest in the Cash Collateral; or (b) "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  Further, the use of cash collateral may be prohibited or conditioned, upon proper request, as is necessary to adequately protect any interest in cash collateral.  *See* 11 U.S.C. §363(e).

50.     Here, the Prepetition Secured Parties consent to the Debtors' use of the Cash Collateral (as well as the Prepetition Collateral), subject to the terms and limitations set forth in the Interim Cash Collateral Order.  As explained more fully herein, the Debtors have provided the Prepetition Secured Parties with fair and reasonable adequate protection, as set forth in the Interim Cash Collateral Order.  Accordingly, the Court should authorize the Debtors' use of Cash

Collateral in accordance with the terms and conditions set forth in the Interim Cash Collateral Order.

51.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  If a secured creditor does not consent to the debtor's proposed use of cash collateral, the court must ensure that the creditor's interests are adequately protected. *See id*.  Thus, courts are required to balance the protection offered to a secured creditor against the debtor's need to use cash in its reorganization effort.  *Stein v. U.S. Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).  In determining whether a creditor is adequately protected, courts "will generally permit the business operation to continue, at least to the point of plan formulation, if the debtors make a solid evidentiary showing to support their projections." *In re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D.N.H. 1993).

52.     "The concept of 'adequate protection' is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in § 361."  *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).  Section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of adequate protection, including a cash payment or periodic cash payments, additional liens, replacement liens, and the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

- 25 -

53.     The concept of adequate protection exists to protect a secured creditor from diminution in value of its interest in collateral during the pendency of the bankruptcy case. *See In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral); s*ee also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180,81 (Bankr. D. Del. 1993) (holding that adequate protection for use of cash collateral under section 363 is limited to use-based decline in value).

54.     After arms' length and good faith negotiations, the Prepetition Secured Parties have agreed to consent to the use of the Prepetition Collateral (as defined in the Interim Cash Collateral Order), including Cash Collateral, subject to the provision by the Debtors of adequate protection. Among other things, the adequate protection contemplated by the Cash Collateral Orders is designed to protect the Prepetition Secured Parties' interests in the Debtors' property from any diminution in value caused by the automatic stay, by the Debtors' use of the Cash Collateral, during the pendency of these Chapter 11 Cases and by the priming of the Prepetition Secured Lender's liens by the DIP Liens. Specifically, the Debtors have agreed to provide the following forms of adequate protection more fully set forth in the Interim Order (collectively, the **"Adequate Protection Obligations"**):

a)      valid and automatically perfected replacement liens and security interests in and upon the Prepetition Collateral under sections 361 and 363(e) of the Bankruptcy Code;

b)      superpriority administrative claims under section 507(b) of the Bankruptcy Code;

c)      The Prepetition Agent shall receive monthly reimbursement of its reasonable and documented fees and expenses including any professional fees (in each case, without the need for the filing of formal fee applications), including as to any amounts arising before, on, or after the Petition Date;

d) The Debtors shall provide the Prepetition Secured Parties with all reports, documents, and other materials, including financial reports, as may be required in the Interim Order and the DIP Term Sheet, and shall continue to provide all financial reporting required by the Credit Agreement; and

e) The Debtors shall comply with, and shall use cash, including Cash Collateral, solely in accordance with the Approved Budget (subject to the Permitted Variances).

55. Therefore, the Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any diminution in value to the Cash Collateral and Prepetition Collateral. *See In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6, *7 (Bankr. D. Del. Dec. 7, 2012) (finding that "(i) interest payments at the applicable default rate, (ii) payment of the Secured Lender's legal fees and expenses incurred in these chapter 11 cases and (iii) replacement liens on the collateral" to be appropriate forms of adequate protection that "protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor."); COLLIER ON BANKR. ¶ 361.01 (16th ed. 2020) ("Section 361 of the Code suggests three forms of adequate protection, but the list is not inclusive: (1) periodic payments; (2) additional or replacement liens; and (3) such other relief as will result in the realization of the 'indubitable equivalent' of the entity's interest.").

56. In light of the foregoing, the Debtors further submit that the proposed Adequate Protection Obligations, to be provided for the benefit of the Prepetition Secured Parties, are appropriate. Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of their estates and all parties in interest.

4912-8749-7047, v. 4

3.      **Scope of Carve Out is Appropriate**

57.      The Interim Order and Interim Cash Collateral Order provide that each of the DIP Liens, the Superpriority Claim, Replacement Lien, Prepetition Liens, and Superpriority Claim (all as defined in the Interim Order or the Interim Cash Collateral Order) shall be subject and subordinate to the Carve-Out.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be compensated in these Chapter 11 Cases would be restricted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties-in-interest of possible rights and powers. Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of amounts to the Clerk of the Court or U.S. Trustee fees, and professional fees of the Debtors.

4.      **The DIP Lender Should Be Deemed a Good-Faith Lender under Bankruptcy Code Section 364(e)**

58.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

- 28 -

59.     As explained herein and in the First Day Declaration and DIP Declaration, the terms of the DIP Facility are the result of (a) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital postpetition financing, and (b) extensive arms'-length, good-faith negotiations between the Debtors and the DIP Lender. The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to the DIP Lender other than as described herein.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

5.      **The Automatic Stay Should Modified on a Limited Basis**

60.     The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Lender and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order and Interim Cash Collateral Order provide that, following the occurrence of an Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Lender and/or the Prepetition Agent to exercise all rights and remedies in accordance with the DIP Documents or the Credit Agreement, or applicable law following five (5) business days' notice to the Debtors, any Committee, and the U.S. Trustee, during which time the Debtors may seek injunctive relief.

61.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases.  *See, e.g.*, *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC,* No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## 6.     Request for Interim Hearing:  Failure to Obtain, on an Interim Basis, Immediate Access to the DIP Facility Would Cause Immediate and Irreparable Harm

62.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  However, Bankruptcy Rules 4001(b)(2) and (c)(2) allow the Court to (a) hold a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral if so requested and (b) authorize, to the extent necessary to avoid immediate and irreparable harm to the estate, the use of cash collateral or the obtaining of credit.

63.     The Debtors request that the Court hold a hearing to consider entry of the Interim Order and Interim Cash Collateral Order authorizing the Debtors—in the period from and after entry of the Interim Order and Interim Cash Collateral Order until the Final Hearing—to borrow funds under the DIP Facility and use Cash Collateral in accordance with the Approved Budget.

4912-8749-7047, v. 4

64.     The Approved Budget was developed by the Debtors and their professionals, and together with the DIP Lender, to ensure that the Debtors have sufficient funds to operate their business in the ordinary course while running a value-maximizing sale process and paying their administrative expenses.  Further, the Approved Budget contemplates that in the period from and after entry of the Interim Order until the Final Hearing the Debtors will use only those funds necessary to avoid immediate and irreparable harm.

## **WAIVER OF BANKRUPTCY RULE 4001(a)(3)**

65.     Bankruptcy Rule 4001(a)(3) provides that an "order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As explained herein, access to the DIP Facility and use of Cash Collateral is essential to prevent irreparable damage to the Debtors' estates.

66.     Accordingly, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 4001(a)(3), and the Debtors requests of waiver of the stay, to the extent such stay applies.

## **WAIVER OF BANKRUPTCY RULES 6004(a) and (h)**

67.     To implement the relief requested in this Motion, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors, such that there is ample cause to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

4912-8749-7047, v. 4

## **RESERVATION OF RIGHTS**

68.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the DIP Orders and the Cash Collateral Orders is intended to or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## **NOTICE**

69.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Lender; (d) counsel to the Prepetition Agent; (e) counsel to the Zohar Lenders; (f) counsel to Phoenix Recovery Entities; (g) counsel to the Ark II Lender; counsel to Ankura Trust; (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service and applicable state taxing authorities; and (j) any other parties entitled to notice pursuant to Local Rules 2002-1(b) and 9013-1(m).  As this Motion is seeking "first day" relief, the Debtors will serve this Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m)(iii).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Debtors respectfully request entry of the Interim and Final orders,

(a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: August 11, 2025          **CHIPMAN BROWN CICERO & COLE, LLP**
       Wilmington, Delaware

                   */s/ William E. Chipman, Jr.*
                   William E. Chipman, Jr. (No. 3818)
                   David W. Carickhoff (No. 3715)
                   Mark D. Olivere (No. 4291)
                   Aaron J. Bach (No. 7364)
                   Alison R. Maser (No. 7430)
                   Hercules Plaza
                   1313 North Market Street, Suite 5400
                   Wilmington, Delaware 19801
                   Telephone:    (302) 295-0191
                   Email:       chipman@chipmanbrown.com
                                carickhoff@chipmanbrown.com
                                olivere@chipmanbrown.com
                                bach@chipmanbrown.com
                                maser@chipmanbrown.com

                   *Proposed Counsel for Debtors and*
                   *Debtors in Possession*

# EXHIBIT A

**(*Proposed* Interim Order)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| IMG Holdings, Inc., *et al.*, | Case No. 25-11500 (KBO) |
| Debtors.[1] | (*Joint Administration Pending*) |

## INTERIM ORDER GRANTING DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDER; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF

Upon the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to Prepetition Secured Lender, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. [•]] (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (the "Interim DIP Order") and a final order (the "Final DIP Order") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1(b), 4001-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), among other things:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows:  (1) IMG Holdings, Inc. (1398); (2) Dana Classic Fragrances Inc. (1439); (3) Inter-Marketing Group, Inc. (6628); (4) Dana Fragrance Brands, LLC (0198); and (5) St. Honore Holding, Inc. (9698). The address of the Debtors' corporate headquarters is 1159 2nd Avenue, #424, New York, NY 10065.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the DIP Term Sheet (as defined herein).

(i)     authorizing IMG Holdings, Inc. and Dana Classic Fragrances, Inc. and each of the other Debtors (each a "<u>Borrower</u>" and collectively, the "<u>DIP Loan Parties</u>") to obtain postpetition financing, on a joint and several basis, in connection with a secured debtor-in-possession credit facility in the aggregate principal amount of up to $500,000 (the "<u>DIP Facility</u>," and the commitments thereunder, the "<u>DIP Commitments</u>" and the loans made thereunder, the "<u>DIP Loans</u>") subject to the terms and conditions set forth in that certain DIP Term Sheet attached hereto as **<u>Exhibit A</u>** (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>DIP Term Sheet</u>"), accepted by and among the DIP Loan Parties and Fragrance Xtreme Inc. (the "<u>DIP Lender</u>"), consisting of new term loans to be funded as set forth below:

    1.     on or after the first business day following entry of the Interim DIP Order and satisfaction of the conditions set forth in the DIP Term Sheet, an initial draw of up to $250,000 (the "<u>Initial Draw</u>"); and

    2.     on or after the first business day following entry of the Final DIP Order that grants all of the relief requested in the Motion on a final basis and satisfaction of the conditions set forth in the DIP Term Sheet, subsequent draws in accordance with the DIP Term Sheet (each a "<u>Draw</u>" and collectively the "<u>Draws</u>"); *provided* that each such Draw shall be conditioned upon the Debtors' satisfaction of the conditions set forth in the DIP Term Sheet.

(ii)    authorizing the Debtors to execute, deliver, and perform under the DIP Term Sheet, any security agreement, and any other related documents, including pledge agreements, mortgages, guaranties, promissory notes, certificates, instruments, and such other documents that may be reasonably necessary, desirable or required to implement the DIP Facility and perform thereunder and/or that may be reasonably requested by the DIP Lender (collectively, as such may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "<u>Documentation</u>"), each of which shall be in form and substance acceptable to the DIP Lender and consistent with the DIP Term Sheet; and to perform such other acts as may be reasonably necessary, desirable or appropriate in connection with the Documentation;

(iii)   granting to the DIP Lender, (a) DIP Liens on all of the DIP Collateral (each as defined below) pursuant to sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code, as further described herein and (b) DIP Superpriority Claims pursuant to section 364(c)(1) of the Bankruptcy Code, subject and subordinate to the Carve Out;

(iv)    authorizing and directing the Debtors to pay all principal, interest, fees, costs, expenses, and other amounts payable under the Documentation as such become due and payable, as provided and in accordance therewith;

(v)     authorizing the Debtor to perform such other and further acts as may be necessary or desirable in connection with the Interim DIP Order, the DIP Loan Documents (including the DIP Term Sheet) and the transactions contemplated hereby and thereby, subject to the Interim DIP Order and the Approved Budget;

(vi)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Documentation and this Interim DIP Order;

(vii)   scheduling a final hearing (the "Final Hearing") to consider entry of the Final DIP Order, and approving the form of notice with respect to the Final Hearing; and

(viii)  providing for the immediate effectiveness of this Interim DIP Order and waiving any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the Motion, the *Declaration of Larry Thompson in Support of Debtors' Chapter 11 Petitions and First Day Motions* [D.I. [•]] (the "First Day Declaration"), the *Declaration of Larry Thompson in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to Prepetition Secured Lender, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. [•]] (the "DIP Declaration") and evidence submitted or proffered at the hearing on the Motion held on [•], 2025 (the "Interim Hearing"); and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and the Court having determined that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having determined that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered the Motion, the First Day Declaration, the [•] Declaration and the arguments of counsel at the Interim Hearing; and the Court having found that

the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rules 4001 and 6003; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors and their respective estates, creditors, and other parties in interest; and it appearing that the Debtors' entry into the DIP Facility is a sound and prudent exercise of the Debtors' business judgment; and the Court having found that proper and adequate notice of the Motion and Interim Hearing thereon has been given under the circumstances and that no other or further notice is necessary for the interim relief requested in the Motion; and the Court having found that good and sufficient cause exists for the granting of the relief requested in the Motion after having given due deliberation to the Motion and all of the proceedings had before the Court in connection with the Motion, **THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:[3]

A.    <u>Petition Date</u>. On August 11, 2025 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>"), commencing the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>").

B.    <u>Debtors in Possession</u>. The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

C.    <u>Jurisdiction and Venue</u>. This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District*

---

[3]    Where appropriate in this Interim DIP Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

*of Delaware*, dated February 29, 2012. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue of the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 9013, and 9014, and Local Rules 2002-1, 4001-1, 4001-2, 7007-1, 9013-1, 9013-4, and 9014-2.

        D.     <u>Committee</u>. As of the date hereof, the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") has not yet appointed an official committee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (any such committee, "<u>Committee</u>").

        E.     <u>Debtors' Stipulation</u>. After consultation with their attorneys and financial advisors, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (the "<u>Debtors' Stipulation</u>") that, as a condition to the DIP Obligations, the DIP Lender obtained the consent of the Prepetition Secured Lender to the Debtors' entry into the DIP Term Sheet and the DIP Facility and to the subordination of the Prepetition Secured Financing Liens to the DIP Liens (as defined herein).

        F.     <u>Cash Collateral</u>. All of the Debtors' cash including any cash in deposit accounts of the Debtors, wherever located, is cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>") of the Prepetition Secured Lender which shall be subject to the Interim Cash Collateral Order.

        G.     <u>Findings Regarding Postpetition Financing</u>.

        1.     The Debtors have requested from the DIP Lender, and the DIP Lender is willing to provide, financing to the Debtors subject to: (i) for the Initial Draw, entry of this Interim

DIP Order and, for subsequent draws, the Final DIP Order; (ii) Court approval of the terms and conditions of the DIP Facility and the Documentation; (iii) satisfaction or waiver of the closing conditions set forth in the DIP Term Sheet and Documentation; and (iv) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP Lender is extending credit to the Debtors pursuant to the DIP Term Sheet and Documentation in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim DIP Order and the DIP Term Sheet and other Documentation will have the protections provided by section 364(e) of the Bankruptcy Code.

        2.      The Debtors have an immediate and critical need to obtain postpetition financing pursuant to the DIP Facility (solely to the extent consistent with the Approved Budget, subject to any Permitted Variance set forth herein and in the DIP Term Sheet), in order to, among other things, permit the orderly continuation of the operation of their business, to maintain business relationships, to make capital expenditures, to pay professional fees, to satisfy other working capital and operational needs, and to pursue and consummate a sale of the Debtors' business for the benefit of the Debtors' stakeholders. The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest. The Debtors do not have sufficient available sources of working capital and financing to preserve the value of their businesses without the ability to borrow under the DIP Facility. The Debtors and their estates will be immediately and irreparably harmed if the financing under the DIP Facility is not obtained pursuant to the terms of this Interim DIP Order and, as applicable, the DIP Term Sheet and other Documentation. Entry of this Interim

DIP Order is necessary and appropriate to avoid such harm to the Debtors, their estates, and other parties in interest.

