**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| IMG Holdings, Inc., *et al.*, | Case No. 25-11500 (KBO) |
| Debtors.[1] | (*Joint Administration Pending*) |

**DECLARATION OF LARRY THOMPSON IN SUPPORT OF DEBTORS' MOTION
SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS
TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH
COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED LENDERS; (III) MODIFYING THE AUTOMATIC STAY; (IV)
SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Larry Thompson, hereby declare under penalty of perjury

that the following is true and correct to the best of my knowledge, information, and belief:

1.      I serve as the chief executive officer ("**CEO**") and chief financial officer ("**CFO**")

of IMG Holdings, Inc. ("**IMG**" and together with its affiliates, the debtors and debtors-in-

possession in the above-captioned cases (collectively, the "**Debtors**," or the "**Company**"). I have

been the CFO since 2019 and appointed CEO in 2022. I hold a Bachelor of Science degree in

finance from the University of Alabama, Birmingham, and a Master of Business Administration

from the University of Michigan, Stephen M. Ross School of Business.

2.      I have more than twenty (20) years of business experience, primarily in serving as

CFO or finance manager for large retail product companies. Prior to joining the Debtors'

organization, I was the CFO of Champagne Armand De Brignac, the brand finance manager for

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (1) IMG Holdings, Inc. (1398); (2) Dana Classic Fragrances Inc. (1439); (3) Inter-Marketing Group, Inc. (6628); (4) Dana Fragrance Brands, LLC (0198); (5) St. Honore Holding, Inc. (9698); and (6) IMG Fragrance Brands, LLC (0026). The address of the Debtors' corporate headquarters is 1159 2nd Avenue, #424, New York, New York 10065.

Diageo North America and was an institutional equity trader with Morgan Stanley.  In May of 2020, David Cuthbert was appointed as the Company's independent director (the "**Independent Director**").

3.      As the Debtors' CEO and CFO, I have familiarity with the operations and financial activities of the Debtors, and I am generally familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of such matters.  I am authorized by each of the Debtors to submit this declaration (this "**Declaration**") on their behalf.  References to the Bankruptcy Code (the "**Bankruptcy Code**"), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      I submit this Declaration on behalf of the Debtors (a) in support of the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lender; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**DIP Motion**"), filed concurrently herewith, seeing approval of a proposed $500,000 debtor-in-possession financing facility (the "**DIP Facility**").

A.      **Debtors' Need for Postpetition Financing**

5.      The facts and circumstances leading to the commencement of these chapter 11 cases ("**Chapter 11 Cases**") are set forth at length in the *Declaration of Larry Thompson in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**").

6.      As of the Petition Date, the Company had only minimal cash on hand and no remaining availability under its Credit Agreement[2].  Given the Company's current cash position, the Company does not have the ability to pay any of its operating costs in the ordinary course of business and fund these cases, absent approval of the DIP financing.  Just prior to the Petition Date, the DIP Lender provided the Debtors with the DIP Term Sheet for debtor-in-possession financing to fund limited operations and the costs of these Chapter 11 Cases to run a sale process to maximize the value of the Debtors' assets.  The DIP Facility is the best and only path forward to ensure that the Debtors can continue operating their business while providing sufficient liquidity to administer these Chapter 11 Cases and facilitate the restructuring process.

**B.      Debtors' Efforts to Obtain Postpetition Financing**

7.      In order to obtain access to essential liquidity to support the Debtors' postpetition operations and the proposed restructuring process, the Debtors, conducted a market check by seeking competing DIP financing offers from three (3) other prospective lenders.  No other proposals were received.  The primary reasons for the lack of competing proposals are because (i) the Prepetition Secured Parties were unwilling to permit a priming lien in favor of a third party, other than the DIP Lender, and (ii) the other potential lenders are unwilling to provide a DIP facility junior to the Prepetition Secured Parties.  Based upon the Debtors' efforts to arrange DIP financing with other prospective lenders, the Debtors and their advisors believe that no other better options for DIP financing are available to them other than the proposed DIP Facility.

---

[2]    Capitalized Terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

4902-7909-7436, v. 2

C.     **The DIP Facility and Use of Cash Collateral**

8.      The Debtors require immediate access to incremental liquidity in the form of postpetition financing to avoid immediate harm, preserve the value of the Debtors' estates, undertake a successful reorganization process, and maximize recoveries for all stakeholders. Accordingly, the Debtors seek authorization to enter into the DIP Facility in an aggregate principal amount of up to $500,000, with up to $250,000 of such amount available upon interim approval of the DIP Motion.

9.      The Debtors will use the proceeds of the DIP Facility to, among other things, (a) pay the fees, costs, and expenses incurred in connection with these Chapter 11 Cases, (b) fund any obligations benefitting from the Carve-Out, (c) permit the orderly continuation of the operation of their business, (d) maintain business relationships with customers, vendors, and suppliers, (e) make payroll and provide benefits to employees, and (f) satisfy other working capital and operational needs.

10.     Obtaining an immediate injection of cash is critical.  The incurrence of new debt under the DIP Term Sheet and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors.  Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted.

11.     I believe that the determination to move forward with the DIP Facility is an exercise of the Debtors' sound business judgment following an extensive arm's-length negotiation process and careful evaluation of available alternatives.  Having analyzed the advantages and disadvantages of the proposed DIP Facility, I believe that the Debtors have obtained the best

4902-7909-7436, v. 2

financing available under the totality of the circumstances and that the proposed DIP Facility will position the Debtors to maximize the value of their estates.

12.     The DIP Lender and the Debtors, along with their advisors, extensively negotiated the terms of the proposed DIP Facility.  Such negotiations included drafts of key documents, including the proposed Interim Order and the DIP Term Sheet, and various discussions both amongst the Debtors, the DIP Lender, and their respective advisors.  I believe that the terms of the proposed DIP Facility, including the fees and conditions contained therein, represent the best available terms for the Debtors.

13.     Additionally, after arms' length and good faith negotiations, the Prepetition Secured Parties have agreed to consent to the use of the Prepetition Collateral (as defined in the Interim Cash Collateral Order), including Cash Collateral, subject to the provision by the Debtors of adequate protection.  Among other things, the adequate protection contemplated by the Cash Collateral Orders is designed to protect the Prepetition Secured Parties' interests in the Debtors' property from any diminution in value caused by the automatic stay, by the Debtors' use of the Cash Collateral, during the pendency of these Chapter 11 Cases and by the priming of the Prepetition Secured Lender's liens by the DIP Liens.

14.     In light of the foregoing, I believe that the proposed Adequate Protection Obligations, to be provided for the benefit of the Prepetition Secured Parties, are appropriate.  The provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Cash Collateral Order, for the benefit of their estates and all parties in interest.

4902-7909-7436, v. 2

**WHEREFORE**, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: August 11, 2025

/s/ Larry Thompson

LARRY THOMPSON

4902-7909-7436, v. 2