3.     The Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the terms of the DIP Facility. The Debtors are unable to obtain, pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code, (i) unsecured credit allowable under section 503(b) of the Bankruptcy Code as an administrative expense, (ii) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (iii) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. The Debtors are further unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without as provided for herein granting to the DIP Lender the rights, remedies, privileges, benefits and protections provided herein and in the DIP Term Sheet and other Documentation, including the DIP Liens and the DIP Superpriority Claim (as defined below).

4.     The DIP Facility and this Interim DIP Order have been negotiated in good faith and at arm's length among the Debtors and the DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Term Sheet and other Documentation, including all loans made to the Debtors pursuant to the DIP Term Sheet and other Documentation and all other obligations under the DIP Term Sheet and other Documentation (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Lender in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim DIP Order or any provision hereof

is vacated or reversed or modified on appeal, and any liens or claims granted to, or payments made to, the DIP Lender hereunder arising prior to the effective date of any such reversal or modification of this Interim DIP Order shall be governed in all respects by the original provisions of this Interim DIP Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

H.   <u>Section 506(c)</u>. In light of the DIP Lender's agreement to extend credit to the Debtors on the terms described herein, the DIP Lender has negotiated for a waiver of the provisions of section 506(c) of the Bankruptcy Code in respect of the DIP Collateral, subject to the Carve Out and entry of the Final DIP Order.

I.   <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>. The terms and conditions of the DIP Facility, the DIP Term Sheet and other Documentation, and the fees paid and to be paid thereunder to the DIP Lender, are fair, reasonable, and the best available to the Debtors under the circumstances, are ordinary and appropriate for secured postpetition financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. Good cause has been shown for entry of this Interim DIP Order, and entry of this Interim DIP Order is in the best interests of the Debtors and their estates, creditors, and other stakeholders. The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Lender, and the Prepetition Secured Lender with the assistance of their respective counsel and advisors. Credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made or extended in good faith by the DIP Lender, within the meaning of section 364(e) of the Bankruptcy Code and shall be entitled to the full protection of section 364(e). Based on the Motion, the First Day Declaration, and the DIP Declaration, and on the record presented at the Interim Hearing, the terms of the DIP Facility are

fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration.

J.       Notice. The Debtors have caused notice of the Motion, the relief requested therein and the Interim Hearing to be served by electronic mail, facsimile, hand delivery or overnight delivery on the following parties: (a) the Office of the United States Trustee (the "**UST**"); (b) counsel to the Prepetition Agent; (c) counsel to the DIP Lender; and (d) the holders of the twenty (20) largest unsecured claims against the Debtors.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and of the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 2002 and 4001(b) and (d) and the Local Rules.

K.       Immediate Entry. The Debtors have requested immediate entry of this Interim DIP Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2), and 6003. Absent entry of this Interim DIP Order, the Debtors' businesses, and estates would be immediately and irreparably harmed. This Court concludes that entry of this Interim DIP Order is in the best interests of the Debtors' respective estates and stakeholders and sufficient cause exists for immediate entry of this Interim DIP Order.  Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.       Interim Financing Approved. The Motion is GRANTED on an interim basis as set forth herein.

2.       Objections Overruled. Any objections, reservations of rights, or other statements with respect to entry of the Interim DIP Order, to the extent not withdrawn or resolved, are OVERRULED on the merits.

3.    <u>Authorization of the DIP Facility and the Documentation</u>.

(a)    The Borrowers are hereby immediately authorized and empowered to enter into, and execute and deliver, the Documentation, including the DIP Term Sheet, and such additional documents, instruments, certificates, and agreements as may be reasonably required or requested by the DIP Lender to implement the terms or effectuate the purposes of this Interim DIP Order and the Documentation. To the extent not already negotiated and executed as of the date hereof, and as requested by the DIP Lender, the Debtors and the DIP Lender shall negotiate the Documentation in good faith, and in all respects such Documentation shall be, subject to the terms of this Interim DIP Order and the Final DIP Order, consistent with the terms of the DIP Term Sheet and otherwise acceptable to the DIP Lender. Upon entry of this Interim DIP Order, the Interim DIP Order, the DIP Term Sheet, and other Documentation shall govern and control the DIP Facility. Upon execution and delivery thereof (or entry of this Interim DIP Order with respect to documents executed and delivered prior to the date hereof), the Documentation shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms. To the extent there exists any conflict among the terms and conditions of the Documentation and this Interim DIP Order, the terms and conditions of this Interim DIP Order shall govern and control.

(b)    Upon entry of this Interim DIP Order, the Borrowers are hereby authorized to borrow up to $250,000 of DIP Loans, which will be made available to the Borrowers on or after the date of this Interim DIP Order, subject to, and in accordance with, this Interim DIP Order and the DIP Term Sheet.

(c)    Pursuant to the terms of this Interim DIP Order and the DIP Term Sheet and other Documentation, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Term Sheet and other Documentation and this Interim DIP Order, and in accordance

with the Approved Budget, subject to any Permitted Variance as set forth in this Interim DIP Order and the Documentation. Attached as <u>Exhibit A</u> to the DIP Term Sheet, and incorporated herein by reference is an interim budget prepared by the Debtors and approved by the DIP Lender in accordance with the DIP Term Sheet, which, for the avoidance of doubt, shall constitute the initial "Approved Budget."

(d)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including the DIP Term Sheet and any other Documentation), and to pay all fees (including all amounts owed to the DIP Lender under the DIP Term Sheet or other Documentation) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, including:

(i)    the execution, delivery, and performance of the DIP Term Sheet and other Documentation;

(ii)    the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the Documentation (in each case in accordance with the terms of the DIP Term Sheet and in such form as the Debtors and the DIP Lender may reasonably agree), it being understood that no further Court approval shall be required for amendments, waivers, consents, or other modifications to and under the DIP Term Sheet or the DIP Obligations that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder;

(iii)    the non-refundable payment to the DIP Lender of the fees referred to in the DIP Term Sheet, including (x) all fees and other amounts owed to the DIP Lender and (y) all reasonable and documented costs and expenses as may be due from time to time, including the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Term Sheet and this Interim DIP Order (whether incurred before or after the Petition Date), which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment

be required to file with respect thereto any interim or final fee application with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of paragraph [20] of this Interim DIP Order; and

(iv)    the performance of all other acts required under or in connection with the DIP Term Sheet and other Documentation.

(e)    Upon entry of this Interim DIP Order and subject and subordinate to the Carve Out, the DIP Term Sheet and other Documentation, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor in accordance with their respective terms and the terms of this Interim DIP Order for all purposes during the Chapter 11 Cases and any Successor Cases. Subject to the preservation of rights set forth in paragraph [44] herein, no obligation, payment, transfer, or grant of security under the DIP Term Sheet or other Documentation, or this Interim DIP Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim. All payments or proceeds remitted to or on behalf of the DIP Lender pursuant to the DIP Term Sheet or other Documentation, the provisions of this Interim DIP Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including (subject to entry of the Final DIP Order) any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code.

4.    <u>Approved Budget</u>. The proceeds of the DIP Facility shall be used solely in accordance with the DIP Term Sheet and the Approved Budget, subject to the Permitted Variance. The Debtors shall comply in all respects with the terms of the DIP Term Sheet and other

Documentation with respect to, among other things, the delivery and compliance with the Approved Budget and all obligations related thereto.

5.      [RESERVED]

6.      <u>Access to Records</u>. The Debtors shall provide the DIP Lender and its advisors with all reporting and other information required to be provided to the DIP Lender under the DIP Term Sheet and other Documentation. In addition to, and without limiting, whatever rights to access the DIP Lender has under the DIP Term Sheet, upon reasonable advance notice to counsel to the Debtors (email being sufficient), at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Lender to have reasonable access to (a) inspect the Debtors' assets, and (b) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Lender shall be provided with access to such information as they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law or any binding agreement entered into prior to the date of this Interim DIP Order that would violate confidentiality obligations.

7.      <u>DIP Superpriority Claims</u>. Subject and subordinate only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims of the DIP Lender against each of the Debtors' estates (the "<u>DIP Superpriority Claims</u>") (without the need to file any proof of claim) to the extent set forth in the Bankruptcy Code, with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or

hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c) (subject to entry of the Final DIP Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise to the extent allowable under the Bankruptcy Code, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof. Except as set forth in this Interim DIP Order or the Final DIP Order, or any superpriority claim granted to the DIP Lender in its capacity as a stalking horse bidder, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

8.      <u>DIP Liens</u>. As security for the DIP Obligations, effective and perfected upon the date of this Interim DIP Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Lender of, or over, any DIP Collateral, the following security interests and liens are hereby granted by the Debtors to the DIP Lender on the DIP Collateral (all such liens and security interests granted to the DIP Lender pursuant to this Interim DIP Order and the DIP Term Sheet and other Documentation, the "<u>DIP Liens</u>"). The "DIP Collateral" shall consist of all assets and properties (whether tangible, intangible, real, personal, or mixed) of the Debtors and their estates, whether owned by or owing to the Debtors on the Petition Date, or acquired after the Petition Date, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, or thereafter acquired by, the

Debtors, and regardless of where located, before or after the Petition Date, including, without limitation, (a) all Prepetition Collateral; (b) all cash, cash equivalents, deposit accounts, securities accounts, accounts, Cash Collection Accounts (as defined below), other receivables (including credit card receivables and receivables from non-debtor foreign affiliates), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock or equivalents of each of their subsidiaries, and all proceeds thereof), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by the Debtors, books and records related to the foregoing, accessions and the proceeds, products, rents and profits, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all of the foregoing, wherever located, including insurance or other proceeds; (c) all owned real property, all owned real property interests, and all proceeds of leased real property (but, for the purposes of this Interim DIP Order, not the leases themselves); (d) all proceeds of actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; (e) subject to entry of a Final DIP Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents (collectively, the "Avoidance Actions"); (f) subject to entry of a Final DIP Order, proceeds of the Debtors' rights under section 506(c) and 550 of the Bankruptcy

Code, and (g) all DIP Collateral that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date, and all proceeds of any of the foregoing (all of the foregoing property and assets, collectively, the "DIP Collateral"). The DIP Liens shall have the following priorities (subject in all cases to the Carve Out):

(a)     Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully, and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to valid, perfected, and non-avoidable liens or security interests in existence as of the Petition Date (or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including, upon entry of the Final DIP Order, Avoidance Actions and the proceeds thereof (collectively, "Unencumbered Property").

(b)     Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully, and automatically perfected super-priority priming liens and security interests in all DIP Collateral that is subject to valid, perfected and enforceable security interests or liens in existence as of the Petition Date or valid security interests or liens granted prior to (but not perfected until after) the Petition Date (to the extent that such perfection in respect of a prepetition claim is expressly permitted under section 546(b) of the Bankruptcy Code).

9.     Carve Out.

(a)     Carve Out Defined. As used in this Interim DIP Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable and

documented fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim or final compensation or other order, all accrued and unpaid claims for fees, costs, and expenses (the "Allowed Professional Fees") incurred by (or payable to) persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any Committee appointed pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Termination Notice, in the aggregate not to exceed the amount set forth in the prevailing Approved Budget for all Professional Persons through the date a Termination Notice is delivered.

(b)    No Direct Obligation To Pay Allowed Professional Fees. The DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim DIP Order or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

10.    [RESERVED]

11.    Reservation of Rights of the DIP Lender. Subject only to the Carve Out, notwithstanding any other provision in this Interim DIP Order, the DIP Term Sheet or other Documentation, or the Prepetition Secured Financing Agreement to the contrary, the entry of this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or

implicitly, or otherwise impair: (a) any of the rights of the DIP Lender under the DIP Term Sheet or other Documentation, the Prepetition Secured Financing Agreement, any intercreditor agreement, or the Bankruptcy Code or under non-bankruptcy law (as applicable), including the right of the DIP Lender (subject to this Interim DIP Order) to request modification of the automatic stay of section 362 of the Bankruptcy Code or (B) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lender. The delay in or failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies shall not constitute a waiver of any such rights and remedies. Notwithstanding anything herein to the contrary, the entry of this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Debtors, the Committee (if any), or any other party in interest to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim DIP Order.

12.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim DIP Order</u>. The DIP Lender has acted at arm's length in good faith in connection with this Interim DIP Order and is entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code. Based on the findings set forth in this Interim DIP Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code to the maximum extent set forth therein.

13.    <u>Events of Default</u>. The occurrence of any of the following events, unless waived by the DIP Lender in accordance with the terms of the DIP Term Sheet or other Documentation, shall constitute an event of default (collectively, the "<u>Events of Default</u>"): (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or

obligations under this Interim DIP Order, or (b) the occurrence of an "Event of Default" under the DIP Term Sheet, in each case unless waived by the DIP Lender.

14.    Milestones. For the avoidance of doubt, the failure of the Debtors to comply with any of the Sale Milestones set forth in the DIP Term Sheet shall constitute (a) an Event of Default under the DIP Term Sheet and (b) an Event of Default under this Interim DIP Order.

15.    Rights and Remedies Upon Event of Default. Immediately upon the occurrence and during the continuation of an Event of Default, unless such Event of Default has been waived by the DIP Lender, without any application, motion, or notice to, hearing before, or order from, the Court, subject to the terms of this Interim DIP Order and the Remedies Notice Period (defined below), the DIP Lender may deliver a Termination Notice to the Debtors, their lead restructuring counsel, the Office of the United States Trustee, counsel to the Prepetition Secured Parties, and counsel to any Committee declaring (i) all DIP Obligations owing under the DIP Term Sheet and other Documentation to be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Term Sheet and other Documentation as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens, DIP Superpriority Claims or the DIP Obligations, (iv) the Carve Out shall be triggered, and (v) interest under the DIP Facility shall accrue at the Default Rate. The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Lender is hereby modified so that five (5) business days after the delivery of a Termination Notice (the "Remedies Notice Period"), the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Term Sheet

and other Documentation and this Interim DIP Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out; *provided*, *however*, that the Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of the Cash Collateral Order during any Remedies Notice Period only to make payroll and fund critical expenses necessary to preserve the DIP Collateral, in each case in accordance with the terms of the Approved Budget. During the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court with respect to any relevant matters; *provided*, *however*, that nothing herein limits the Court's ability to hear other matters it deems appropriate at such hearing. Absent a contrary Court order prior to the expiration of the Remedies Notice Period, the automatic stay, as to the DIP Lender, shall be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period and termination of the stay as set forth in the prior sentence, the DIP Lender shall be permitted to exercise all remedies set forth herein, in the DIP Term Sheet or other Documentation, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim DIP Order.

16.    <u>Limitation on Charging Expenses Against Collateral</u>. Subject to entry of the Final DIP Order, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (except to the extent of the Carve Out), the DIP Lender, or (subject to entry of a the Final DIP Order) the Prepetition Secured Lender, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.

17.      [RESERVED]

18.      <u>Expenses and Indemnification</u>.

(a)      The Debtors are hereby authorized to and shall pay, in accordance with this Interim DIP Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Term Sheet as such amounts become due and without need to obtain further Court approval, including the reasonable and documented fees and disbursements of counsel and other professionals, whether or not such fees arose before or after the Petition Date, all to the extent provided in the DIP Term Sheet.

(b)      the Debtors hereby indemnify the DIP Lender and its affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each, an "<u>Indemnified Person</u>") and hold them harmless from and against all costs, expenses (including reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility as and to the extent provided in the DIP Term Sheet (subject to entry of the Final DIP Order). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's bad faith, gross negligence or willful misconduct. In no event shall any Indemnified Person or any Debtor be liable on any theory of liability for any special, indirect, consequential, or punitive damages; *provided*, that this shall not affect the Debtor's indemnification obligations pursuant to the immediately preceding sentence.

19.    <u>No Third-Party Rights</u>. Except as explicitly provided for herein, this Interim DIP Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

20.    <u>Insurance</u>. Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the DIP Collateral on substantially the same basis as maintained prior to the Petition Date. Upon entry of this Interim DIP Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral: (i) the DIP Lender shall be, and shall be deemed to be, without any further action by or notice to any person, named as additional insureds; and (ii) the DIP Lender shall be and shall be deemed to be, without any further action by or notice to any person, named as loss payee for DIP Collateral on which the DIP Lien holds a first priority lien. The Debtors are hereby authorized to and shall take any actions necessary to have the DIP Lender added as an additional insured and loss payee on each insurance policy maintained by DIP Debtors consistent with this Interim DIP Order which in any way relates to the DIP Collateral.

21.    <u>No Waiver for Failure to Seek Relief</u>. The failure or delay of the DIP Lender to exercise rights and remedies under this Interim DIP Order, the DIP Term Sheet or other Documentation, or applicable law, as the case may be, shall not constitute a waiver of its respective rights hereunder, thereunder, or otherwise.

22.    <u>Perfection of the DIP Liens</u>.

(a)    Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 8 hereof, the DIP Lender is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to

validate and perfect the liens and security interests granted hereunder. Whether the DIP Lender

shall choose to file such financing statements, intellectual property filings, mortgages, notices of

lien, or similar instruments, such liens and security interests shall be deemed valid, perfected,

allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination as of

the date of entry of this Interim DIP Order. If the DIP Lender determines to file or execute any

financing statements, agreements, notice of liens, or similar instruments (which, in each case, shall

be at the sole cost and expense of the Debtors), the Debtors shall cooperate and assist in any such

execution and/or filings as reasonably requested by the DIP Lender, and the automatic stay shall

be modified solely to allow such filings as provided for in this Interim DIP Order.

(b)     A certified copy of this Interim DIP Order may be filed with or recorded in

filing or recording offices by the DIP Lender in addition to or in lieu of such financing statements,

mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to

accept such certified copy of this Interim DIP Order for filing and recording; *provided*, *however*,

that notwithstanding the date of any such filing, the date of such perfection shall be the date of this

Interim DIP Order.

(c)     Subject to entry of the Final DIP Order, any provision of any lease or other

license, contract or other agreement that requires (i) the consent or approval of one or more

landlords, lessors, or other parties or (ii) the payment of any fees or obligations to any

governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any

such leasehold interest, or the proceeds thereof, or other collateral related thereto, shall be deemed

to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable

law, and any such provision shall have no force and effect with respect to the granting of the DIP

Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any

Debtor in accordance with the terms of the DIP Term Sheet or this Interim DIP Order, subject to applicable law.

23.  <u>Release</u>.  Subject to entry of the Final DIP Order, each of the Debtors and the Debtors' estates, each on its own behalf and on behalf of each of their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully and forever release, remise, acquit, relinquish, irrevocably waive, and discharge, effective upon entry of this Interim DIP Order, the DIP Lender (solely in its capacity as DIP Lender) and each of its affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "<u>Related Parties</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, or the DIP Term Sheet or other Documentation, as applicable, including: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lender; *provided* that nothing in this

paragraph shall in any way limit or release the obligations of any party under the DIP Term Sheet or other Documentation, this Interim DIP Order, and the Final DIP Order.

24.    Credit Bidding. Subject to entry of the Final DIP Order, the DIP Lender shall have the unqualified right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of all principal and interest due and outstanding under the DIP loan in accordance with Bankruptcy Code section 363(k) in any sale of all or any portion of the DIP Collateral (including, for the avoidance of doubt, any asset for which the DIP Collateral is limited to the proceeds thereof as a result of applicable law prohibiting encumbrances from being attached to such asset), including sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii).

25.    Preservation of Rights Granted Under this Interim DIP Order.

(a)    In the event this Interim DIP Order or any provision hereof is reversed or modified on appeal, any liens or claims granted to the DIP Lender hereunder arising prior to the effective date of any such reversal or modification of this Interim DIP Order shall be governed in all respects by the original provisions of this Interim DIP Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the DIP Lender shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(b)    Notwithstanding any order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, and the other administrative claims granted pursuant to this Interim DIP Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim DIP Order and notwithstanding any dismissal, remain binding on all

parties in interest; and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(c)     Except as expressly provided in this Interim DIP Order or in the DIP Term Sheet or other Documentation, the DIP Liens, the DIP Superpriority Claims, ction Claims and all other rights and remedies of the DIP Lender granted by the provisions of this Interim DIP Order and the DIP Term Sheet and other Documentation shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases or any Successor Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases. The terms and provisions of this Interim DIP Order and the DIP Term Sheet and other Documentation shall continue and be binding in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code. The DIP Liens, the DIP Superpriority Claims, and all other rights and remedies of the DIP Lender granted by the provisions of this Interim DIP Order shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the DIP Lender).

(d)     Other than as set forth in this Interim DIP Order, subject and subordinate to the Carve Out, none of the DIP Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and none

of the DIP Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

26.     <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. None of the DIP Facility, the DIP Collateral (including Cash Collateral), or the Carve Out or proceeds thereof may be used: (a) to investigate (including by way of examinations or discovery proceedings), analyze, initiate, assert, prosecute, join, commence, threaten, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against the DIP Lender and its affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Lender under the DIP Term Sheet or other Documentation, or this Interim DIP Order, including for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed in these Chapter 11 Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of the DIP Lender to recover on the DIP Collateral or seeking affirmative relief against the DIP Lender related to the DIP Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the DIP Lender's liens or security interests in the DIP Collateral; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Lender or the DIP

Lender's respective liens on or security interests in the DIP Collateral that would impair the ability of the DIP Lender to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests held by or on behalf of the DIP Lender related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including any Avoidance Actions related to the DIP Obligations or the DIP Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Liens or any other rights or interests of the DIP Lender related to the DIP Obligations or the DIP Liens.

27.     _Conditions Precedent_. No DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Loan Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Loan Documents have been satisfied in full or waived in accordance with such DIP Loan Documents.

28.     _Use of DIP Facility Proceeds_. From and after the Petition Date, the Debtors shall be permitted to use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim DIP Order and the DIP Term Sheet and other Documentation, and only in compliance with the Approved Budget (subject to the Permitted Variances) and the terms and conditions in this Interim DIP Order and the DIP Term Sheet and other Documentation.

29.     _No Monitoring Obligation_. The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Lender may rely upon each Debtor's representations that the use of the DIP Facility at any time is in accordance with the

requirements of this Interim DIP Order, the Final DIP Order, and the DIP Term Sheet and other Documentation, including but not limited to the Approved Budget.

30.    <u>Repayment of DIP Superpriority Claims</u>. Notwithstanding anything to the contrary herein or in the other DIP Term Sheet or other Documentation, the Debtors shall indefeasibly pay to each holder of a DIP Superpriority Claim cash equal to the full amount of such DIP Superpriority Claim on the effective date of a chapter 11 plan, unless such holder of a DIP Superpriority Claim consents to a different treatment with respect to such DIP Superpriority Claim. The requirements set forth in this paragraph may not be amended without the prior written consent of the DIP Lender.

31.    <u>Cash Collection</u>. From and after the Petition Date, all collections and proceeds of any DIP Collateral or Prepetition Collateral or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession, custody or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same deposit accounts into which the collections and proceeds of the Prepetition Collateral were deposited under the Prepetition Secured Financing Agreement (or in such other accounts as are designated by the DIP Lender from time to time) (collectively, the "<u>Cash Collection Accounts</u>"), which accounts shall be subject to a DIP Lien in favor of the DIP Lender. The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order (as defined below)) are authorized and directed to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP Lender consistent with the DIP Term Sheet and other Documentation and subject to paragraph 16 herein. Unless otherwise agreed to in writing by the DIP Lender, the Debtors shall maintain no accounts except those identified in any cash management order entered by the Court (a "<u>Cash Management Order</u>").

32.     <u>Proceeds of Subsequent Financing</u>. If the Debtor, any trustee, any examiner, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Term Sheet or other Documentation) and the termination of the DIP Lender's obligations to extend credit under the DIP Facility, then, after satisfaction of the Carve Out, and unless otherwise agreed by the DIP Lender, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Interim DIP Order and the DIP Term Sheet and other Documentation.

33.     <u>Payments Held in Trust</u>. Except as expressly permitted in this Interim DIP Order or the DIP Term Sheet or other Documentation, including in respect of the Carve Out, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Term Sheet or other Documentation, and termination of the DIP Facility in accordance with the DIP Term Sheet, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral and shall immediately turn over such proceeds to the DIP Lender, for application in accordance with the DIP Term Sheet and this Interim DIP Order.

34.     <u>Binding Effect; Successors and Assigns</u>. The DIP Term Sheet and other Documentation and the provisions of this Interim DIP Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including the DIP Lender, any Committee appointed in these Chapter 11 Cases, and the Debtors and their respective successors

and permitted assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors in the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case) to the extent permitted by applicable law and shall inure to the benefit of the DIP Lender; *provided* that, except to the extent expressly set forth in this Interim DIP Order, the DIP Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

35.     <u>Limitation of Liability</u>. In determining to make any loan under the DIP Term Sheet or other Documentation the DIP Lender shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute). Furthermore, nothing in this Interim DIP Order or in the DIP Term Sheet or other Documentation shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

36.     <u>No Requirement to File Claim for DIP Obligations</u>. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, the DIP Lender shall not be required to

file any proof of claim or request for payment of administrative expenses in the Chapter 11 Case

or any Successor Cases with respect to any of the DIP Obligations, all of which shall be due and

payable in accordance with the DIP Term Sheet and other Documentation without the necessity of

filing any such proof of claim or request for payment of administrative expenses, and the failure

to file any such proof of claim or request for payment of administrative expenses shall not affect

the validity, priority, or enforceability of any of the DIP Term Sheet or other Documentation, or of

any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise

adversely affect the DIP Lender's rights, remedies, powers, or privileges under any of the DIP

Term Sheet or other Documentation, this Interim DIP Order, or applicable law. Notwithstanding

the foregoing, the DIP Lender may, in its sole discretion, but is not required to, file (and amend

and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter

11 Case for any claim allowed herein. The provisions set forth in this paragraph are intended solely

for the purpose of administrative convenience and shall not affect the substantive rights of any

party- in-interest or their respective successors-in-interest.

37.    No Marshaling. Subject to and upon entry of the Final DIP Order, the DIP Lender

shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with

respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and

applied pursuant to the Final DIP Order, the DIP Term Sheet and other Documentation,

notwithstanding any other agreement or provision to the contrary.

38.    Equities of the Case. Subject to entry of a Final DIP Order, the DIP Lender is

entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities

of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP

Lender with respect to proceeds, product, offspring or profits of any of the DIP Collateral.

- 32 -

39.     <u>Necessary Actions</u>. The Debtors are authorized and directed, on a final basis, to take any and all such necessary actions as are reasonable and appropriate to implement the terms of this Interim DIP Order.

40.     <u>Final Hearing</u>. The Final Hearing on the Motion shall be held on September [•], 2025, at [•] [•].m. prevailing Eastern Time. Any objections or responses to entry of the Final DIP Order shall be filed on or before 4:00 p.m. prevailing Eastern Time, on September [•], 2025, and shall be served on: (a) proposed counsel to the Debtors, Chipman Brown Cicero & Cole, LLP (Attn: William Chipman, Esq.); (b) counsel to the DIP Lender, Herrick, Feinstein LLP (Attn: Steven B. Smith, Esq.) and Benesch (Attn: Jennifer R. Hoover, Esq.); (c) counsel to the Prepetition Secured Lender, Cole Schotz P.C. (Attn: Norman Pernick, Esq.), (d) counsel to the Office of the United States Trustee, 844 N. King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Timothy J. Fox, Jr., Esq.); and (e) counsel to any Committee. In the event no objections to entry of the Final DIP Order on the Motion are timely received, this Court may enter such Final DIP Order without need for the Final Hearing.

41.     <u>Effect of this Interim DIP Order</u>. This Interim DIP Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

42.     Bankruptcy Rule 6003(b) has been satisfied.

43.     The requirements of Bankruptcy Rule 6004(a) are waived, or are inapplicable due to Bankruptcy Rules 4001(b)(2) and (c)(2).

44.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim DIP Order shall be immediately effective and enforceable upon entry of this Interim DIP Order.

45.    <u>Headings</u>. All paragraph headings used in this Interim DIP Order are for ease of reference only and are not to affect the construction hereof or to be taken into consideration in the interpretation hereof.

46.    <u>Retention of Jurisdiction</u>. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Interim DIP Order.

## Exhibit 1

**DIP Term Sheet**

**Summary of Proposed Terms and Conditions
for Senior Secured, Super-priority
Debtor-in-Possession Financing**

**August 8, 2025**

The following term sheet (the "DIP Term Sheet") represents a summary of certain terms and conditions pursuant to which Fragrance Xtreme Inc. (the "DIP Lender") would be willing to provide debtor-in-possession financing to the Debtors (defined below) in connection with the Debtors' anticipated chapter 11 bankruptcy cases (the "Chapter 11 Cases").

This DIP Term Sheet is for discussion purposes only, and is not, and will not be deemed to be, a commitment, agreement, offer or assurance to provide or arrange any financing on these or any other terms and conditions unless and until: (i) all conditions precedent set forth herein, including any modifications or supplements hereinafter requested by the DIP Lender, are satisfied or waived in the sole discretion of the DIP Lender; (ii) the DIP Lender agrees to and executes this DIP Term Sheet in form and substance acceptable to the DIP Lender in its sole discretion; and (iii) the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), in connection with the Chapter 11 Cases, authorizes and approves the DIP Facility on terms and conditions, including any modifications or supplements thereto, which are satisfactory to the DIP Lender in its sole discretion and pursuant to order(s) of the Bankruptcy Court in form and substance acceptable to the DIP Lender in its sole discretion.

| Borrowers/Debtors | IMG Holdings, Inc. and Dana Classic Fragrances, Inc., and its wholly owned subsidiaries (collectively, the "Debtors" and each a "Debtor"), as debtors and debtors in possession under title 11 of the United States Code (the "Bankruptcy Code"). |
|---|---|
| DIP Lender | Fragrance Xtreme Inc. |
| Cash Collateral Secured Party | Patriarch Partners Agency Services, LLC |
| DIP Facility | The DIP Lender shall extend to the Debtors as joint and several obligors a secured debtor-in-possession credit facility made available to the Debtors in a principal amount of up to $500,000.00 (the "DIP Facility"), comprised of new term loans made by, and other obligations owed to, the DIP Lender on, and from time to time after, the Closing Date (as defined herein) (such new loans and obligations, the "DIP Loans" and commitments with respect to such DIP Loans, the "DIP Commitments") to be funded as set forth below under the heading "Availability and Draw Procedure", subject to the entry of an interim order (the "Interim DIP Order") and final order (the "Final DIP Order" and collectively with the Interim DIP Order, the "DIP Orders"), as applicable, by the Bankruptcy Court approving the DIP Facility. All DIP Loans and other obligations |

1

HF 18200691v.1

| | |
|---|---|
| | outstanding under the DIP Facility shall become due and payable on the Maturity Date (as defined below).<br><br>As used herein, the terms Interim DIP Order and Final DIP Order mean an unstayed order in form and substance satisfactory to the DIP Lender in its sole discretion, entered upon an application or motion of the Debtors that is in form and substance satisfactory to the DIP Lender, which order: (i) authorizes the Debtors to enter into the transactions contemplated by this DIP Term Sheet, including the authorization to borrow under the DIP Facility on the terms set forth herein; (ii) grants the super-priority claim status and senior priming and other liens contemplated in this DIP Term Sheet; (iii) subject to entry of the Final DIP Order, contains provisions prohibiting claims against the collateral of the DIP Lender pursuant to 11 U.S.C. § 506(c), a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and a waiver of the equitable doctrine of marshalling; (iv) approves payment by the Debtors of all of the fees and expenses provided for herein subject to the Approved Budget; and (v) shall not have been stayed, vacated, reversed or rescinded or, without the prior written consent of the DIP Lender in its sole discretion, amended or modified. |
| **Availability and Draw Procedure** | The DIP Facility shall be made available for the purposes set forth below under the heading "Use of DIP Loan Proceeds": (i) in a principal amount of up to $250,000 in accordance with the Approved Budget on or after the first business day following entry of the Interim DIP Order and satisfaction of the conditions under the heading "Conditions Precedent to the Closing" herein (the "<u>Initial Draw</u>"); and (ii) in an additional principal amount of up to $250,000 in accordance with the Approved Budget on or after the first business day following the entry of the Final DIP Order (the "<u>Final Draw</u>" and together with the Initial Draw, each a "<u>Draw</u>" and collectively the "<u>Draws</u>"), subject to, in each case of the foregoing clauses (i) and (ii): (a) no default or Event of Default having occurred and be continuing as of the date of such Draw; (b) the representations and warranties set forth herein shall be true and correct in all material respects as of the date of such Draw (unless (i) such representation or warranty, by its terms, expressly relates to another date, in which case such representation or warranty shall have been true and correct in all material respects on and as of such earlier date or (ii) such representation and/or warranty is already qualified by materiality or Material Adverse Effect or similar language, in which case such representation and warranty shall be true and correct in all |

| | |
|---|---|
| | respects, as of such date); and (c) compliance with the Bankruptcy Milestones (as defined herein) as of the date of such Draw.<br><br>Requests for Draws by the Debtors shall be honored by the DIP Lender in accordance with the following procedures:<br><br>a. *Written Request.* Other than with respect to the Initial Draw, the Debtors shall have delivered to the DIP Lender a written request for a Draw at least three (3) business days prior to the date that the Draw will be transferred to the Debtors. The request shall: (i) specify the amount of the Draw; (ii) state the date that the Draw is requested; (iii) provide wiring instructions for the Draw; (iv) certify the Draw is consistent with the categories, amounts and timing of the Approved Budget; and (v) certify that all conditions set forth above with respect to the Draws are and will be satisfied as of the date of the request and the date of the Draw.<br><br>b. *Amount.* On or after the first business day following entry of the Interim DIP Order, the Debtors shall Draw $[TBD] from the DIP Facility. |
| **Documentation** | The DIP Facility shall be documented in the form of this DIP Term Sheet and the DIP Orders (collectively, the "Documentation") which shall be in form and substance acceptable to the DIP Lender and its counsel in their sole discretion; *provided* that on the Closing Date, this DIP Term Sheet shall govern the terms of the DIP Facility. Any Documentation shall be consistent with the terms and conditions set forth in the DIP Term Sheet. |
| **Use of DIP Loan Proceeds** | The Debtors will be permitted to use the proceeds of the DIP Facility to fund the operational, employee, and other costs of the Debtors, including, without limitation, payments authorized to be made under "first day" or "second day" orders, and payments related to the working capital and other general corporate purposes of the Debtors, including the payment of professional fees and expenses, and, in each case, consistent with, subject to, and within the categories and limitations contained in, the Approved Budget (as defined herein).<br><br>No portion of the proceeds under the DIP Facility may be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to: (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the DIP Lender; or (ii) the liens or security interests in the collateral securing such indebtedness, |

| | including challenges to the perfection, priority or validity of the liens granted in favor of the DIP Lender and Patriarch with respect thereto. |
|---|---|
| **Maturity Date** | The maturity date ("<u>Maturity Date</u>") shall be the earliest to occur of: (i) 90 days after the Petition Date (defined below); (ii) the closing date following entry of one or more final orders approving the sale of all or substantially all of the assets belonging to the Debtors in the Chapter 11 Cases; (iii) the acceleration of any outstanding DIP Loans following the occurrence of an uncured Event of Default (as defined herein); or (iv) entry of an order by the Bankruptcy Court in the Chapter 11 Cases either (a) dismissing such case or converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or (b) appointing a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of the Debtors (*i.e.*, powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), in each case without the consent of the DIP Lender. All amounts outstanding under the DIP Facility shall be due and payable in full, and the DIP Commitments thereunder shall terminate, on the Maturity Date. |
| **Interest Rate** | The principal balance of the DIP Facility (the "<u>Principal Balance</u>") shall be comprised of the aggregate amounts available under the DIP Facility minus any voluntary, mandatory or other prepayments, other than payments of fees, costs and interest, made to the DIP Lender by or on behalf of the Debtors. Interest shall accrue on the Principal Balance based on the portion of the Principal Balance the Debtors have actually drawn, at a per annum fixed rate of 12%; *provided* that, after the occurrence and during the continuance of an Event of Default, interest shall accrue at the fixed rate of 2% above the then applicable rate thereof.<br><br>All interest shall be paid monthly (in arrears on the first day of immediately following month); *provided*, *however*, that any accrued unpaid interest shall be payable on the Maturity Date by wire transfer in the event the Debtors' assets are not sold to the DIP Lender pursuant to a credit bid in a section 363 sale consummated prior to the Maturity Date. All interest will be calculated using a 360-day year and actual days elapsed. |
| **Closing Date** | As used herein, the term "<u>Closing Date</u>" shall mean the date on which each of the conditions specified under the hearing "Conditions Precedent to the Closing of the DIP Facility" below shall have been satisfied (or waived by the DIP Lender). The Closing Date shall occur as promptly as is practical after the entry of the Interim DIP Order by the Bankruptcy Court. |

| Approved Budget | "Approved Budget" shall mean the rolling consolidated 9-week cash flow and financial projections of the Debtors covering the period ending the week of September 30, 2025 and itemizing on a weekly basis all uses, and anticipated uses, of the DIP Facility, revenues or other payments projected to be received and all expenditures proposed to be made during such period, which shall at all times be in form and substance reasonably satisfactory to the DIP Lender and Patriarch, which Approved Budget may be amended with the consent of the DIP Lender and Patriarch. A copy of the Approved Budget must be attached as an exhibit to each of the Interim DIP Order and the Final DIP Order. |
|---|---|
| Budget—Permitted Variance | The Approved Budget shall be subject to standard and customary permitted variances, determined on a line by line basis of actual receipts and expenses against budgeted receipts and expenses provided for in the Approved Budget not to be less than 90% of receipts for the applicable measuring period or more than 110% of expenses for the applicable measuring period (the "Permitted Variances") reflecting (i) the Debtors' anticipated cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the ninth (9th) calendar week thereafter and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by professionals retained by the Debtors and other professionals during the nine (9) week period.<br><br>Subject to the provisions of this Term Sheet, including the subsection entitled "Availability and Draw Procedure", budgeted expenditures and cash receipts may be paid and received, as applicable, in an earlier or later period in the reasonable discretion of the Debtors, in which event, the Approved Budget shall be deemed so amended for the purpose of calculating variances. |
| Amortization | None. |
| Security/Priority | Subject to the Carve Out (as defined below), all amounts owing by the Debtors to the DIP Lender under the DIP Facility shall be joint and several as to each Debtor and (a) will be entitled to super-priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any or all administrative expense claims of every kind and nature whatsoever, and (b) will be secured by a first priority perfected security interest and lien on all the Collateral described in the "Collateral" section below pursuant to section 364(c)(2), section 364(c)(3) and section 364(d) of the Bankruptcy Code (the "Existing Indebtedness").<br><br>The relative priority of all amounts owed under the DIP Facility will be subject only to the Carve-Out (as defined below). |

| | |
|---|---|
| | All of the liens described herein shall be effective and perfected as of the entry of any DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. |
| **Separate Cash Accounts** | The proceeds of the DIP Facility and all other cash from operation of the Debtors during the period in which the DIP Facility is in place shall be maintained in one or more segregated accounts over which the DIP Lender shall have a Lien as described above. |
| **Collateral** | All amounts owing by the Debtors under the DIP Facility in respect thereof will be secured by a first priority perfected security interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Debtors, whether now owned or hereafter acquired, including, without limitation, all cash, inventory, equipment, capital stock or other ownership interest in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, and other general intangibles, and, upon entry of the Final DIP Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates (collectively, the "Collateral"), subject only to the Carve-Out.

The DIP Facility shall be the joint and several obligation of each Debtor and the DIP Lender may exercise its rights with respect to any asset or grouping of assets, through foreclosure or otherwise. Subject to entry of the Final DIP Order, the Debtors shall waive and the DIP Orders shall prohibit marshalling of any of the Collateral or other interest of the DIP Lender or under any similar theory. |
| **Carve-Out** | The carve-out (the "Carve-Out") means an amount equal to the sum of: (i) all fees required to be paid to the clerk of the Bankruptcy Court under section 156(c) of title 28 of the United States Code and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the applicable statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "Statutory Fees"), which Statutory Fees shall not be subject to any budget; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent permitted to be paid at any time, whether by interim order, procedural order, or otherwise (which order has not been vacated or stayed), all unpaid fees and expenses of professionals pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "Professionals" and such claims, the "Allowed Professional Claims") subject to the Approved Budget |

6

| | |
|---|---|
| | Nothing herein shall be construed as impairing the ability of any party to object to any fees and expenses of a professional in the Chapter 11 Cases.<br><br>The DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.<br><br>Nothing in this DIP Term Sheet or in the DIP Orders or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any Professionals or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. |
| **Credit Bidding** | The DIP Orders shall provide that, in connection with any sale of any of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization the DIP Lender shall have the undisputed right to credit bid the full amount of all principal and interest due and outstanding under the DIP Loan in accordance with section 363(k) of the Bankruptcy Code. For the avoidance of doubt, any Credit Bid shall not include fees and costs, such as professionals. |
| **Conditions Precedent to the Closing of the DIP Facility** | The obligations of the DIP Lender to consummate the transactions contemplated herein and to make the DIP Facility available to the Debtors are subject to the satisfaction, in each case in the sole judgment of the DIP Lender, of the following:<br><br>• All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility and the approval thereof shall comply with the terms of this DIP Term Sheet and be in form and substance reasonably satisfactory to the DIP Lender;<br>• The Interim DIP Order shall be in full force and effect, and shall not have been appealed, reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is or may be materially adverse to the interests of the DIP Lender; and<br>• The DIP Lender shall have received and approved the Approved Budget. |
| **Conditions Precedent to Each Draw** | On the Closing Date and the funding date of each Draw, the following conditions precedent shall have been satisfied: |

7

| | |
|---|---|
| | • Each of the Interim DIP Order or Final DIP Order, as the case may be, shall be in a form that is acceptable to the DIP Lender in its sole and absolute discretion;<br><br>• The Interim DIP Order or Final DIP Order, as the case may be, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is materially adverse to the interests of the DIP Lender;<br><br>• The Debtors' use of the proceeds is consistent with the Approved Budget;<br><br>• There shall be no uncured Event of Default; and<br><br>• The representations and warranties of the Debtors shall be true and correct immediately prior to, and after giving effect to, funding, as qualified in "Availability and Draw Procedure." |
| **Bankruptcy Milestones** | The Debtors shall comply with the following milestones for a sale of substantially all of the Debtors' assets (a "Bankruptcy Sale") in the Chapter 11 Cases (the "Bankruptcy Milestones"):<br><br>• Within five (5) days of the execution of this Agreement, Sellers shall file a motion in the Bankruptcy Court in the Bankruptcy Case seeking the approval of the transactions contemplated in this Agreement including, without limitation, the Expense Reimbursement.<br><br>• Within five (5) days of the execution of this Agreement, Sellers shall file a motion in the Bankruptcy Court in the Bankruptcy Case seeking the approval of the DIP Loan.<br><br>• On or before August 15, 2025, the Interim DIP Order shall have been entered by the Bankruptcy Court in the Bankruptcy Case.<br><br>• On or before September 12, 2025, the Final DIP Order shall have been entered by the Bankruptcy Court in the Bankruptcy Case.<br><br>• On or before October 10, 2025, an order approving the Bankruptcy Sale to the Buyer or other winner of the auction, as applicable, shall have been entered by a Bankruptcy Court; and |

HF 18200691v.1

| | |
|---|---|
| | • On or before October 24, 2025, or such later date as Buyer shall agree in writing, the Bankruptcy Sale shall been consummated. |
| **Reporting** | After entry of the Interim DIP Order, the Debtors shall provide to the DIP Lender and Patriarch, as soon as available but no later than 5:00 p.m. Eastern Time on the last Friday of the rolling two-week period, a budget variance and reconciliation report setting forth: (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Approved Budget; (ii) the percentage variance of the aggregate receipts and aggregate disbursements, for (A) the rolling two-week period ended on (and including) the last Sunday of the two-week reporting period and (B) the cumulative period to date; and (iii) projections for the following nine weeks, including a rolling cash receipts and disbursements forecast for such period. |
| **Repayment** | No repayments of any Draws under the DIP Facility shall be due until the Maturity Date. Upon the Maturity Date, the unpaid Principal Balance, together with all unpaid interest, fees, costs, expenses and any other amounts due under the DIP Facility shall be due and payable immediately in full without demand by the DIP Lender or consent or action by the Bankruptcy Court.<br><br>The Debtors may voluntarily prepay the Principal Balance at any time without penalty or premium. |
| **Events of Default** | The occurrence of any one or more of the following shall constitute an "Event of Default":<br><br>(i)     Failure by the Debtors to pay principal, interest or any other amounts provided by this DIP Term Sheet when due;<br><br>(ii)     Any representation or warranty made by any Debtor shall prove to have been incorrect in any material respect when made;<br><br>(iii)     Without the consent of the DIP Lender, any of the Chapter 11 Cases shall be dismissed or converted to a Chapter 7 case;<br><br>(iv)     Unless consented to, or such relief is granted pursuant to a motion by, the DIP Lender, a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers relating to the operation of the business of the Debtors (*i.e.*, powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases; |

HF 18200691v.1

|  | (v)     Any other super-priority claim or lien which is *pari passu* with or senior to the claims or liens of the DIP Lender under the DIP Facility shall be granted in any of the Chapter 11 Cases, other than the Carve-Out; |
|  | (vi)     Any Debtor shall make any payment on account of any pre-petition indebtedness or payables of a Debtor except as otherwise permitted under the Approved Budget; |
|  | (vii)     Any material provision of this DIP Term Sheet or the DIP Orders shall cease to be valid and binding on any Debtor, or any Debtor shall so assert in any pleading filed in any court; |
|  | (viii)     An order shall be entered amending, modifying or supplementing the DIP Orders without the prior written consent of the DIP Lender; |
|  | (ix)     The failure to satisfy any of the Bankruptcy Milestones; and |
|  | (x)     The filing of a challenge by the Debtors or supported by the Debtors to the liens or claims of the DIP Lender based upon the DIP Lender's conduct. |
| **Relief from Stay/Remedies** | Upon the occurrence and continuance of an Event of Default beyond the applicable grace period set forth below, the DIP Lender shall be entitled to take all or any of the following actions without further order of or application to the Bankruptcy Court:<br><br>(i)     declare the principal of and accrued interest on the outstanding DIP Loans to be immediately due and payable;<br><br>(ii)     terminate the DIP Facility;<br><br>(iii)     implement the default rate of interest on all outstanding DIP Loans; and<br><br>(iv)     take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the applicable loan documents, or by applicable law.<br><br>Any automatic stay otherwise applicable to the DIP Lender shall be modified so that upon the occurrence of an Event of Default and upon five (5) business days' prior written notice of such occurrence (a "Termination Notice"), in each case given to the |

10

| | Debtors, counsel to the Committee appointed in these proceedings (if any), and the U.S. Trustee, the DIP Lender shall be entitled to exercise customary remedies including, without limitation, the right to realize on all Collateral and the right to exercise any remedy available under applicable law, in each case without obtaining any further relief or order of the Bankruptcy Court unless, within such five (5) business day period, the Bankruptcy Court has entered an order to the contrary. Consistent with the foregoing sentence, section 362 relief from the stay in favor of the DIP Lender shall be embodied in any order approving the DIP Facility and the use of Cash Collateral. |
|---|---|
| **Bankruptcy Court Filings** | As soon as practicable in advance of filing with the Bankruptcy Court, Debtors shall furnish to the DIP Lender and Patriarch: (i) the motion seeking approval of and proposed form of the DIP Orders and Cash Collateral Orders, which motion shall be in form and substance reasonably satisfactory to the DIP Lender and Patriarch; (ii) as applicable, any motions seeking approval of bidding procedures and any 363 sale, and the proposed forms of orders related thereto, which shall be in form and substance reasonably satisfactory to the DIP Lender and Patriarch; and (iii) any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive, retention or severance plan, and/or the assumption, rejection, modification or amendment of any material contract (each of which must be in form and substance reasonably satisfactory to the DIP Lender and Patriarch). |
| **Insurance** | Subject to DIP Lender's sole discretion and approval. |
| **Controlling Documents** | In the event of any inconsistencies between this DIP Term Sheet and the DIP Orders, the terms of the DIP Orders shall control. |
| **DIP Loan Costs** | N/A |
| **Indemnification** | The Debtors shall jointly and severally indemnify and hold harmless the DIP Lender and its officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or related to the DIP Loan or the transactions contemplated thereby, or any use made or proposed to be made with the DIP Loan proceeds whether or not such investigation, litigation or proceeding is brought by any Debtor or any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party |

11

| | |
|---|---|
| | is otherwise a party thereto and whether to not the transactions contemplated hereby, except, with respect to any Indemnified Party, to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's fraud, gross negligence or willful misconduct or any of such Indemnified Party.<br><br>The foregoing indemnification shall be included in the Final DIP Order but not in the Interim DIP Order. |
| **Good Faith Finding** | The DIP Orders shall contain a 'good faith finding' under Bankruptcy Code § 364(e). |
| **Governing Law** | All documentation in connection with the DIP Facility shall be governed by the laws of the State of New York, subject to applicable bankruptcy laws. |
| **Counsel to DIP Lender** | Herrick, Feinstein LLP |
| **Delaware Counsel to DIP Lender** | Benesch |
| **Counsel to Patriarch** | Cole Schotz PC |

*[Signature Pages to Follow]*

12

**IN WITNESS WHEREOF**, the parties hereto have executed and agree to be bound by the terms set forth in this DIP Term Sheet or caused the same to be executed by their respective duly authorized officers as of the day and year first above written.

FRAGRANCE XTREME INC

By:/s/ _____
Shai Perry, President

IMG HOLDINGS, INC.

By:/s/ _____
[TBD], Authorized Signatory

DANA CLASSIC FRAGRANCES, INC.

By:/s/ _____
Authorized Signatory

13

**Exhibit 2**

**Initial 9-Week Budget**

## IMG Holdings, Inc.

### 9 Week Cash Forecast

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | |
| | 8/11/2025 | 8/18/2025 | 8/25/2025 | 9/1/2025 | 9/8/2025 | 9/15/2025 | 9/22/2025 | 9/29/2025 | 10/6/2025 | **Total** |
| Initial Cash Balance | 230,658 | 501,653 | 508,148 | 501,143 | 515,094 | 758,329 | 469,824 | 510,819 | 410,709 | |
| Cash Receipts | 315,995 | 65,995 | 65,995 | 69,451 | 319,235 | 65,995 | 65,995 | 67,390 | 66,787 | 1,102,838 |
| Cash Disbursements | 45,000 | 59,500 | 73,000 | 55,500 | 76,000 | 354,500 | 25,000 | 167,500 | 402,693 | 1,258,693 |
| **Remaining Cash Balance** | **501,653** | **508,148** | **501,143** | **515,094** | **758,329** | **469,824** | **510,819** | **410,709** | **74,803** | |
| | | | | | | | | | | |
| Summary of Operating Cash Disbursements | | | | | | | | | | |
| Payroll | | 32,500 | | 32,500 | | 32,500 | | 32,500 | | 130,000 |
| Board Fees | | | | | 11,000 | | | | 11,000 | 22,000 |
| Operating Expenses | 25,000 | 25,000 | 65,000 | 10,000 | 40,000 | 70,000 | 25,000 | 85,000 | 90,000 | 435,000 |
| Insurance | | | 8,000 | | | | | | 1,693 | 17,693 |
| **Total Operating Cash Disbursements** | **25,000** | **57,500** | **73,000** | **42,500** | **51,000** | **102,500** | **25,000** | **125,500** | **102,693** | **604,693** |

| Breakdown of Restructuring Costs | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | |
| | 8/11/2025 | 8/18/2025 | 8/25/2025 | 9/1/2025 | 9/8/2025 | 9/15/2025 | 9/22/2025 | 9/29/2025 | 10/6/2025 | **Total** |
| **Restructuring Fees** | | | | | | | | | | **-** |
| Claims and Noticing Agent Fees | 20,000 | | | | 25,000 | | | 30,000 | | **75,000** |
| Legal Fees Chipman | | | | | | 200,000 | | | 200,000 | **400,000** |
| US Trustee Fees | | | | 1,000 | | | | | 9,000 | **10,000** |
| Ordinary Course Professionals | | | | 10,000 | | | | 10,000 | | **20,000** |
| Accounting/Tax | | 2,000 | | 2,000 | | 2,000 | | 2,000 | 41,000 | **49,000** |
| UCC Professionals (Counsel/FA) | | | | | | 50,000 | | | 50,000 | **100,000** |
| **Total Restructuring Costs** | **20,000** | **2,000** | **-** | **13,000** | **25,000** | **252,000** | **-** | **42,000** | **300,000** | **654,000** |
| **Total Cash Disbursements** | **45,000** | **59,500** | **73,000** | **55,500** | **76,000** | **354,500** | **25,000** | **167,500** | **402,693** # | **1,258,693** |

| Breakdown of Cash Receipts | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | |
| | 8/11/2025 | 8/11/2025 | 8/11/2025 | 8/11/2025 | 8/11/2025 | 8/11/2025 | 8/11/2025 | 8/11/2025 | 8/11/2025 | **Total** |
| **Cash Receipts** | | | | | | | | | | |
| DIP Funding | 250,000 | | | | 250,000 | | | | | **500,000** |
| Invoice Receipts | 65,995 | 65,995 | 65,995 | 69,451 | 69,235 | 65,995 | 65,995 | 67,390 | 66,787 | **602,838** |
| **Grand Total Receipts** | **315,995** | **65,995** | **65,995** | **69,451** | **319,235** | **65,995** | **65,995** | **67,390** | **66,787** | **1,102,838** |

# EXHIBIT B

**(*Proposed* Interim Cash Collateral Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| INTER-MARKETING GROUP, INC.,[1] | Case No. 25-11500 (KBO) |
| Debtors. | (*Joint Administration Pending*) |

### INTERIM ORDER (I) AUTHORIZING POSTPETITION USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PATRIARCH PARTNERS AGENCY SERVICES, LLC, AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(B) [2]

Upon consideration of the Motion of the Debtors and Debtors-in-Possession for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to Patriarch Partners Agency Services, LLC in its capacity as Prepetition Agent (as defined below), (III) Scheduling a Final Hearing, and (IV) Granting Related Relief (the "**Motion**"); pursuant to sections 105, 361, 362, 363, 364, and 507(b) of title 11 of the United States Code (the "**Bankruptcy Code**") and Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") 2002, 4001, 6003, 6004 and 9014, and rules 2002-1, 4001-2, 9006-1, and 9013-1 of the Local Rules of the Bankruptcy Practice and Procedure for the District of Delaware (the "**Local Rules**") and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and consideration

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (1) IMG Holdings, Inc. (1398); (2) Dana Classic Fragrances Inc. (1439); (3) Inter-Marketing Group, Inc. (6628); (4) Dana Fragrance Brands, LLC (0198); (5) St. Honore Holding, Inc. (9698); and (6) IMG Fragrance Brands, LLC (0026). The address of the Debtors' corporate headquarters is 1159 2nd Avenue, #424, New York, New York 10065.

[2] NTD: We are providing this draft without having seen the DIP Financing Order. The two orders will need to be synthesized where there is overlap, such as Approved Budget, Reporting, and Events of Default. Therefore, this Order can be cut down significantly, as the provisions can be in the DIP Order, and this Cash Collateral Order can refer to those provisions and incorporate them by reference.

of the Motion and the relief requested therein being a core proceeding as defined in 28 U.S.C. §

157(b)(2); and due and proper notice having been given, and it appearing that no other or further

notice need be provided; and the Court having determined that the legal and factual bases set forth

in the Motion establish just cause for the relief granted herein; and it appearing that the relief

requested in the Motion is in the best interest of the Debtors, their estates, creditors and equity

security holders and upon due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED, on an interim basis, as follows:[3]

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW:**

A.    **Petition Date**.  On July __, 2025 (the "**Petition Date**"), the Debtors filed

voluntary petitions under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy

Court for the District of Delaware (the "**Court**").  The Debtors have continued in the management

and operation of their businesses and property as debtors in possession pursuant to sections 1107(a)

and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11

Cases.

B.    ***Jurisdiction and Venue.***  This Court has core jurisdiction over the above-

captioned chapter 11 cases (the "**Chapter 11 Cases**"), this Motion, and the parties and property

affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    ***Statutory Committee.***  As of the date hereof, no official committee of

unsecured creditors has been appointed in these Chapter 11 Cases.

---

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

D.    ___*Notice.*___  The Debtors have caused notice of the Motion, the relief requested therein and the Interim Hearing to be served by electronic mail, facsimile, hand delivery or overnight delivery on the following parties: (a) the Office of the United States Trustee (the "__UST__"); (b) counsel to the Prepetition Agent; (c) counsel to the DIP Lender; and (d) the holders of the twenty (20) largest unsecured claims against the Debtors.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and of the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 2002 and 4001(b) and (d).

E.    ___*Findings Regarding the Use of Cash Collateral.*___

i.    __Prepetition Indebtedness__ Prior to the Petition Date, the Debtors, Patriarch Partners Agency Services, LLC (the "__Prepetition Agent__"), and certain lenders that are signatories thereto (the "__Prepetition Secured Parties__") entered into a Third Amended and Restated Loan and Security Agreement dated January 15, 2009 (as amended, the "__Prepetition Loan Agreement__").  Pursuant to the Prepetition Loan Agreement and as security for payment of amounts due under the Prepetition Loan Agreement, the Debtors granted to the Prepetition Agent a security interest in substantially all of the Debtors' assets as more fully described in the Prepetition Loan Agreement.

ii.    __Stipulations as to Prepetition Obligations__.  Subject to the rights of any party in interest as and to the extent set forth in paragraph 10 hereof, after consultation with their attorneys, the Debtors permanently, immediately, and irrevocably admit, acknowledge, represent, stipulate, and agree with the provisions set forth in this paragraph E which stipulations shall be binding on the Debtors, their estates, and all parties in interest (collectively, the "__Stipulations__"):

a)     **Prepetition Obligations**.  As of July 8, 2025, the Debtors are justly and lawfully indebted and liable to the Prepetition Secured Parties under the Prepetition Loan Agreement, without objection, defense, counterclaim, or offset of any kind, in the aggregate amount of not less than $1,457,365.49 plus per diem interest of $180.38 per day to PPAS for agency fees, and $1,643,968.06 plus per diem interest at the rate of $274.18 per day to Ark II for the revolver (the "**Prepetition Loans**") (on account of principal and certain accrued and unpaid prepetition interest and fees), plus accrued and accruing (both before and after the Petition Date) and unpaid interest (including at the default rate), interest late fees, liquidated damages, other fees and expenses, and all other obligations under the Prepetition Loan Agreement, including any and all attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the Prepetition Loan Agreement (collectively, the "**Prepetition Obligations**").

b)     **Enforceability, etc. of the Prepetition Obligations**.  The Prepetition Loan Agreement and the Prepetition Obligations are (a) legal, valid, binding, enforceable, and non-avoidable obligations against the Debtors and (b) not subject to any contest, attack, objection, recoupment, defense, counterclaim, offset, subordination, re-characterization, avoidance, or other claim, cause of action, or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise and the Debtors do not possess, and shall not assert, any claim, counterclaim, setoff, deduction, or defense of any kind, nature, or description that would in any way impair, reduce, or affect the validity, enforceability, and non-avoidability of any of the Prepetition Obligations.

c)     **Validity, Perfection, and Priority of the Prepetition Liens**.  The liens granted by the Debtors under the Prepetition Loan Agreement to the Prepetition

Agent (the "**Prepetition Liens**") for the benefit of the Prepetition Secured Parties as security for the Prepetition Obligations encumber all Collateral (as defined in the Prepetition Loan Agreement), which includes substantially all of the Debtors' assets and property and all proceeds thereof (collectively, the "**Prepetition Collateral**"). The Prepetition Liens on the Prepetition Collateral have been properly recorded and perfected under applicable law and are legal, valid, binding, enforceable, non-avoidable, and not subject to contest, avoidance, attack, offset, recharacterization, subordination, or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law, or otherwise, and were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value. As of the Petition Date, (a) the Prepetition Liens are senior in priority over any and all other liens on the Prepetition Collateral, subject only to any permitted Liens set forth in Schedule P-2 of the Prepetition Loan Agreement (the "**Prepetition Permitted Liens**") which, as of the Petition Date, were senior to the Prepetition Liens (solely to the extent any such Prepetition Permitted Liens were (i) valid, properly perfected, and non-avoidable as of the Petition Date or (ii) perfected after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code), (b) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the Prepetition Loan Agreement, (c) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or any other applicable law, and (d) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action,

including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the Prepetition Term Loan Agreement, (e) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, perfection, and priority of the liens securing the Prepetition Obligations, and (f) the Prepetition Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

        d)      **Indemnity**.  The Prepetition Secured Parties and their Related Parties (as defined below) have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the use of Cash Collateral, including in respect of the granting of the Adequate Protection Liens, the Adequate Protection Superpriority Claim (each as defined below), and any of the other rights, privileges, remedies, and protections granted hereunder, any challenges or objections to the use of Cash Collateral, and all documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification (including any and all rights of the Prepetition Secured Parties to indemnification under the Prepetition Loan Agreement), the Prepetition Secured Parties and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys, and representatives (collectively, the "**<u>Related Parties</u>**") shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto; *provided, however*, that the

Debtors shall not indemnify the Prepetition Secured Parties against any successful Challenge under the Challenge Period (each as defined herein). No exception or defense in contract, law, or equity exists as to any obligation set forth, as the case may be, in this paragraph E.2.d), in the Prepetition Loan Agreement to indemnify and/or hold harmless any Prepetition Secured Party and any Related Party, as the case may be, and any such defenses are hereby waived.

e)      **No Control**.  None of the Prepetition Secured Parties are control persons or insiders of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Prepetition Loan Agreement or the use of Cash Collateral.

f)      **No Claims, Causes of Action**.  As of the date hereof, there exist no claims or causes of action against any of the Prepetition Secured Parties or their Related Parties with respect to, in connection with, related to, or arising from the Prepetition Loan Agreement that may be asserted by the Debtors or any other person or entity.

g)      **Cash Collateral**.  Any and all of the Debtors' cash, whether existing as of the Petition Date or thereafter, wherever located (including, without limitation, all cash or cash equivalents in the control of or on deposit or maintained by the Debtors in any account or accounts, any amounts generated by the sale or other disposition of Prepetition Collateral, and all income, proceeds, products, rents or profits of any Prepetition Collateral), constitutes Cash Collateral of the Prepetition Secured Parties.

h)      **Default**.  The Debtors are in default under the Prepetition Loan Agreement and an event of default has occurred thereunder.

i)      **Release**.  Effective as of the date of entry of this Interim Cash Collateral Order, but subject to entry of the Final Order, the Debtors hereby forever and

irrevocably release, discharge, and acquit all former, current and future (a) Prepetition Secured Parties, (b) the Related Parties, (c) Affiliates of the Prepetition Secured Parties, and (e) officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, investment committee members, sub advisors and predecessors and successors in interest of each of the Prepetition Secured Parties and each of their respective Affiliates, in each case acting in their respective capacities as such (collectively, the "**Releasees**") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the Prepetition Loans, the Prepetition Loan Agreement, and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection, or avoidability of the liens or claims of any of the Prepetition Secured Parties (the "**Releases**"). The Debtors further waive and release any defense, right of counterclaim, right of setoff or deduction to the payment of the Prepetition Obligations which the Debtors now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the entry of this Interim Cash Collateral Order by the Court.

   j)  **Sale and Credit Bidding**.  The Prepetition Secured Parties shall have the right, subject to section 363(k) of the Bankruptcy Code, to credit bid (independently or together) up to the full amount of the applicable outstanding Prepetition Obligations (including any Adequate Protection Superpriority Claims), in each case including, without limitation, any accrued interest and fees, in a sale of any Prepetition Collateral, and whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, or otherwise.

   iii.  **Immediate Need for Postpetition Financing and Use of Cash Collateral**.  The Debtors have requested immediate entry of this Interim Cash Collateral Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  Good cause has been shown for entry of this Interim Cash Collateral Order.  An immediate need exists for the Debtors to use Cash Collateral on an interim basis pursuant to this Interim Cash Collateral Order in order to, among other things, enable the orderly continuation of their operations and to administer and preserve the value of their estates.  In the absence of the immediate availability of such funds and liquidity in accordance with the terms hereof, the ability of the Debtors to maintain business relationships with their vendors, suppliers, licensors, licensees, and customers, to retain and pay their employees and otherwise finance their operations, including to continue to operate as a going concern, would not be possible, and immediate and irreparable harm to the Debtors and their estates and creditors would occur.  Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize returns for creditors requires the availability of working capital from the use of Cash Collateral.

   iv.  **No Credit Available on More Favorable Terms**.  Other than the DIP Loan, the Debtors have been unable to obtain credit on more favorable terms and conditions than those provided in this Interim Cash Collateral Order, including for (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, (b)

credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, (c) credit for money borrowed secured by a lien on property of the estates that is not otherwise subject to a lien, or (d) credit for money borrowed secured by a junior lien on property of the estates which is subject to a lien.  The Debtors are unable to obtain credit for borrowed money without granting the adequate protection as set forth herein (in each case, subject to the Carve-Out (as defined below))

    v. **Use of Cash Collateral and Proceeds of the Prepetition Collateral**.  Subject to the Challenge Period and except as provided in Paragraph 11 below, the Debtors represent and stipulate that all of the Debtors' cash, cash equivalents, accounts receivables, inventory, negotiable instruments, investment property, securities and, in each case, the proceeds thereof, constitute Cash Collateral of the Prepetition Agent on behalf of the Prepetition Secured Parties.  All Cash Collateral and all proceeds of the Prepetition Collateral, including proceeds realized from any sale or disposition thereof, or from payment thereon, shall be used or applied in accordance with the terms and conditions of this Interim Cash Collateral Order, the Final Cash Collateral Order, the Interim DIP Order, the Final DIP Order and the Approved Budget[4] (as defined below), subject to Permitted Variances (as defined below), and for no other purpose.  No portion of the Cash Collateral may be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to: (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the Prepetition Agent or Prepetition Secured Parties; or (ii) the liens or security interests in the collateral securing such indebtedness, including challenges to the perfection, priority or validity of

---

[4] NTD:  We presume that there will be an agreed Approved Budget negotiated with the DIP Lender and that the same Approved Budget will be attached to both orders.

the liens granted in favor of the Prepetition Agent or Prepetition Secured Parties with respect thereto.

vi.     **Adequate Protection for the Prepetition Secured Parties**.  The Prepetition Secured Parties have negotiated in good faith regarding the Debtors' use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and the continued operation of their businesses, in accordance with the terms hereof and the Approved Budget (subject to Permitted Variances).  The Prepetition Secured Parties have agreed to permit the Debtors to use the Prepetition Collateral, including the Cash Collateral, in accordance with the terms hereof and the Approved Budget (subject to Permitted Variances) during the Interim Period subject to the terms and conditions set forth herein.  The Prepetition Secured Parties are entitled to the adequate protection as and to the extent set forth herein pursuant to sections 361, 362, and 363 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the Prepetition Agent's consent thereto; *provided* that, except as provided in the Interim DIP Order or in the Final DIP Order, nothing in this Interim Cash Collateral Order shall (i) be construed as a consent by any Prepetition Secured Party (a) that it would be adequately protected in the event debtor-in-possession financing is provided by a third party (i.e., other than the Prepetition Secured Parties) or (b) to the terms of any other such financing, including the consent to any lien encumbering the Prepetition Collateral (whether senior or junior) or to the use of Cash Collateral (except under the terms hereof), or (ii) prejudice, limit, or otherwise impair the rights of the Prepetition Agent (for the benefit of the

Prepetition Secured Parties) to seek new, different, or additional adequate protection under any circumstances.  The Prepetition Secured Parties' consent to the Debtors' use of Cash Collateral is expressly conditioned upon entry of this Interim Cash Collateral Order and does not and shall not constitute consent other than pursuant to this Interim Cash Collateral Order and on the terms set forth herein.

                vii.          **Sections 506(b) and 552; Marshaling**.  In light of and in exchange for (i) the Prepetition Secured Parties' agreement that their Prepetition Liens and claims, including any adequate protection liens and claims, shall be subject to the Carve-Out, as set forth herein, (ii) the consensual use of Cash Collateral consistent with the Approved Budget and the terms of this Interim Cash Collateral Order, and (iii) the Prepetition Secured Parties' agreement to the payment (in a manner consistent with the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions of this Interim Cash Collateral Order of certain expenses of administration of these Chapter 11 Cases, the Prepetition Secured Parties are each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code and a waiver of the provisions of section 506(c) of the Bankruptcy Code and of the equitable doctrine of marshaling and other similar doctrines upon entry of the Final Order.[5]

                viii.          **Limitation of Liability**.  The Debtors stipulate and, subject to paragraph 10, this Court finds that in making decisions to permit the Debtors to use Cash Collateral, in accepting the Approved Budget, or in taking any other actions permitted by this Interim Cash Collateral Order, none of the Prepetition Secured Parties shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

---

[5]    NTD: This will need to be synthesized with the DIP Financing Order.

   ix.  **Relief Essential; Best Interest**.  The relief requested in the Motion (and provided in this Interim Cash Collateral Order) is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and property and satisfies the requirements of Bankruptcy Rule 6003.  It is in the best interest of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties that the Debtors are allowed to grant the liens and claims contemplated herein to the Prepetition Secured Parties, and use Prepetition Collateral, including Cash Collateral, as contemplated herein.

   x.  **Findings Regarding Corporate Authority**.  The Debtors have all requisite corporate power and authority to enter into, ratify, and perform all of their obligations under this Interim Cash Collateral Order.

   xi.  **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Cash Collateral Order pursuant to Bankruptcy Rules 4001(b)(2), (c)(2) and (d).

   xii.  **Approved Budget**.  The Debtors have filed with their Motion a proposed budget (such initial budget, the "**Initial Budget**"), a copy of which is attached hereto as **Exhibit A.** The Initial Budget reflects the Debtors' anticipated net cash flow and anticipated disbursements on a weekly basis for the period from the Petition Date through and including 9 (nine) calendar weeks after the Petition Date. The Initial Budget may be modified, amended, or updated from time to time in accordance with the terms of this Interim Cash Collateral Order and the terms of the Interim DIP Order and the Final DIP Order, as applicable, and upon such modification, shall supplement and replace the Initial Budget (the Initial Budget, following entry of the Interim Cash Collateral Order, and each subsequently approved budget, shall each constitute without duplication, an "**Approved Budget**").  The Initial Budget is reasonable under the facts

and circumstances.  The Approved Budget shall be, in form and substance, satisfactory to the Prepetition Agent and the DIP Lender.

xiii.        **No Modification or Amendment**.  Notwithstanding anything to the contrary in this Interim Cash Collateral Order and the Initial Budget, the Prepetition Agent does not and has not agreed to waive or modify any of the payment or other terms in the Prepetition Loan Agreement.  Any deviation from the terms of the Prepetition Loan Agreement in this Interim Cash Collateral Order or the Initial Budget is inadvertent and does not affect a modification of the Prepetition Loan Agreement.  If the Initial Budget does not accurately reflect the post-petition amounts owed to the Prepetition Agent under the Prepetition Loan Agreement, the Debtors agrees to the amendment of the Initial Budget to accurately reflect such amounts, subject to the Debtors, the DIP Lender and the Prepetition Agent agreeing on the amounts due.

**NOW, THEREFORE**, on the Motion of the Debtors and the record before this Court with respect to the Motion, including the record made during the Interim Hearing, and with the consent of the Debtors and the Prepetition Secured Parties, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

1.        ***Motion Granted.***  The Motion is **GRANTED** on an interim basis, as set forth herein.  Any objection to the Motion that was not withdrawn or resolved is hereby overruled.

2.        **Authorization of Use of Cash Collateral**.  Subject to the terms hereof, including but not limited to, that (i) this Interim Cash Collateral Order or the Final Order, as the case may be, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is materially adverse to the interests

of Prepetition Secured Parties, (ii) the Debtors' use of the proceeds is consistent with the Approved Budget, and (iii) there shall be no uncured Event of Default (as defined below), the Debtors are hereby authorized to use the Cash Collateral for (a) working capital requirements, (b) general corporate purposes, and (c) the costs and expenses of administering this Chapter 11 Case (including payments benefiting court-approved Professionals from the Carve-Out) incurred in the Chapter 11 Case.

3.    **Authorization and Approval to Use Cash Collateral**.  Subject to the terms and conditions of this Interim Cash Collateral Order, the Debtors are authorized to use the Cash Collateral as set forth in the Approved Budget (subject to Permitted Variances) and in accordance with this Interim Cash Collateral Order.  Notwithstanding anything herein to the contrary, subject only to the Debtors' rights under paragraph 15(b) hereof and the Carve-Out, the Debtors' right to use Cash Collateral shall terminate on the Maturity Date.  Nothing in this Interim Cash Collateral Order shall authorize the disposition of any assets of the Debtors or their estates or proceeds resulting therefrom outside the ordinary course of business except as expressly permitted herein (subject to any required Court approval).  Except as provided in Paragraph 11, no portion of the Cash Collateral may be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to: (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the Prepetition Agent or Prepetition Secured Parties; or (ii) the liens or security interests in the collateral securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of the Prepetition Agent or Prepetition Secured Parties with respect thereto.

4.    **Adequate Protection for Prepetition Secured Parties**.  The Prepetition Secured Parties shall receive adequate protection of their interests in the Prepetition Collateral,

including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, as a result of the use of Prepetition Collateral, including Cash Collateral, and the Carve-Out, and the imposition or enforcement of the automatic stay (collectively, "**Diminution in Value**").  As adequate protection, the Prepetition Secured Parties will be granted, subject to paragraph 10 below, the following:

> (a)      **Adequate Protection Liens**.  Pursuant to sections 361 and 363(e) of the Bankruptcy Code, effective as of the Petition Date and perfected without the need for execution by the Borrower or the Guarantors or the recordation or other filing by the Prepetition Secured Parties of security agreements, control agreements, pledge agreements, financing statements, or other similar documents or the possession or control by the Prepetition Secured Parties, the Prepetition Secured Parties, solely to the extent of any Diminution in Value, shall be granted valid, binding, continuing, enforceable, fully perfected replacement and additional liens on and security interests in (collectively, the "**Adequate Protection Liens**") all Prepetition Collateral and Cash Collateral.  The Adequate Protection Liens shall be junior only to: (i) the DIP Liens; (ii) the DIP Superpriority Claims; (iii) the Carve-Out; and (iv) any Permitted Encumbrance, and senior to all other security interests in, liens on, or claims.  The Adequate Protection Liens shall be non-avoidable and shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code.  The Adequate Protection Liens shall be enforceable against and binding upon the Borrower, the Guarantors, their estates and any successors thereto, including, without limitation, any trustee or other estate representative appointed in any Successor Case.

(b)      **Adequate Protection Superpriority Claim**.  To the extent of the aggregate Diminution in Value, the Prepetition Secured Parties shall be granted allowed superpriority administrative expense claims against the Debtors, and their estates, as provided in section 507(b) of the Bankruptcy Code, subject only to the DIP Liens, the DIP Superpriority Claims and the Carve-Out, and with priority in payment over any and all other claims and administrative expense claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114, and any other provision of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, and any successor trustee or creditor in the Chapter 11 Cases or any Successor Case (the "Adequate Protection Superpriority Claims").

(c)      **Adequate Protection Payments, Etc**.  As further adequate protection, from and after entry of this Interim Cash Collateral Order, the Debtors shall accrue, to be paid at closing from sale proceeds, (1) under the terms of the Prepetition Loan Agreement, all interest due under the Prepetition Loan Agreement, calculated at the default rates under the Prepetition Loan Agreement, and (2) all accrued and unpaid fees and disbursements (including all reasonable and documented fees, out-of-pocket costs and expenses of legal, financial, and other advisory professionals of the Prepetition Secured Parties (including, without limitation, Cole Schotz P.C.)) owing to the Prepetition Secured Parties under the Prepetition Loan Agreement, whether incurred prior to or after the Petition Date.  Payment of any amounts set forth in this clause (c)(2) shall not be subject to disgorgement or recharacterization.

5.      **Approved Budget**.

(a)      The budget attached hereto as **Exhibit A** constitutes an "Initial Budget". The Debtors will subsequently provide the Prepetition Agent with an updated budget every Wednesday prior to the end of the Approved Budget Period (defined below) for the remaining weeks left under the Approved Budget. The "**Approved Budget Period**" shall refer to period commencing on the date that this Interim Cash Collateral Order is entered and ending on the date that is 9 (nine) weeks after the Petition Date.

(b)      The Debtors shall provide to the Prepetition Agent a budget variance report (the "**Budget Variance Report**") on the Wednesday of every week, the Budget Variance Report shall set forth in reasonable detail actual receipts and disbursements of the Debtors, together with a statement certifying compliance with the Budget Covenant (as defined below) set forth below. The Borrower shall not permit or suffer to exist, a negative variance of 10% or more of total the total disbursements set forth in the Approved Budget for such period, in the aggregate, from the amounts set forth in the Approved Budget (each, a "**Permitted Variance**"), tested on a cumulative rolling two (2) week basis (the "**Budget Covenant**"). The Debtors shall operate in accordance with the Approved Budget and all disbursements of the Debtors shall be consistent with the provisions of the Approved Budget, subject in each case to any Permitted Variance provided herein; *provided* that unspent budgeted disbursements shall not be carried forward on a line-item basis and shall be counted for purposes of calculating variances.

(c)      The Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral, and the Borrower shall have no authority to use Cash Collateral, other than in accordance with the Approved Budget, subject to the Budget Covenant as set forth in the Interim Cash Collateral Order.

6.      **Monitoring of Collateral**.   The Prepetition Secured Parties and their consultants and advisors shall be given reasonable access to the Debtors' books, records, assets, and properties for purposes of monitoring the Debtors' businesses and the value of the Prepetition Collateral, including view access to the Debtors' accounts at the Debtors' cost and expense.

7.      **Financial Reporting, Etc**.   The Debtors shall provide to the Prepetition Secured Parties (and, in each case, their consultants, advisors, and professionals) (a) all financial information required under the Prepetition Loan Agreement and (b) access upon reasonable notice and during regular business hours to the Debtors' books and records, assets, and properties for purposes of monitoring its businesses and the value of the Prepetition Collateral.   The Debtors shall reasonably cooperate, discuss with, and provide to the Prepetition Secured Parties (and, in each case, their professionals) all such information as may be reasonably requested.   In addition, the Debtors hereby authorize their accountants, attorneys, financial advisors, bankruptcy professionals, and consultants to cooperate, consult with, and provide to the Prepetition Secured Parties (and, in each case, their consultants, advisors and professionals) all such information as may be reasonably requested with respect to the business, results of operations and financial condition of the Debtors.

8.      **Subordination of Intercompany, Affiliate Liens**.   All intercompany or affiliate liens of the Debtors other than the DIP Liens, if any, will be contractually subordinated to the Adequate Protection Liens granted pursuant to this Interim Cash Collateral Order, on terms satisfactory to the Prepetition Agent.

9.      **Adequate Protection Replacement Lien Perfection**.   Automatically upon entry of this Interim Cash Collateral Order, the Adequate Protection Liens, shall be deemed to be valid, binding, perfected, enforceable, non-avoidable, and effective by operation of law, and not

subject to challenge as of the Petition Date, without the need of any further action of any kind; *provided, however*, that the Adequate Protection Liens shall both be subject to the Challenge Period.  This Interim Cash Collateral Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Adequate Protection Liens or to entitle the Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, the Prepetition Agent may file such financing statements, deeds of trust, mortgages, security agreements, notices of liens, and other similar documents and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.  The Debtors shall execute and deliver to the Prepetition Agent all such financing statements, mortgages, security agreements, notices and other documents as the Prepetition Agent may reasonably request to evidence, confirm, validate, or perfect or to insure the contemplated priority of the Adequate Protection Liens, and the Debtors shall take all such further actions that may be required under any applicable law or that the Prepetition Secured Parties may reasonably request in order to grant, preserve, protect or perfect the Adequate Protection Liens granted pursuant to this Interim Cash Collateral Order.  The Prepetition Agent may file a photocopy of this Interim Cash Collateral Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property and, in such event, the subject filing or recording officer

shall be authorized to file or record such copy of this Interim Cash Collateral Order. To the extent that a Prepetition Secured Party is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies or is the secured party under any loan document, financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction to create, validate, attach, perfect, or prioritize liens (any such instrument or document, a "**Security Document**"), then (i) such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the Prepetition Agent, and such Prepetition Secured Party shall comply with the instructions of the Prepetition Agent with respect to the exercise of such control and (ii) the Prepetition Agent is also hereby deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies and the secured party under each such Security Document, and shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Interim Cash Collateral Order.

10.     **Reservation of Certain Third-Party Rights and Bar of Challenges and Claims.**

(a)     The Debtors' stipulations, admissions, agreements, Releases, and waivers contained in this Interim Cash Collateral Order, including the Stipulations, are and shall be irrevocably binding upon the Debtors and any and all of the Debtors' successors in interest and assigns (subject to the Challenge Period, including, without limitation, any chapter 7 or chapter 11 trustee, responsible person, examiner with expanded powers, or other estate representative) in all circumstances and for all purposes.

(b)     The Stipulations and all other admissions, agreements, releases, and waivers set forth in this Interim Cash Collateral Order also are and shall be binding upon all other persons and entities (including any Committee) and each of their respective successors in interest and assigns in all circumstances and for all purposes, unless, and solely to the extent that (i) such parties in interest (including any Committee) in each case with standing and requisite authority to do so (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) have timely filed the proper pleadings, and timely commenced the appropriate proceedings under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth below in this paragraph 10), (x) objecting to or challenging any of the Stipulations or (y) otherwise asserting or prosecuting any action against the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees in connection with or related to the matters covered by the Stipulations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "**Challenge**"), no later than seventy-five (75) calendar days after the date of entry of this Interim Cash Collateral Order for any party in interest with requisite standing (such period, the "**Challenge Period**" and the date that is the next calendar day after the termination of the Challenge Period shall be referred to as the "**Challenge Period Termination Date**"), as such date may be extended to any such party in interest by the Prepetition Agent and each applicable Prepetition Secured Party that is the subject of a Challenge or by any such later date as has been ordered by the Court for cause upon a motion filed and served within the Challenge Period (before giving effect to such extension) and (ii) the Court enters judgment in favor of the plaintiff or

movant in any such timely and properly commenced Challenge proceeding, and any such judgment

has become final and is not subject to any further review or appeal.

(c)     Any Challenge not asserted by the timely and proper filing of a

pleading by a party in interest with the requisite standing and authority as contemplated herein

prior to the Challenge Period Termination Date (or any extension thereto) shall be deemed forever

waived, released, and barred with respect to such party in interest.  To the extent a party in interest

with requisite standing and authority timely and properly commences a Challenge prior to the

Challenge Period Termination Date, all claims, causes of action and other matters not specifically

set forth in such Challenge shall be deemed forever waived, released, and barred with respect to

such party in interest.

(d)     To the extent any Stipulations are (i) not subject to a Challenge

timely and properly commenced prior to the Challenge Period Termination Date or (ii) subject to

a Challenge timely and properly commenced prior to the Challenge Period Termination Date, to

the extent any such Challenge does not result in a final and non-appealable judgment or order of

the Court that is inconsistent with such Stipulations, then, in each case, without further notice,

motion or application to, or order of, or hearing before this Court and without the need or

requirement to file any proof of claim: (1) any and all such Challenges by any Committee or any

other party in interest shall be deemed to be forever waived, released, and barred (including in any

Successor Case), and (2) the Prepetition Obligations shall be deemed to be an allowed secured

claim within the meaning of sections 502 and 506 of the Bankruptcy Code for all purposes in

connection with these Chapter 11 Cases, and all of the Stipulations and all other waivers, releases,

and affirmations set forth in this Interim Cash Collateral Order (or any not properly and timely

challenged) shall be in full force and effect and shall be binding, conclusive, and final on any

person, entity, or party in interest, including any Committee, (in each case, and their successors and assigns) in these Chapter 11 Cases and in any Successor Case for all purposes, without any further order of the Court, and shall not be subject to challenge or objection by the Committee or any other party in interest, including, without limitation, any other statutory committee, any trustee, responsible individual, examiner with expanded powers or other representative of the Debtors' estates.

(e)     If any Challenge is timely and properly filed during the Challenge Period, the Stipulations and all other waivers, releases, and affirmations contained in this Interim Cash Collateral Order shall nonetheless remain binding and preclusive, as provided in this paragraph 10, on all other parties in interest (including any Committee) and on any other person or entity, except for the plaintiff or movant timely and successfully asserting such Challenge, as set forth in a final, non-appealable order of a court of competent jurisdiction.  Notwithstanding anything to the contrary herein, the right to commence any Challenge under this Interim Cash Collateral Order is preserved only as against any particular Prepetition Obligation or against any Prepetition Secured Party to the extent such Challenge is commenced timely and properly prior to the Challenge Period Termination Date and, in respect of such Prepetition Obligation or Prepetition Secured Party, is otherwise waived as set forth in this paragraph 10.

(f)     All remedies or defenses of any party with respect to any Challenge are hereby preserved.  Nothing in this Interim Cash Collateral Order vests or confers on any person (as defined in the Bankruptcy Code), including any Committee (if any) appointed in these Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges with respect to the Prepetition Obligations, and an order of the Court (or any other court of competent jurisdiction) conferring such standing

on a Committee or other party in interest shall be a prerequisite for the prosecution of a Challenge

by the Committee or such other party in interest. If a Committee or other party in interest files a

motion for standing to pursue a Challenge that includes a draft of the complaint or motion such

party in interest seeks to pursue, then the Challenge Period Termination Date shall be stayed as to

such movant(s) until the Court rules on the motion for standing.

(g)    For the avoidance of doubt, if a chapter 7 or 11 trustee is appointed

before the Challenge Period expires, then such trustee shall be deemed to be a party in interest

other than the Debtors and shall not be bound by the waivers, releases, affirmations, and

Stipulations of the Debtors in this Interim Cash Collateral Order until the Challenge Period expires.

Notwithstanding anything to the contrary herein, if a Committee or other party in interest timely

and properly files a Challenge within the Challenge Period that is pending as of the time a chapter

7 or chapter 11 trustee is appointed or elected in these cases, such trustee shall have the right (but

not the obligation) to intervene in such Challenge and, upon such intervention, shall be deemed to

have timely and properly filed such Challenge within the Challenge Period to the same extent as

the party originally instituting the Challenge.

11.    **Limitations on Use of Cash Collateral**. Notwithstanding anything herein

to the contrary, no portion of the proceeds of the Prepetition Collateral, any Cash Collateral, or the

Carve-Out and no disbursements set forth in the Approved Budget may be used, in any way,

directly or indirectly (a) for any investigation, adversary action, suit, arbitration, proceeding,

application, motion, objection, defense, other contested matter, or other litigation of any type,

including any Challenge, adverse to the interests of any or all of the Prepetition Agent, the

Prepetition Secured Parties, or their respective rights and remedies under this Interim Cash

Collateral Order, the Final Order, or the Prepetition Loan Agreement and other documents and

instruments in respect of the Prepetition Obligations, including without limitation (i) any action arising under the Bankruptcy Code, (ii) any so-called "lender liability" claims and causes of action, (iii) any action with respect to the validity and extent of the Prepetition Obligations or the validity, extent, perfection and priority of Prepetition Liens, (iv) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against or with respect to the Prepetition Liens, in whole or in part, or (v) appeal or otherwise challenge this Interim Cash Collateral Order or the Final Order; *provided* that no more than $25,000 in the aggregate of the proceeds of the Prepetition Collateral, and the Cash Collateral (including any proceeds of the Prepetition Collateral, or the Cash Collateral used to fund the Carve-Out) may be used by a Committee (if any) appointed in these Chapter 11 Cases to investigate (but not prosecute or Challenge, or commence, or initiate the prosecution of, any Challenge, including the preparation of any complaint or motion on account of, or objection to) the Stipulations before termination of the Challenge Period, (b) for any purpose that is prohibited under the Bankruptcy Code, this Interim Cash Collateral Order, or the Final Order or that is not in accordance with the Approved Budget, (d) to make any payment, advance, intercompany advance or transfer, or any other remittance or transfer whatsoever (including any intercompany loans and investments) that is not in accordance with the express terms of the Approved Budget, (e) to make any payment in settlement of any claim, action, or proceeding without Bankruptcy Court approval and the prior written consent of the Prepetition Agent, which consent shall not be unreasonably withheld or delayed, (f) to prevent, hinder, impede, or delay any of the Prepetition Secured Parties' enforcement or realization upon or exercise of rights in respect of any of Prepetition Collateral in

accordance with the Interim Cash Collateral Order or the Final Order, or (g) to seek to amend or modify any of the rights or interests granted to any of the Prepetition Secured Parties under this Interim Cash Collateral Order or the Prepetition Loan Agreement, in a manner adverse to any Prepetition Secured Party, including seeking to use Cash Collateral on a contested basis, without the prior written consent of The Prepetition Agent.

      12.    **Carve-Out**

      (a)    <u>Carve Out Defined</u>.  As used in this Interim Cash Collateral Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable and documented fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) to the extent allowed at any time, whether by interim or final compensation or other order, all accrued and unpaid claims for fees, costs, and expenses (the "<u>Allowed Professional Fees</u>") incurred by (or payable to) persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and any Committee appointed pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Lender or the Prepetition Agent of a Termination Notice, in the aggregate not to exceed the amount set forth in the prevailing Approved Budget for all Professional Persons through the date a Termination Notice is delivered.

      (b)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  The Prepetition Agent shall not be responsible for the payment or reimbursement of any fees or

disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Cash Collateral Order or otherwise shall be construed to obligate the Prepetition Agent in any way to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement Professionals.

13.     **Section 506(c) Claims**.  The Debtors' authorization to use the Cash Collateral and the consent of the Prepetition Secured Parties to the payment of the Carve-Out to the extent provided herein, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights, benefits, or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the Prepetition Secured Parties, the Adequate Protection Liens, the Prepetition Liens, and the Prepetition Collateral, and except to the extent of the Carve-Out, nothing contained in this Interim Cash Collateral Order or the Final Order shall be deemed a consent by the Prepetition Secured Parties to any charge, lien, assessment, or claim against or in respect of the Prepetition Collateral under sections 105 or 506(c) of the Bankruptcy Code or otherwise, other than the DIP Liens and DIP Superpriority Claims, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties.

14.     **Collateral Rights; Limitations in Respect of Subsequent Court Orders**. Without limiting any other provisions of this Interim Cash Collateral Order, and except with respect to the DIP Liens and DIP Superpriority Claims, unless the Prepetition Agent has provided its prior written consent, no credit shall be obtained, or indebtedness incurred that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the Prepetition Collateral or entitled to priority administrative status which is superior to or *pari passu* with those

granted pursuant to this Interim Cash Collateral Order to or for the benefit of the Prepetition Secured Parties.  Further, the Cash Collateral shall not be used for any purpose other than as permitted under this Interim Cash Collateral Order and the Approved Budget.

15.    **Survival of Certain Provisions**.  In the event of the entry of any order converting any of these Chapter 11 Cases into a Successor Case, the Adequate Protection Liens and the Adequate Protection Superpriority Claim, and the Carve-Out shall continue in this proceeding and in any Successor Case, and such Adequate Protection Liens and Adequate Protection Superpriority Claim, and the Carve-Out shall maintain their respective priorities as provided by this Interim Cash Collateral Order, the Interim DIP Order and the Final DIP Order.

16.    **Maturity Date and Events of Default**.

(a)    Any automatic stay otherwise applicable to the Prepetition Secured Parties and the Prepetition Agent, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, is hereby modified so that, (i) upon the occurrence and during the continuance of an Event of Default (as that term is defined herein), the Prepetition Secured Parties, in their sole and absolute discretion, may immediately (w) deliver a notice of Event of Default; and (x) terminate any use of Cash Collateral;(y) sweep all cash in any controlled account (subject to the rights of the DIP Lender under the Interim DIP Order and Final DIP Order), and (ii) upon and after the occurrence of the Maturity Date, the Prepetition Agent shall, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the Prepetition Secured Parties to take any or all of the following actions, at the same time or different times, unless the Court orders otherwise, and subject only to DIP Lender consent and subparagraph (b) of this paragraph 16, as applicable, be immediately entitled to exercise all of their rights and remedies in respect of the Prepetition Collateral, including Cash Collateral, in accordance with this Interim Cash Collateral

Order and/or the Prepetition Loan Agreement, as applicable.  The term "**Maturity Date**" shall mean the date that is the earliest of (i) the date that is seventy-five (75) days after the Petition Date, (ii) the effective date or date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a Plan of Reorganization or similar dispositive restructuring plan that has been confirmed by an order of the Bankruptcy Court; (iii) the date the Bankruptcy Court orders the conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; (iv) the date the Bankruptcy Court orders the dismissal of the Chapter 11 Cases; (v) the date on which the Debtors consummates a sale of all or substantially all of the assets of the Debtors or their Subsidiaries pursuant to Section 363 of the Bankruptcy Code or otherwise; and (vi) the occurrence of any Event of Default.

(b)     Notwithstanding the foregoing subparagraph (a) of this paragraph 16, immediately following the giving of notice by the Prepetition Agent to counsel to the Debtors, the DIP Lender, the U.S. Trustee, and counsel to the Committee, if any, of the occurrence of Event of Default (the "**Termination Notice**") (i) the Debtors shall have no right to request or use any proceeds of any Prepetition Collateral or to use Cash Collateral, other than a) the DIP Collateral used in accordance with the Approved Budget and the Interim DIP Order or Final DIP Order, as applicable, and (b) towards the satisfaction of the Prepetition Obligations, the Carve-Out, as provided in this Interim Cash Collateral Order; *provided* that, during the Default Notice Period (as defined below), (ii) the Debtors shall be permitted solely to continue to use any Cash Collateral subject to the consent of the Prepetition Agent and the DIP Lender for any critical business-related expenses necessary to operate the Debtors' businesses and preserve the Prepetition Collateral and the DIP Collateral as determined by the Debtors in their reasonable discretion and in good faith; *provided, further* that the only basis on which the Debtors shall have the right to contest a

Termination Notice shall be with respect to the validity of the Event of Default giving rise to such Termination Notice (i.e., whether or not such Event of Default has occurred or not), (iii) the Debtors shall deliver and cause the delivery of the proceeds of the Prepetition Collateral, including the Cash Collateral, to the Prepetition Agent as provided herein and in the Prepetition Loan Agreement subject to the funding of the Carve-Out and the DIP Lender's consent, and (iv) the Prepetition Agent shall be permitted to apply such proceeds in accordance with the terms of this Interim Cash Collateral Order and the Prepetition Loan Agreement.    The Debtors and the Committee (if any) shall be entitled to an emergency hearing before this Court within five (5) calendar days after the Termination Notice is sent by the Prepetition Agent to the Debtors, the DIP Lender, the U.S. Trustee, and counsel to the Committee (if any) (such 5-calendar-day period, the "**Default Notice Period**").  If the Debtors, the DIP Lender, the Committee (if any), or any other party in interest does not contest the occurrence of the Event of Default within the Default Notice Period or if there is a timely contest of the occurrence of the Event of Default and the Court after notice and a hearing declines to stay the enforcement thereof, the Maturity Date shall be deemed to have occurred for all purposes and the automatic stay shall be modified to permit the Prepetition Agent and the Prepetition Lenders to exercise all remedies under this Interim Cash Collateral Order, the Final Order, the Prepetition Loan Agreement, and applicable law, including, without limitation, to (i) set-off any and all amounts in accounts maintained by the Debtors with the Prepetition Agent or the Prepetition Lenders against the Prepetition Obligations, (ii) to otherwise enforce any and all rights against the Prepetition Collateral in the possession of any of the applicable Prepetition Lenders, including, without limitation, disposition of the Prepetition Collateral solely for application towards the Prepetition Obligations; and (iii) take any other actions or exercise any other rights or remedies permitted under this Interim Cash Collateral Order,

the Final Order, the Prepetition Loan Agreement, or applicable law to effect the repayment of the Prepetition Obligations.

(c)    Upon the occurrence of the Maturity Date (but subject, only in the case of the occurrence of the Maturity Date resulting from an Event of Default, to the provisions of paragraph 16(b)), the Prepetition Secured Parties are authorized to exercise all remedies and proceed under or pursuant to the applicable the Prepetition Loan Agreement, this Interim Cash Collateral Order, and applicable law.

(d)    Any one or more of the following shall constitute an "**Event of Default**":

i.    Failure by the Debtors to pay principal, interest or any other amounts provided for in this Interim Cash Collateral Order when due;

ii.    Any representation or warranty made by any Debtor shall prove to have been incorrect in any material respect when made;

iii.    Without the consent of the Prepetition Agent, any of the Chapter 11 Cases shall be dismissed or converted to a Chapter 7 case;

iv.    Unless consented to, or such relief is granted pursuant to a motion by the Prepetition Agent, a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers relating to the operation of the business of the Debtors (*i.e.*, powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

v.    Except for the claims and liens under the Interim DIP Order and the Final DIP Order, any other super-priority claim or lien which is *pari passu* with or senior

to the claims or liens of the Prepetition Agent under this Interim Cash Collateral Order shall be granted in any of the Chapter 11 Cases, other than the Carve-Out;

vi.    Any Debtor shall make any payment on account of any pre-petition indebtedness or payables of a Debtor except as otherwise permitted under the Approved Budget;

vii.    Any material provision of this Interim Cash Collateral Order shall cease to be valid and binding on any Debtor, or any Debtor shall so assert in any pleading filed in any court;

viii.    An order shall be entered amending, modifying or supplementing this Interim Cash Collateral Order without the prior written consent of the Prepetition Agent;

ix.    The failure to satisfy any of the Sale Milestones in the DIP Term Sheet; and

(e)    The filing of a challenge by the Debtors or supported by the Debtors to the liens or claims of the Prepetition Agent based upon the Prepetition Agent's conduct.

(f)    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to this Interim Cash Collateral Order and the Prepetition Loan Agreement as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and to incur all liabilities and obligations to the Prepetition Secured Parties hereunder, and (ii) authorize the Prepetition Agent to retain and apply payments and otherwise enforce its respective rights and remedies hereunder, subject to the provisions of paragraph 16(b) hereof.

(g)    The Debtors shall reasonably cooperate with the Prepetition Secured Parties in their efforts to enforce their liens and security interests in the Prepetition Collateral, in

accordance with this Interim Cash Collateral Order and (other than the right to contest whether a Termination Event has occurred and is continuing) the Debtors shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the Prepetition Collateral, as applicable.

(h)    Nothing included herein shall prejudice, impair, or otherwise affect the Prepetition Agent's rights to seek (on behalf of the Prepetition Secured Parties) any other or supplemental relief in respect of the Debtors (including, as the case may be, other or additional adequate protection).

17.    **Applications of Proceeds of Collateral, Payments and Collections**.

(a)    As a condition to the authorization to use Cash Collateral, the Debtors have agreed that proceeds of any Prepetition Collateral, any amounts held on account of the Prepetition Collateral, and all payments and collections received by the Debtors with respect to all proceeds of Prepetition Collateral shall be used and applied in accordance with the Approved Budget (subject to Permitted Variances), this Interim Cash Collateral Order and the Interim DIP Order or the Final DIP Order, as applicable.

(b)    Subject to the Debtors' rights under paragraph 16(b) hereof, the funding of the Carve-Out, and the repayment of the DIP Loan, if applicable, upon and after the occurrence of the Maturity Date, all proceeds of the Prepetition Collateral, whenever received, shall be paid and applied as follows: (i) *first*, subject to paragraph 10 hereof, to permanently and indefeasibly repay and reduce the Prepetition Obligations (including any adequate protection obligations) then due and owing in accordance with the Prepetition Loan Agreement, until paid and satisfied in full in cash; and (iii) *second*, to the Debtors' estates.

18.     **Proofs of Claim, etc**.  The Prepetition Secured Parties shall not be required to file a proof of claim in the Chapter 11 Cases or any Successor Case for any claim described herein.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in the Chapter 11 Cases or any Successor Case to the contrary, the Prepetition Agent, on behalf of itself and the Prepetition Secured Parties, is hereby authorized and entitled (but not required), in each of their sole and absolute discretion to file (and amend or supplement, as each sees fit) a proof of claim or aggregate proofs of claim in the Chapter 11 Cases or any Successor Case for any claim described herein; any proof of claim filed by the Prepetition Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in the Chapter 11 Cases or any Successor Case shall not apply to the Prepetition Agent or the Prepetition Secured Parties.

19.     **Payments Free and Clear**.  Subject to the Paragraph 10, any and all payments or proceeds remitted to the Prepetition Secured Parties, pursuant to the provisions of this Interim Cash Collateral Order, or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability.

20.     **Other Rights and Obligations**.

(a)     **Credit Bid**.  Subject to section 363(k) of the Bankruptcy Code, the Prepetition Secured Parties shall each have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the Prepetition Obligations, and the Adequate Protection Superpriority Claims, in connection with any sale of all or any portion of the Prepetition Collateral, including (without limitation) any sale occurring pursuant to section 363 of the

Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, without the need for further court order authorizing the same. The Debtors shall not object to any Prepetition Secured Party credit bidding up to the full amount of the applicable outstanding Prepetition Obligations (including any Adequate Protection Superpriority Claims), in each case including any accrued interest, fees, and expenses, in any sale of any Prepetition Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. If The Prepetition Agent and the Prepetition Secured Parties (either directly or through one or more acquisition vehicles) make a credit bid in connection with any auction or other sale process relating to the sale or other disposition of any Prepetition Collateral, then for purposes of such auction or sale process or any applicable order of this Court, each of the Prepetition Agent and the Prepetition Secured Parties shall be deemed to be a "qualified bidder" and its bid shall be a "qualified bid" regardless of whether any qualified bidder or qualified bid requirements are satisfied. The Prepetition Agent shall be a "Consultation Party" for purposes of any sale of the Prepetition Collateral subject to ordinary industry restrictions and rights.

(b)      **Lenders Not Responsible Persons**.  In making the decision to consent to the use of Cash Collateral and making the decision to collect the indebtedness and obligations of the Debtors, neither the Prepetition Agent nor the Prepetition Secured Parties shall be considered to (x) owe any fiduciary obligation to the Debtors or any other party with respect to their exercise of any consent or other rights afforded them under this Interim Cash Collateral Order or (y) be exercising control over any operations of the Debtors or acting in any way as a responsible person, or as an owner or operator under any applicable law, including without limitation, any

environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq.*, and the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state statute, but in both cases solely by reason of having allowed the use of Cash Collateral).

(c)     **Binding Effect**.  The provisions of this Interim Cash Collateral Order shall be binding upon and inure to the benefit of the Prepetition Secured Parties, the Debtors, and their successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Chapter 11 Cases, in any Successor Case, or upon dismissal of any such Chapter 11 or Chapter 7 case.

21.    <u>**No Waiver**</u>.

(a)     The failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Cash Collateral Order or the Prepetition Loan Agreement or otherwise, as applicable, shall not constitute a waiver of any of the Prepetition Secured Parties' rights hereunder, thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Interim Cash Collateral Order is without prejudice to and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses, or remedies of the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court, including without limitation, the rights of The Prepetition Agent (1) to request conversion of the Chapter 11 Cases to a case under Chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases, (2) to propose, subject to the provisions of section 1121 of

the Bankruptcy Code, a Plan, or (3) to exercise any of the rights, claims or privileges (whether legal, equitable, or otherwise) on behalf of the Prepetition Secured Parties.

(b)     The failure or delay on the part of any Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Cash Collateral Order the Prepetition Loan Agreement, or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder, or otherwise.  No delay on the part of any party in the exercise of any right or remedy under this Interim Cash Collateral Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Interim Cash Collateral Order shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the party against whom such amendment, modification, suspension, or waiver is sought.  No consents required hereunder by any Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the Prepetition Secured Parties, respectively.

(c)     **No Third-Party Rights**.  Except as explicitly provided for herein, this Interim Cash Collateral Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party, or incidental beneficiary.

(d)     **Limitation on Surcharge**.  Without limiting the terms of the Carve-Out and subject to the entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the Prepetition Secured Parties, the Carve-Out (other than parties entitled to assert a right to be paid under the Carve-Out),or the Prepetition Collateral, pursuant to sections 105 or 506(c) of

the Bankruptcy Code or otherwise, without the prior written consent of the Prepetition Agent (and the beneficiaries of the Carve-Out in the case of a surcharge against the Carve-Out).  No action, inaction or acquiescence by the Prepetition Secured Parties shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the Prepetition Secured Parties or the Prepetition Collateral.

(e)    **Section 552(b)**.  The Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code; and, subject to the entry of the Final Order, to the extent provided therein, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

(f)    **Survival of Interim Cash Collateral Order**.  The provisions of this Interim Cash Collateral Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan in the Chapter 11 Cases, (ii) converting of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing the Chapter 11 Cases, (iv) withdrawing of the reference of the Chapter 11 Cases from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court.  The terms and provisions of this Interim Cash Collateral Order and the Prepetition Loan Agreement and any priorities and protections granted to or for the benefit of the Prepetition Secured Parties (including the Adequate Protection Liens and the Adequate Protection Superpriority Claim) hereunder and thereunder shall continue in full force and effect to the fullest extent provided by the Bankruptcy Code.

(g) **Enforceability**. This Interim Cash Collateral Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(h) **No Waivers or Modification of Interim Cash Collateral Order**. The Debtors irrevocably waive any right to seek any modification or extension of this Interim Cash Collateral Order without the prior written consent of The Prepetition Agent. The Debtors may not seek to modify or to alter relative lien priority of the Prepetition Liens and the Adequate Protection Liens set forth in this Interim Cash Collateral Order.

(i) **Waiver of any Applicable Stay**. Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Cash Collateral Order.

(j) **Reservations to Final Order**. Notwithstanding language in this Interim Cash Collateral Order that provides that certain relief is subject to or conditioned upon entry of a Final Order, such provisions are without prejudice to rights of parties in interest to object to the relief on a final basis and the Court's authority to determine the final relief.

22. **Final Hearing**.

(a) The Final Hearing to consider entry of the Final Order and final approval of the use of Cash Collateral is scheduled for September ___, 2025, at _____.m. (prevailing Eastern Time) at the United States Bankruptcy Court for the District of Delaware.

(b) On or before two (2) business days after entry of this Interim Cash Collateral Order, the Debtors shall cause to be served, by United States mail, first-class postage prepaid, notice of the entry of this Interim Cash Collateral Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Cash Collateral Order and the

Motion, on any known party affected by the terms of this Interim Cash Collateral Order, and to any other party that has filed a request for notices with this Court prior thereto.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than _____, at 4:00 p.m. (prevailing Eastern Time), which objections shall be served on (i) proposed counsel for the Debtors, Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 N. Market Street, Suite 5400, Wilmington, DE 19801 (Attn: William Chipman, Esq.)_; (ii) counsel to The Prepetition Agent, Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn: Norm Pernick (NPernick@coleschotz.com) and 1325 Avenue of the Americas, 19th Floor, New York, NY 10019 (Attn: Daniel F.X. Geoghan (DGeoghan@coleschotz.com)); (iii) counsel to the DIP Lender, Herrick, Feinstein LLP, Two Park Avenue, New York, NY 10016 (Attn: Steven B. Smith (ssmith@herrick.com)) and Benesch, 1313 North Market Street, Suite 1201, Wilmington, DE 19801 (Attn: Jennifer R. Hoover (jhoover@Beneschlaw.com); and (iv)  the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Timothy J. Fox, Jr. (Timothy.Fox@usdoj.gov).

23.    **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce this Interim Cash Collateral Order according to its terms.

_____

United States Bankruptcy Judge

**EXHIBIT A**

**INITIAL BUDGET**

# IMG Holdings, Inc.

## 9 Week Cash Forecast

|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | |
|  | 8/11/2025 | 8/18/2025 | 8/25/2025 | 9/1/2025 | 9/8/2025 | 9/15/2025 | 9/22/2025 | 9/29/2025 | 10/6/2025 | **Total** |
| Initial Cash Balance | 230,658 | 501,653 | 508,148 | 501,143 | 515,094 | 758,329 | 469,824 | 510,819 | 410,709 | |
| Cash Receipts | 315,995 | 65,995 | 65,995 | 69,451 | 319,235 | 65,995 | 65,995 | 67,390 | 66,787 | 1,102,838 |
| Cash Disbursements | 45,000 | 59,500 | 73,000 | 55,500 | 76,000 | 354,500 | 25,000 | 167,500 | 402,693 | 1,258,693 |
| **Remaining Cash Balance** | 501,653 | 508,148 | 501,143 | 515,094 | 758,329 | 469,824 | 510,819 | 410,709 | 74,803 | |
| **Summary of Operating Cash Disbursements** | | | | | | | | | | |
| Payroll | | 32,500 | | 32,500 | | 32,500 | | 32,500 | | 130,000 |
| Board Fees | | | | | 11,000 | | | | 11,000 | 22,000 |
| Operating Expenses | 25,000 | 25,000 | 65,000 | 10,000 | 40,000 | 70,000 | 25,000 | 85,000 | 90,000 | 435,000 |
| Insurance | | | 8,000 | | | | | 8,000 | 1,693 | 17,693 |
| **Total Operating Cash Disbursements** | 25,000 | 57,500 | 73,000 | 42,500 | 51,000 | 102,500 | 25,000 | 125,500 | 102,693 | 604,693 |

## Breakdown of Restructuring Costs

|  | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 8/11/2025 | 8/18/2025 | 8/25/2025 | 9/1/2025 | 9/8/2025 | 9/15/2025 | 9/22/2025 | 9/29/2025 | 10/6/2025 | **Total** |
| **Restructuring Fees** | | | | | | | | | | **-** |
| Claims and Noticing Agent Fees | 20,000 | | | | 25,000 | | | 30,000 | | **75,000** |
| Legal Fees Chipman | | | | | | 200,000 | | | 200,000 | **400,000** |
| US Trustee Fees | | | | 1,000 | | | | | 9,000 | **10,000** |
| Ordinary Course Professionals | | | | 10,000 | | | | 10,000 | | **20,000** |
| Accounting/Tax | | 2,000 | | 2,000 | | 2,000 | | 2,000 | 41,000 | **49,000** |
| UCC Professionals (Counsel/FA) | | | | | | 50,000 | | | 50,000 | **100,000** |
| **Total Restructuring Costs** | 20,000 | 2,000 | - | 13,000 | 25,000 | 252,000 | - | 42,000 | 300,000 | **654,000** |
| **Total Cash Disbursements** | 45,000 | 59,500 | 73,000 | 55,500 | 76,000 | 354,500 | 25,000 | 167,500 | 402,693 # | 1,258,693 |

## Breakdown of Cash Receipts

|  | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 8/11/2025 | 8/11/2025 | 8/11/2025 | 8/11/2025 | 8/11/2025 | 8/11/2025 | 8/11/2025 | 8/11/2025 | 8/11/2025 | **Total** |
| **Cash Receipts** | | | | | | | | | | |
| DIP Funding | 250,000 | | | | 250,000 | | | | | **500,000** |
| Invoice Receipts | 65,995 | 65,995 | 65,995 | 69,451 | 69,235 | 65,995 | 65,995 | 67,390 | 66,787 | **602,838** |
| **Grand Total Receipts** | 315,995 | 65,995 | 65,995 | 69,451 | 319,235 | 65,995 | 65,995 | 67,390 | 66,787 | **1,102,838** |